MICHAEL J. MORGAN,

                     Plaintiff,

     v.

RICKY J. SPIVEY, in his individual and official capacities as a Wake County Sheriff's Deputy, CASEY L. MILLER, in his individual and official capacities as a Wake County Sheriff's Deputy, JOSHUA K. LEGAN, in his individual and official capacities as a Wake County Sheriff's Deputy, DONNIE HARRISON, in his official capacity as Sheriff of Wake County, North Carolina, and WAKE COUNTY, NORTH CAROLINA,

                     Defendants.

**COMPLAINT**
(Jury Trial Demanded)

**COMES NOW**, Plaintiff Michael J. Morgan, by and through his undersigned attorneys, and complaining of the Defendants alleges and says as follows:

## **INTRODUCTION**

1.      This is an action to recover compensatory and punitive damages as a result of the intentional misconduct, gross negligence, negligence, assault, battery, malicious prosecution, civil conspiracy, and false imprisonment perpetrated by Defendants against Plaintiff. Plaintiff alleges that he experienced multiple violations of his rights as guaranteed by the U.S. and North Carolina Constitutions, as well as by federal and state law, when deputies employed by the Wake County Sheriff's Office used excessive force on his person that included, but was not limited to, shooting him twice with a firearm from close range when the same deputies knew that Plaintiff was unarmed, was committing no crime, and was lawfully exercising his right to operate a motor vehicle on his own, private property.

1

2.     The actions of the Defendants, as described more fully below all upon information and belief, deprived Plaintiff of his civil rights and constitute egregious, malicious, corrupt, excessive, and objectively unreasonable use of force and improper police conduct that proximately caused him to endure excruciating pain, mental suffering, unjustified incarceration, and permanent injury.

## PARTIES, JURISDICTION, AND VENUE

3.     This cause of action arises in Wake County, North Carolina.

4.     At all times relevant to this action, Plaintiff Michael J. Morgan ("Morgan") was and is an adult citizen and resident of Wake County, North Carolina, under no legal disability, with his residential address located at 1129 Wimberly Road, Wake County, Apex, North Carolina 27523.

5.     Defendant Wake County was and is a political subdivision and county of the State of North Carolina, duly chartered and existing pursuant to the provisions of N.C. Gen. Stat. § 153A-10, and vested with corporate powers and rights as specified in N.C. Gen. Stat. § 153A-11 including, but not limited to, the capacity to sue and be sued.  At all times relevant to this action, Defendant Wake County acted through its managers and policy makers, including the Sheriff of Wake County, Defendant Sheriff Donnie Harrison ("Sheriff Harrison"), and other employees of the Wake County Sheriff's Office; and the acts, edicts, and practices of said persons represent the official policies of Defendant Wake County.

6.     Defendant Sheriff Harrison is and was, at all times relevant hereto, the Sheriff of Wake County, North Carolina, and is named as a defendant in his official capacity.

7.     At all times relevant hereto, Sheriff Harrison was acting in the course and scope of his official duties as the Sheriff of Wake County and under the color of state law.

8.     Upon information and belief, Sheriff Harrison is an adult citizen and resident of Wake County, North Carolina, and is under no legal disability.

2

9. Defendant Rickey Jason Spivey ("Spivey") is and was, at all times relevant hereto, an adult citizen and resident of Wake County, North Carolina under no legal disability. He is sued in his individual and official capacities for compensatory and punitive damages under both state and federal law.

10. At all times relevant hereto, Defendant Spivey was employed as a Deputy by the Wake County Sheriff's Office, and he was acting in the course and scope of his official duties as a Sheriff's Deputy for Wake County, under the color of state law.

11. Defendant Casey Lane Miller ("Miller") is and was, at all times relevant hereto, an adult citizen and resident of Wake County, North Carolina under no legal disability. He is sued in his individual and official capacities for compensatory and punitive damages under both state and federal law.

12. At the time of the arrest and use of force encounter with Plaintiff on July 5, 2013, which is more fully described below, Defendant Miller was employed as a Deputy by the Wake County Sheriff's Office, and he was acting in the course and scope of his official duties as a Sheriff's Deputy for Wake County, under the color of state law.

13. Upon information and belief, subsequent to the July 5, 2013 encounter with Plaintiff, Defendant Miller's employment with the Wake County Sheriff's Office was terminated.

14. Upon information and belief, the reasons for Defendant Miller's termination of employment from the Wake County Sheriff's Office included the discovery that Miller lied to and/or knowingly provided false information to his superiors within the Sheriff's Office about his conduct as a Sheriff's Deputy.

15. Defendant Joshua Kyle Legan ("Legan") is and was, at all times relevant hereto, an adult citizen and resident of Wake County, North Carolina under no legal disability. He is sued in his individual and official capacities for compensatory and punitive damages under both state and federal law.

3

16.     At all times relevant hereto, Defendant Legan was employed as a Deputy by the Wake County Sheriff's Office, and he was acting in the course and scope of his official duties as a Sheriff's Deputy for Wake County, under the color of state law.

17.     At all times the actions and practices of the Defendants named herein and those acting in their direction, were performed under the color of state law and constitute state action within the meaning of the Fourteenth Amendment to the United States Constitution.

18.     Upon information and belief, to the extent that any and/or all of the Defendants in this action claim they are a municipal and/or governmental and/or County owned, operated and/or funded entity, or an employee and/or agent of any such entity, such Defendants do not have governmental immunity and/or sovereign immunity for any of the acts or omissions described herein.  In the alternative, should any and/or all of the Defendants in this action have governmental immunity and/or sovereign immunity, upon information and belief, any and/or all such Defendants have waived any and all such governmental and/or sovereign immunity to which they may have been otherwise entitled, for themselves, their agents, employees and all officials acting in their official (and, if applicable, individual) capacities for civil liability and tort by the act of purchasing (or otherwise procuring, obtaining and/or having in place) liability insurance (or the functional and substantive equivalent thereof, i.e., participation in a local governmental risk pool, purchase of a surety bond, etc.) prior to, concurrent with, and/or subsequent to and/or applicable to the acts and omissions alleged herein.

19.     Upon information and belief, both Defendant Wake County was and is a participant in local governmental risk pool or the functional and substantive equivalent thereof, at all times applicable to the events that are the subject of this action.

20.     Upon information and belief, Defendant Sheriff Harrison purchased and maintains a surety bond through a company licensed, admitted, and authorized to do business in the State of North Carolina who serves as a surety for Defendant Sheriff Harrison pursuant to N.C. Gen. Stat. §§ 162-8 and 58-76-5, and by virtue of said surety bond has undertaken that in all

4

things, the Sheriff would faithfully execute the office of Sheriff and perform all duties incumbent upon him by reason of his election to said office. Under North Carolina law, the Sheriff has waived governmental immunity by the purchase of his official bond.

21. Upon information and belief, the Defendants, their officers, directors, employees and agents have waived governmental immunity under state tort law, if any there be, by the purchase of insurance by Wake County, North Carolina, and/or the Sheriff of Wake County, insuring the Office of Sheriff of Wake County and any of their officers, agents and employees, including the Defendants named herein, against liability for negligent or intentional damage to person or property, or against absolute liability to person or property caused by an act or omission of the defendants or of any of their officers, agents or employees when acting within the scope of their authority and in the course of their employment.

22. Subject matter jurisdiction is, therefore, appropriate and proper and any and all such governmental immunity and sovereign immunity is and has been fully waived pursuant to N.C. Gen. Stat. §160A-485 and/or N.C. Gen. Stat. §153A-435.

23. This case presents an actual case and controversy arising under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and asserts claims for relief under 42 U.S.C. §§ 1983 and 1988, as well as claims for relief under North Carolina state law.

24. Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1343(a) in that this action is to redress depravation by the Defendants, under the color of state laws, of the rights of privileges and immunities granted to Plaintiff by the United States Constitution and by federal statutes.

25. Jurisdiction is further proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1443.

26. This Court has pendant and/or supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

27.     Venue is proper in this, the Eastern District of North Carolina, under 28 U.S.C. § 1391 in that one or more of the Defendants reside in Wake County, North Carolina, and a substantial part of the claims asserted herein arose in this District.

## ACTUAL AND/OR APPARENT AGENCY

28.     The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference.

29.     Upon information and belief, in the exercise of statutory powers granted by the North Carolina General Assembly, Defendant Wake County funds, supports, and oversees the operation of the Wake County Sheriff's Office.

30.     At all times relevant to this action, Defendant Sheriff Harrison served as the chief law enforcement officer for Defendant Wake County.

31.     At all times relevant to this action, the Wake County Sheriff's Office exercised jurisdiction throughout the County, including both the incorporated and the unincorporated areas, and the Sheriff's Office provided primary law enforcement for the unincorporated areas of Wake County.

32.     Upon information and belief, the operating budget of the Wake County Sheriff's Office is funded by Defendant Wake County, and Wake County funds the salaries of employees working for the Wake County Sheriff's Office.

33.     Upon information and belief, Defendant Wake County reposed in its Sheriff's Office, Sheriff, and Sheriff's Deputies employed by the Sheriff's Office final policymaking authority with respect to the use of force by deputies employed with the Sheriff's Office.

34.     Defendant Wake County is sued under the doctrine of *respondeat superior*, as all individual Defendants were acting in the course and scope of their official duties as the Sheriff and Sheriff's Deputies in the employ of Wake County, and as agents thereof, when engaged in the actions alleged herein.

35.     Upon information and belief, Defendant Wake County has the actual right and legal authority to direct and control the Wake County Sheriff's Office, its policies and procedures, officers, and employees.

36.     In the alternative, Wake County has the apparent right and authority to direct and control the Wake County Sheriff's Office, its policies and procedures, officers and employees.

37.     The enforcement of laws of the state of North Carolina is an essential and well-recognized duty of all counties in the state of North Carolina. As such, at all relevant times in this action, Defendant Wake County had a non-delegable duty to engage in law enforcement activities within its borders.

38.     At times relevant to the allegations alleged in this Complaint, Defendants Spivey, Miller, and Legan were employed by the Defendant Wake County and/or the Wake County Sheriff's Office as law enforcement officers, and each was acting at all relevant times as an agent of Defendant Wake County and/or Defendant Sheriff Harrison within the course and scope of his duties as a sworn officer of the Wake County Sheriff's Office and/or law enforcement agent of Defendant Wake County.

39.     In the alternative, Defendants Spivey, Miller, and Legan's actions toward Plaintiff alleged herein were malicious, corrupt, and outside the scope of their official duties as Sheriff's Deputies.

40.     Defendant Wake County and/or Sheriff Harrison had the right and/or power to direct and control the manner in which its/their employees and/or agents executed their official duties.

41.     The acts, omissions and liability of all Defendants includes their agents, principals, employees and/or servants, both directly and vicariously, pursuant to principals of non-delegable duty, corporate liability, actual authority, apparent authority, actual agency, ostensible agency and/or *respondeat superior* and the acts and/or omissions of the above-named Defendants were a direct and proximate cause of the injuries, damages and losses sustained by the Plaintiff.

7

## JOINT AND SEVERAL LIABILITY OF ALL DEFENDANTS

42.     The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference.

43.     The Defendants are jointly and severally liable to Plaintiff for all damages alleged herein since their negligent or wrongful acts and omissions, singularly or in combination, concurred or combined to produce, as a proximate cause, indivisible injuries to Plaintiff.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

44.     The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference.

45.     Plaintiff Michael Morgan is the owner and chief operator of "Mike's Tree Service," a business which provides tree and brush removal services for customers in and around the Wake County area.

46.     Prior to July 5, 2013, Morgan had worked hard for several years to build his tree service business from the ground up.  As a result of his hard work, by July 5, 2013, Plaintiff had established Mike's Tree Service as a successful business with several employees and steady work from people in the community.

47.     One of Morgan's employees was Charlie Johnson ("Johnson").  Prior to July 5, 2013, Johnson had worked for Plaintiff for several years as an employee.

48.     July 5, 2013, the day after Independence Day, was a Friday.  Instead of taking the day off to celebrate a long holiday weekend, Morgan and Johnson were working a tree and brush removal job that day for an individual who lived on Wimberly Road in Apex, North Carolina.

49.     This job required Morgan and Johnson to cut down large amounts of tree limbs and brush on the individual's property and then remove the debris from the property.  On July 5,

8

2013, Morgan and Johnson were using Morgan's Dodge Ram diesel truck to haul loads of debris from the property and transport them to a large field located at 1116 Wimberly Road.

50.    The field located at 1116 Wimberly Road belongs to Plaintiff and is his private property.  The field is a large grass and dirt area that Plaintiff regularly uses as a brush and debris dumping site for his business.

51.    Morgan's private field is approximately 300 yards in length and is shaped like a long pie piece, with the south end of the field being the widest part.

52.    A dirt roadway runs down the center of the field and stretches from the north end to the south end of the field.

53.    The south end of the field is large, open, and flat, with over 7,500 square feet of surface area that can be easily driven on by cars and trucks of all types.

54.    A grass-covered ditch runs between the edge of Wimberly Road and the field itself. This grassy ditch is shallow and can be easily driven over by cars or trucks.

55.    The field has multiple vehicle entrance points that were and are regularly used by cars and trucks.  Three entry points were most often used to gain ingress and egress to and from the field: a grassy, sloped entrance at the far north end of the field ("Entrance #1"); a flat driveway that runs over a buried, concrete drainage pipe at the approximate midway points of the field ("Entrance #2"); and a flat driveway at the far south end of the field ("Entrance #3").

56.    An overhead image of the field is depicted below with the three above-described entrances marked for identification purposes:

[Continued on next page]

9



57.     Upon information and belief, the three entrances described above were open and obvious to any reasonable motorists or passerby as places where a car or truck could be used to enter or exit the field if they so desired.

58.     The private field sits directly across the street from Morgan's residential property located at 1129 Wimberly Road.

59.     Upon information and belief, it is well-known to the local Apex community that this field belongs to Morgan and is his private property.

60.     Prior to and on July 5, 2013, Morgan maintained the field and had the area marked prominently with "No Trespassing" signs.  These "No Trespassing" signs were up and posted on July 5, 2013.

61.     Upon information and belief, prior to and on July 5, 2013, it was well known to the Wake County Sheriff's Office, and in particular to the individual Defendants, that this field was the private property of Morgan.

10

62.     Upon information and belief, prior to July 5, 2013, it was well known to the Wake County Sheriff's Office, and in particular to the individual Defendants, that Morgan regularly utilized this private field for his tree removal operations, primarily as a debris dumping site.

63.     Upon information and belief, prior to July 5, 2013, deputies employed by the Wake County Sheriff's Office drove their patrol cars in and out of Morgan's private field on numerous occasions, and they were familiar with the multiple entrances to the field.

64.     The tree removal job Morgan and Johnson were performing on July 5, 2013 lasted several hours.  Throughout the course of the day, Morgan and Johnson hauled numerous loads of debris in Morgan's truck from the job site to Morgan's private field for dumping.

65.     During each one of these debris removal trips, Morgan drove his truck and left the job site, travelling southeast on Wimberly Road.  Each time, as Morgan approached his private field, he safely and carefully turned off of Wimberly Road and onto his private field using Entrance #1.  Each time, after entering the field from Entrance #1, Morgan parked his truck in the north end of the field, and he and Johnson exited the truck to remove debris from the truck bed by hand. This required Morgan and Johnson to walk around to the sides of the truck, disconnect safety straps holding the debris down into the truck bed, and take each piece of debris out by hand to place them in piles.

66.     On July 5, 2013, while working the tree removal job, Morgan, Johnson, and the individual for whom they were performing the tree removal job, observed a Wake County Sheriff's Deputy drive by their location on multiple occasions.

67.     By the time Morgan and Johnson had gathered their last load of the day to take to Morgan's field for dumping it was approximately 7:00 p.m., still full daylight hours for the month of July.

68.     At approximately 7:00 p.m., Morgan and Johnson were driving Morgan's truck down southeast on Wimberly Road, toward Morgan's field, and just as they were approaching the

last curve before reaching the field they passed Defendant Spivey in his patrol car in the opposite lane of travel.

69.     At the time Morgan passed Defendant Spivey on the roadway, Morgan was driving safely and in a careful manner on the roadway.

70.     After passing one another, Morgan looked up in his rearview mirror and saw Deputy Spivey quickly slow down and begin to use a side road to turn around.

71.     Morgan and Johnson proceeded around the curve, and Morgan turned his truck onto his private field using Entrance #1, just as he had done many times previously during the day.

72.     In exiting Wimberly Road to make the above-described turn into Entrance #1, Morgan drove his truck in a safe and careful manner.

73.     In exiting Wimberly Road to make the above-described turn into Entrance #1, Morgan did not lose any debris from the bed of his truck.

74.     After entering the north end of the field using Entrance #1, Morgan parked the truck, he and Johnson exited the cab, and they began unstrapping the debris from the bed of the truck for removal just as they had done many times previously during the day.

75.      It was at that time Deputy Spivey drove by, watching Morgan and Johnson from the road.  He continued past the north entrance to the field, where it was obvious that Morgan's truck had just entered.  He drove past Entrance #2, and then pulled his patrol car onto the private property by using Entrance #3.

76.     Using the dirt road on Morgan's private field, Spivey then drove from the south end of the field to the north end where Morgan and Johnson were unloaded debris.  As he drove the length of the field, he again passed Entrance #2.  When Spivey reached the north end of the field he came to a stop and parked in the general vicinity of Morgan's truck.

77.     When Spivey came to a stop, his car was parked facing in the north direction. Morgan's truck was parked facing in the south direction.

12

78.     Once parked, Spivey rolled down his window and yelled for Morgan to approach his patrol car.

79.     Morgan complied with Spivey's command and approached the patrol car on foot. He walked up next to Spivey's driver-side window.

80.     Spivey then asked Morgan whether he had a driver's license on him. Morgan replied that he did, and he provided his license to Spivey through the window.

81.     At the time Spivey commanded Morgan to approach and provide his license, Spivey had no reasonable or articulable suspicion that Morgan had committed or was in the process of committing any traffic or criminal violation.

82.     At Morgan's criminal trial, which is described more fully below, Spivey testified under oath and publically that one of the alleged reasons for his traffic stop of Morgan on July 5, 2013 was that Spivey observed Morgan driving carelessly and recklessly in exiting Wimberly Road and entering his private field. Spivey testified that the basis for this careless and reckless allegation was his observation that Morgan's driving caused tree limbs or debris to fly out of the back of his truck when leaving the roadway and entering his field.

83.     In fact, Morgan's driving did not cause any tree limbs or debris to leave his truck bed, and no tree limbs or debris actually left the bed of Morgan's truck at any time when he exited Wimberly Road to enter onto his private field.

84.     Upon information and belief, following the arrest and shooting incident involving Morgan on July 5, 2013, Spivey also gave statements to investigators and other third parties about his alleged observation of Morgan's driving causing debris to fly out of the back of his truck.

85.     Upon information and belief, Spivey's statements, as well as his trial testimony under oath, regarding debris leaving the bed of Morgan's truck was not true, and were knowingly false when Spivey made them.

86.     Upon information and belief, following the July 5, 2013 shooting incident, Spivey also made statements and/or testified publically that the other alleged reason for his traffic stop

13

of Morgan on July 5 was that Morgan was known to him as someone who has driven on prior occasions without a license or with an expired registration.

87. Upon information and belief, prior to July 5, 2013, Defendants should have known that an officer's knowledge that an individual has in the past driven without a license, or with an expired registration, does not constitute reasonable or articulable suspicion that the same individual is presently violating any law when he is observed by an officer.

88. Upon information and belief, prior to July 5, 2013, Defendants should have known that an officer's knowledge that an individual has in the past driven without a license, or with an expired registration, does not provide a lawful basis to initiate a traffic stop or arrest of that individual after observing him driving on the roadway in an otherwise safe manner.

89. Upon information and belief, Deputy Spivey never actually saw or ran Morgan's license tag or registration information prior to initiating the traffic stop with him on July 5, 2013.

90. Upon information and belief, it was only after Spivey began the traffic stop and commanded Morgan to approach his patrol car to provide information that Spivey first ran Morgan's license and registration information in his computer system.

91. At the time Spivey decided to initiate the traffic stop encounter on Morgan's private land on July 5, 2013, he informed the Wake County law enforcement dispatcher service that he was beginning a routine traffic stop of Michael Morgan.

92. Defendants Legan and Miller heard over their radio systems that Spivey was initiating a traffic stop with Michael Morgan on his private property on Wimberly Road. At that time, Legan and Miller were located over 20 miles away from the scene.

93. After learning that the stop involved Michael Morgan on Wimberly Road, Defendants Legan and Miller hurried into their separate patrol cars and proceeded to drive at extreme and unsafe speeds, through two-lane residential streets, toward the Wimberly Road location.

14

94. The dash-cam video of Deputy Miller's patrol car during this drive to Wimberly Road shows Legan and Miller reaching speeds of over 100 miles per hour, with audible tire screeching around curves in the road, and with their patrol cars forcing unsuspecting civilian vehicles off the roadway and onto the shoulder with little to no warning from behind. On numerous occasions, the dashcam video shows the two patrol cars narrowly missing impact with the side panels of several civilian cars by inches as they passed.

95. Upon information and belief, Deputies Legan and Miller's manner of driving in response to this traffic stop call was reckless and dangerous.

96. Upon information and belief, Defendants should have known that the above-described manner of driving in response to a traffic stop call is reckless and improper.

97. Upon information and belief, the reason why Legan and Miller traveled at extreme and unsafe speeds in response to Spivey's radio call was that Defendants wanted to take advantage of an opportunity to force an improper encounter with Morgan and/or provoke him in the hopes he would commit a criminal offense in their presence so they could forcibly arrest him.

98. As Defendants Legan and Miller were racing to the scene, Spivey was running Morgan's license through his computer system while Morgan and Johnson continued to wait calmly outside and away from Morgan's truck.

99. Legan and Miller drove southeast along Wimberly Road as they approached Morgan's private field. The dashcam video from Miller's patrol car during this time shows that no tree limbs or debris are present on the roadway, or on the grass shoulder, anywhere in or near the location where Spivey later stated that Morgan had caused them to fly out of the back of his truck.

100. After Legan and Miller arrived on scene, they parked their patrol cars on the grass shoulder of Wimberly Road and Morgan's private field, they exited their vehicles, and they approached the traffic stop area on foot. At this time, Spivey was still in the process of looking up Morgan's information in his computer system and/or writing traffic citations for Morgan.

15

101.    Upon Legan and Miller's arrival on foot, Spivey told them to search around Morgan's truck to see if Morgan or Johnson had thrown down any contraband or evidence during Morgan's entry onto the property and before Spivey's arrival.

102.    Legan and Miller proceeded to search the area surrounding Morgan's truck and found no contraband or any evidence of any violation of law.

103.    While searching the area, Deputy Legan took it upon himself to open Morgan's truck and search all areas of the truck's cab, consoles, and glove box.

104.    At the time Legan searched Morgan's truck he had no consent to do so, and he had no search warrant.

105.    Upon information and belief, Defendants should have known that an officer has no constitutional or lawful basis to search a motor vehicle under the above-described circumstances.

106.    While the above search was being conducted, Morgan and Johnson were many feet away from the truck and not in a position to enter the vehicle or obtain any item from the vehicle.

107.    Defendants' search of Morgan's truck under these circumstances was unlawful and in violation of his state and federal rights to be free from unreasonable searches.

108.    Johnson, who was standing away from the truck, saw Legan's search of Morgan's truck cab occurring and notified Morgan of the same by calling over to him and asking whether it was okay for the officers to be searching his truck in that manner.   At this time, Morgan looked up, saw what was happening, and called out to Defendants informing them that no one had his consent to search his vehicle, telling them that they could not search without a warrant.

109.    Upon information and belief, Legan and/or Miller responded by forcefully telling Morgan and Johnson to "shut the fuck up" and "when you go to law school you can tell us what we can and cannot do."

110.    After the above statements were made, Deputy Legan proceeded to complete his search of Morgan's truck.  At that time, Johnson began approaching the truck in an effort to help

16

locate Morgan's registration. Deputy Legan then yelled at Johnson, saying, "Step the fuck back from the vehicle!" He stated again that Defendants "did not need permission to search the truck."

111. Defendants' search of Morgan's truck revealed no contraband, no evidence of any violation of law, and no weapons.

112. During the time of the search, Spivey wrote traffic citations to Morgan for expired registration, driving while license revoked, and for careless and reckless driving.

113. At no point between Spivey and Morgan's initial interactions and the receipt of these traffic citations did Morgan make any threat or respond with any undo animosity. Instead, Morgan remained calm and obedient during this entire time.

114. Once Spivey was finished writing the citations, and after Defendants' unlawful searches revealed no evidence of contraband or illegal activity, Spivey handed Morgan the tickets while still seated in his patrol car. At this time, Morgan saw for the first time that he had just been charged with the misdemeanor criminal offense of careless and reckless driving on his own private property. Morgan then asked Spivey how he could possibly be charged with careless and reckless driving on his property. Spivey refused to tell Morgan the basis of his charge and instead told him he would just have to "sort it out in court."

115. Morgan then asked Spivey if he was free to go. Spivey responded yes, telling Morgan he was free to leave and was not under arrest.

116. At this time, Defendants had no basis to extend Morgan's traffic stop or initiate a second encounter with Morgan. Morgan was absolutely free to leave and continue about his business or personal affairs on his own private property.

117. Upon information and belief, Defendants should have known that once Spivey informed Morgan he was free to leave that they had no basis to extend Morgan's traffic stop or initiate a second encounter with Morgan.

118. After Spivey informed him that he was free to leave, Morgan turned around and walked away from Spivey's vehicle and toward his own truck. Defendants Miller and Legan

remained standing by Spivey's car as they watched Morgan walk away toward Johnson and his truck.

119.     As Morgan approached Johnson, Morgan commented to him that he was in disbelief that Spivey had actually charged him with the crime of careless and reckless driving on his own private property when he had done nothing wrong.

120.     Morgan then told Johnson to wait outside while Morgan got into his truck and started the engine.

121.     Morgan then began driving his truck along the dirt road, away from Spivey's car and toward the south end of his private field.  Morgan drove away from the location of Spivey's patrol car in a calm manner and at a safe speed.  Defendants watched as he drove away in this manner.

122.     Once Morgan had driven many feet away from the location of Spivey's patrol car, and when his truck was much further down the dirt roadway, he increased his speed and performed several "fishtails."

123.     Once Morgan reached the large and open south end of his private field, he began performing several "donuts" with his truck.

124.     The entire time Morgan performed fishtails and donuts with his truck he was completely on his own private property and no one was in the truck with him.

125.     The entire time Morgan performed fishtails and donuts with his truck, no debris flew out of his truck and onto Wimberly Road.

126.     The entire time Morgan performed fishtails and donuts with his truck, he was not endangering any other person or other person's property with his driving.

127.     The entire time Morgan performed fishtails and donuts with his truck, he was completely within his rights to drive in that manner in his own private field.

128.     Upon information and belief, Defendants knew that Morgan was completely within his rights to perform fishtails and donuts in that manner in his own private field.

129. Upon information and belief, Defendants knew that they had no basis in law to initiate another encounter, an arrest, or a traffic stop of Morgan because he performed fishtails or donuts in this manner on his own private property.

130. Upon information and belief, Defendants should have known that Morgan was completely within his rights to perform fishtails and donuts in that manner on his own private property.

131. Upon information and belief, Defendants should have known that they had no basis in law to initiate another encounter, an arrest, or a traffic stop of Morgan because he was performing fishtails or donuts in this manner on his own private property.

132. Defendants watched as Morgan increased the speed of his truck and performed the above-described fishtails and donuts. At that time, Johnson heard the Defendants say out loud "if he touches the road, he's ours."

133. After the above statement was made, Defendants Legan and Miller walked over to their patrol cars and started their vehicles' engines.

134. Upon information and belief, Morgan's choice to perform fishtails and donuts angered Defendants, and in particular angered Spivey who was still in his patrol car pointed in a northerly direction.

135. Upon information and belief, after seeing Morgan pull away and perform fishtails and donuts, Spivey formed the intent to force a new encounter with Morgan in the south end of the field to "teach him a lesson" and/or use Morgan's behavior as an improper excuse to engage in the use of force with Morgan.

136. Upon seeing Morgan performing fishtails and donuts in the south end of the field, Deputy Spivey deliberately performed a three-point turnaround and chose to drive straight toward the direction of Morgan's truck in the south end of the field.

137.     After Spivey turned his car around and began driving toward the south end of the field, he drove past Entrance #2 and did not use it to exit the field.  Spivey could have exited the field easily by using Entrance #2 and left the scene completely on Wimberly Road.

138.     Defendants knew or should have known that, under these circumstances, Spivey should have left Morgan's private field by using Entrance #2.

139.     Upon information and belief, Spivey made the intentional choice to not leave the field by using Entrance #2.   Instead, he knowingly chose to drive his car past this driveway and all the way to the south end of the field into the immediate vicinity of Morgan's truck performing donuts.

140.     At the time Morgan was performing donuts in the south end of his field, he had no knowledge that Spivey was driving his patrol car directly into the area where Morgan was driving.

141.     Once Morgan saw for the first time that Spivey's car was approaching, Morgan stopped performing donuts and stopped his truck completely.   Morgan's truck remained in a completely stopped position, with the front of his truck facing west, as Spivey drove his patrol car within feet of Morgan's truck.

142.     When Spivey pulled up, he knowingly drove his patrol car in the direction of Morgan's stopped truck such that the front end of Spivey's patrol car would have been heading in the general vicinity of the rear of Morgan's truck if Spivey continued forward and Morgan refused to move his truck.

143.     At this time, Johnson had walked up the dirt road and was standing less than twenty to thirty feet away from where Spivey and Morgan's vehicles were stopped in the south end of the field.  Johnson watched and listened to the entire encounter that ensued.

144.     The moment that Spivey pulled his patrol car into Morgan's direction he yelled from his driver's seat in an extremely aggressive tone, ordering Morgan to "move!"

145.     From the vantage point of the driver seat of his truck with the windows down, Morgan could see and hear Spivey make this aggressive statement.

20

146. Morgan immediately told Spivey to drive around him saying "you've got plenty of room."

147. Based on the positions of Spivey and Morgan's vehicles, Spivey had ample room and the obvious opportunity to simply drive his patrol car around Morgan's truck and leave the field without Morgan having to move his truck a single foot.

148. Based on the positions of Spivey and Morgan's vehicles, Spivey had ample room and the obvious opportunity to simply drive his patrol car around Morgan's truck and use Entrance #3 to leave the field.

149. Based on the positions of Spivey and Morgan's vehicles, Spivey had ample room and the obvious opportunity to simply turn his patrol car away from Morgan's truck, toward Wimbery Road, and drive across the shallow grass ditch to leave the field.

150. Based on the positions of Spivey and Morgan's vehicles, Spivey had ample room and the obvious opportunity to simply turn his patrol car around in a routine three-point turnabout, drive back the way he came, and leave the field using Entrance #2.

151. Upon information and belief, Defendants should have known that Spivey should have taken advantage of the multitude of alternative means to leave the field without forcing another encounter with Morgan, or without ordering him to move his truck from its resting position on Morgan's private property where it had a right to be resting.

152. At this time, Spivey had no lawful basis to order Morgan to move his truck from its resting position on Morgan's private property.

153. Instead of leaving the scene as he should have, Spivey immediately exited his vehicle in an aggressive manner, extended his ASP baton, and began approaching the driver side of Morgan's truck in an obviously hostile manner.

154. At this time, Johnson was standing approximately twenty feet away watching Spivey extend his baton and approach Morgan's driver-side door in a belligerent manner.

155. Morgan's driver-side window was rolled down when Spivey approached.

21

156.     Upon information and belief, the moment Spivey came within range of Morgan seated in his truck, Spivey swung down twice with his ASP baton, striking Morgan twice in the head.

157.     After striking Morgan twice, Spivey then reached his hands and arms inside Morgan's truck and grabbed Morgan's body and shirt about the shoulders and neck and began trying to physically pull Morgan out of the driver's side window.

158.     At the time, Morgan was only 5'6" and weighed 150 pounds.  Upon information and belief, Spivey is much larger, standing over six feet tall.

159.     Upon information and belief, at no time did Spivey notify Morgan that he was under arrest or that he had committed any crime.

160.     During this time, Spivey had no lawful basis to attack Morgan with his baton, to grab Morgan about his body or clothes, to try and pull Morgan out of his truck, or to otherwise engage in the use of force in any manner against Morgan.

161.     During this time, Spivey had no lawful basis to arrest Morgan under state or federal law, and Morgan had an absolute right to resist any such illegal arrest attempt.

162.     Defendants Legan and Miller watched from their patrol cars as Spivey approached Morgan's truck and begin forcibly striking him.  Legan and Miller stopped their patrol cars and ran toward Morgan's truck.

163.     In response to seeing Spivey strike Morgan – a civilian the Defendants had just confirmed was unarmed, on his own private property, and was free to leave Spivey's initial traffic stop – Defendant Legan drew his Taser weapon and Defendant Miller drew his .357 service pistol.

164.     Miller ran to the passenger window of the truck with his .357 pistol loaded, cocked, and pointed directly at Morgan.

165.     Legan positioned himself directly behind Deputy Spivey, who at the time was physically pulling Morgan through the driver-side window and out of the truck.

166.     Johnson watched as Spivey began pulling Morgan's body out of his truck window.

22

167.     At the time Spivey was physically pulling Morgan, Morgan's truck was still in the drive gear and his foot was pressed down on the brake.

168.     It is foreseeable that an officer physically pulling a driver from behind the wheel of a vehicle that is in gear could cause the vehicle to idle or move forward.

169.     Defendants knew or should have known that the act of pulling Morgan from the driver's seat of his truck could cause it to idle or move forward.

170.     Due to being literally pulled out of the car by Spivey, Morgan's foot came off the brake of the truck and it began idling forward.

171.     As soon as the truck started moving, Deputy Spivey dropped Morgan back into the driver's seat where he landed with both of his hands back on the steering wheel.  Morgan immediately pushed his foot back on the brake to stop the truck from rolling forward.

172.     Miller saw the truck moving forward and took aim with his service pistol at Morgan.  The moment Morgan pressed the brake and stopped the truck, Miller fired his pistol twice, hitting Morgan both times.  The first bullet pierced Morgan's flesh and became lodged in the bones of his left leg.  The second shot ripped through Morgan's right hand that was holding onto the steering wheel.

173.     Morgan watched as three fingers on his right hand exploded in front of him.  He managed to put the truck in park with his left hand, open his driver door, and collapse out onto the ground.  He screamed in excruciating and horrible pain as he lay on the ground bleeding.

174.     While writhing in pain, Morgan called out, "I need EMS! I need an ambulance!"

175.     Johnson, who saw Deputy Miller fire the two shots in rapid succession, saw Morgan fall to the ground screaming.  Johnson called out "where did you shoot him?"  Defendant Miller immediately turned his gun on Johnson, screaming for Johnson to put his hands behind his head and get on the ground.  Johnson immediately complied, and Miller ran over to his body, rammed his knee in Johnson's back, handcuffed him, and left him lying face-down on the ground.

23

176.    Not knowing whether Morgan had been mortally wounded, Johnson continued to yell out asking where Miller had shot Morgan.  Spivey walked around Morgan's truck and told Johnson, "That's what happens when you play rough with the big dogs."

177.    Upon information and belief, as Morgan laid on the ground crying in excruciating pain, and Johnson laid on the ground handcuffed, Defendants Spivey, Miller, and Legan huddled together and began talking amongst themselves about what had just transpired.  Defendants talked in this position for several minutes.  They continued to talk privately and without Morgan or Johnson being able to hear until other personnel arrived on scene in response to their radio call that shots had been fired.

178.    Upon information and belief, Defendants Spivey, Miller, and Legan either explicitly or implicitly agreed with one another to falsely claim inaccurate facts about the July 5, 2013 encounter for the improper purposes of instituting criminal proceedings against Morgan, and to shield the truth of what occurred in Morgan's private field on July 5, 2013.

179.    Following the shooting, Morgan was taken into custody and transported to Duke University Medical Center for emergency treatment.  Following his treatment at Duke, Morgan was transferred to Wake County Jail and he was forced to endure a period of incarceration that lasted over four months.

180.    Following the shooting, Defendants Spivey, Miller, and Legan all made statements alleging that when Spivey was at Morgan's truck window, Morgan tried to hurt or kill Spivey by "flooring" the gas pedal, causing the tires of his diesel truck to spin and throw up dirt.  They each made statements to investigators, their supervisors, and other third parties that Morgan tried to kill or seriously injure Spivey by slamming down on the gas pedal and dragging Spivey's body for several feet.  They each made statements to investigators, their supervisors, and other third parties that Morgan's alleged dragging of Spivey by flooring the gas pedal was the reason why Miller was justified in shooting Morgan twice.

24

181.     In fact, Morgan never pressed the gas pedal during the above encounter, the tires of his truck never spun or threw up dirt, and he never dragged Spivey with his truck.

182.     Upon information and belief, Defendants' intentionally made these statements in an effort to cause criminal charges to be brought against Morgan.

183.     Upon information and belief, Defendants' statements regarding Morgan accelerating his truck and/or dragging Spivey were not true and were knowingly false when Defendants made them.

184.     Based upon the above statements of Defendants, the State of North Carolina charged Morgan with the crimes of Assault with a Deadly Weapon on a Law Enforcement Officer; Assault Inflicting Serious Injury on a Law Enforcement Officer; Assault on a Law Enforcement Officer; Assault; Felony Habitual Assault; Resist, Delay, or Obstruct a Law Enforcement Officer; and Kidnapping a Law Enforcement Officer.

185.     Based upon the above statements of Defendants, the Defendants caused the State of North Carolina to institute criminal proceedings and a criminal trial against Morgan for the above charges.

186.     Based upon the above statements of Defendants, Morgan was placed into custody and wrongfully incarcerated for four months and nine days following the shooting incident.  He entered Wake County jail on July 8, 2013, and was then transferred to N.C. Central Prison Hospital the following day for continued care of his hand and knee wounds.  He stayed in Central Prison until he was transferred to Craven County Correctional Institution on August 8, 2013.  He remained incarcerated there until he was able to bond out on November 15, 2013, where he was released home with an electronic house arrest bracelet and order that stayed in place until his criminal trial acquittal.

187.     During this terrible time of wrongful incarceration, Morgan was mistreated by prison staff and caretakers on numerous occasions.  Morgan required medication for his injuries and treatment while incarcerated, and on numerous occasions the prison staff mistakenly forced

him to take the wrong medication that belonged to another inmate. He was forced to endure time away from his family, humiliation, fear, anxiety, and sub-standard medical care in the prison system for his severe injuries, including instances of severe infection in his hand as a result of staff refusing to change his dressings for weeks.

188.    Based upon Defendants' above statements, Morgan's criminal charges and Defendants' version of the story were publicized in several news outlets in print and online format, and based upon Defendants' above statements all of the reporting media sources claimed that Morgan tried to kill Spivey by dragging him with his truck. Many of these online articles are still posted online and will be found when any member of the public performs an internet browser search for "Michael Morgan" from "Apex, North Carolina."

189.    Morgan's tree business suffered tremendously as a result of the above incidents, and it still suffers today as he continues to lose customers who look him up online and see the news articles still being publicized about his criminal charges and Defendants' false allegations that he tried to kill Spivey with his truck.

190.    Based upon Defendants' above statements, the State of North Carolina proceeded with a public criminal trial against Morgan in Wake County Superior Court. The jury trial was presided over by the Hon. Donald W. Stephens.

191.    Defendants Spivey, Miller, and Legan each testified under oath during the trial, and each gave under oath statements that Morgan accelerated his truck and dragged Spivey in an attempt to seriously injure or kill Spivey.

192.    Due to the weakness in the evidence presented, Judge Stephens dismissed the kidnapping charge against Morgan at the close of the state's evidence. However, the State of North Carolina was allowed to proceed on the remaining charges.

193.    After the jury deliberated for approximately thirty minutes they returned a unanimous verdict of not guilty on all charges.

194.     Following Spivey's instruction to Morgan that he was free to leave on July 5, 2013, the individual Defendants had no cause, let alone probable cause or reasonable suspicion, to arrest, exercise force, charge, or detain Morgan.  Their actions were based on malice, bad faith, and were supported by their false statements after the fact.

195.     At all times relevant herein, the individual Defendants acted intentionally, willfully, maliciously, negligently, and with reckless disregard for and deliberate indifference to Morgan's rights and physical and mental well-being by physically assaulting, threatening, arresting, imprisoning, and prosecuting Morgan.

196.     Upon information and belief, Defendants Spivey, Miller, and/or Legan had numerous prior incidents of excessive force, aggressive behavior, citizen or detainee complaints, and/or overuse of Resisting, Delay, and Obstructing charges arising from their police-citizen encounters in Wake County.  Upon information and belief, Defendants Wake County and/or Sheriff Harrison and his Office were aware, or should have been aware, of these same prior instances.  Upon information and belief, due to deliberate indifference of Defendants Wake County and/or Sheriff Harrison toward the prior improper conduct by Spivey, Miller, and/or Legan, and/or due to the culture, policies, practices, or customs created by Defendants Wake County and/or Sheriff Harrison for Wake County Sheriff's Deputies, Defendants Spivey, Miller, and/or Legan chose to act in the manner in which they did with Morgan on July 5, 2013.

197.     The actions of the individual Defendants, as set forth herein, were the result of the failure of Defendant Wake County Sheriff's Office to properly train, supervise, and discipline its officers, including the individual Defendants.  Upon information and belief, had Defendant Sheriff Harrison and his office properly trained, educated, and supervised Defendants Spivey, Miller, and Legan on the rights of limitations of police-citizen encounters, then this incident would, more likely than not, have never occurred.  This failure to train, supervise, and discipline is a consequence of policies and practices of Defendant Wake County and its Sheriff's Office.  These

policies and practices are in part responsible for the unconstitutional, wrongful, deliberate, malicious, negligent, careless and intentional actions of the individual Defendants.

198.    At all relevant times herein, Defendant Wake County, acting through Wake County Sheriff's Office, developed, implemented, enforced, encouraged and sanctioned the above negligent conduct of Defendant Harrison and his office.

199.    Defendants' unlawful actions were done willfully, knowingly and with specific intent to deprive Morgan of his constitutional rights under the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

200.    The conduct of the individual Defendants in restraining, arresting, striking, shooting, threatening, incarcerating, and maliciously prosecuting Morgan proximately caused physical, emotional, and financial injury to Morgan, including, but not limited to, severe physical pain, mental suffering, anguish, shock, fright, permanent scarring and disfigurement, permanent loss of use of certain body parts, permanent injury to body parts, loss of enjoyment of life, loss of liberty, reputational harms, loss of business customers and income, incurred medical expenses, humiliation, embarrassment and deprivation of his constitutional rights.

**FIRST CAUSE OF ACTION**
**Negligence/Gross Negligence against Defendant Wake County**

201.    The preceding and foregoing paragraphs are incorporated by reference as if fully set forth herein.

202.    Defendant County owed a duty to Plaintiff, and to the general public, to ensure that the Wake County Sheriff's Office, its agents and employees would perform their duties in such a way as to avoid placing Plaintiff and other members of the public in unreasonable danger of serious injury or death.  Furthermore, Defendant County owed a duty to ensure that Plaintiff and other members of the public would be free from unreasonable searches and seizures and excessive force by officers employed by the Wake County Sheriff's Office

203.    Defendant County breached these duties with regard to Plaintiff in various ways including, but not limited to, the following:

a. It failed to ensure that the Wake County Sheriff's Office and Defendant Harrison had established reasonable and appropriate policies to accomplish the mission of the Sheriff's Office of protecting and serving the law-abiding public, including Plaintiff;

b. It failed to ensure that the Wake County Sheriff's Office and Defendant Harrison had established reasonable and appropriate policies regarding the hiring, promotion and retention of law enforcement personnel;

c. It failed to ensure that the Wake County Sheriff's Office and Defendant Harrison adequately trained, supervised, instructed and/or monitored Wake County Sheriff's Office employees in the use of force against suspects and other law abiding citizens;

d. It failed to establish reasonable and appropriate policies and procedures governing the situations under which and the manner in which Wake County Sheriff's Office personnel could use deadly force against suspicious persons and/or members of the public;

e. It failed to ensure that all Wake County Sheriff's Office personnel complied with existing policies and procedures with regard to the use of excessive or deadly force;

f. It failed to take corrective action to prevent Wake County Sheriff's Office personnel and others under its control from exercising unreasonable and excessive force in response to prior incidents involving the wrongful use of excessive or deadly force by Wake County Sheriff's Office personnel upon citizens of Wake County;

g. It adopted and encouraged a paramilitary approach to law enforcement inconsistent with the goals and responsibilities of a civilian law enforcement agency; and

h. It was careless and negligent in such other ways as may be identified during the course of discovery and/or trial.

204. Defendant County's negligent acts and omissions constitute proximate causes of the incident which resulted in injuries to Plaintiff and as such Plaintiff is entitled to recover damages in excess of $25,000.00, the exact amount to be later determined at trial.

205. At the time Defendants Harrison, Spivey, Miller and Legan committed the acts described herein, they were acting within the course and scope of their employment and/or agency with the Wake County Sheriff's Office. As such, Defendant County is liable for the negligent acts and omissions of Defendants Harrison, Spivey, Miller and Legan and the negligence of Defendants Harrison, Spivey, Miller and Legan is imputed to Defendant County through the doctrines of agency, vicarious liability and *respondeat superior.*

## SECOND CAUSE OF ACTION
### Negligence/Gross Negligence against
### Defendant Harrison, in his Official Capacity

206. The preceding and foregoing paragraphs are incorporated by reference as if fully set forth herein.

207. Defendant Harrison, as the Sheriff of Wake County and the chief law enforcement officer of Wake County, owed a duty to Plaintiff and the general public, to perform his duties and to ensure that the Wake County Sheriff's Office and its agents and employees performed their duties, in such a way as to avoid placing Plaintiff and other members of the law abiding public, in danger of serious injury or death. Furthermore, Defendant Harrison owed a duty to ensure that Plaintiff and other members of the law abiding public, would be free from unreasonable searches and seizures and excessive force at the hands of the Wake County Sheriff's Office.

30

208.    Defendant Harrison breached these duties with regard to Plaintiff in various ways, including, but not limited to, the following:

a.    He failed to establish reasonable policies or to take reasonable precautions in the hiring, promotion and retention of Wake County Sheriff's Office personnel;

b.    He negligently hired Defendants Spivey, Miller and Legan;

c.    He negligently failed to fire or suspend Defendants Spivey, Miller and Legan;

d.    He failed to properly train Defendants Spivey, Miller and Legan;

e.    He failed to properly supervise the activities of Defendants Spivey, Miller and Legan;

f.    He failed to train, supervise, instruct, and/or monitor employees of the Wake County Sheriff's Office, including Defendants Spivey, Miller and Legan, in the use of force against suspects, suspicious persons, and members of the law abiding public;

g.    He failed to establish reasonable procedures to train officers to properly respond to reports of suspicious activity;

h.    He failed to establish reasonable and appropriate policies and procedures governing the situations under which and the manner in which Wake County Sheriff's Office personnel could use deadly force against suspicious persons and/or members of the public;

i.    He failed to ensure that Wake County Sheriff's Office personnel, including patrol officers, complied with existing policies and procedures regarding the use of deadly force against suspicious persons and/or members of the public;

j.    He failed to take appropriate corrective action to prevent Wake County Sheriff's Office personnel and others under his command from utilizing unreasonable and excessive force in response to other prior incidents involving

31

the wrongful use of excessive or deadly force by Wake County Sheriff's Office personnel;

k. He was careless and negligent in such other ways as herein alleged; and

l. He was careless and negligent in such other ways as may be identified during the course of discovery and/or the trial of this action.

209. Defendant Harrison's negligent acts and omissions constitute proximate causes of the incidents herein alleged which resulted in injuries to Plaintiff and as such Plaintiff is entitled to recover damages against Defendant Harrison in excess of $25,000.00, the exact amount later to be determined a trial.

210. At the time Defendants Harrison committed the acts of negligence described herein, he was acting within the course and scope of his employment and/or agency with the Wake County Sheriff's Office. As such, Defendant County is liable for the negligent acts and omissions of Defendants Harrison and the negligence of Defendants Harrison is imputed to Defendant County through the doctrines of agency, vicarious liability and *respondeat superior.*

### THIRD CAUSE OF ACTION
### Violation of Civil Rights – 42 U.S.C. § 1983
### by Defendants Spivey, Miller, and Legan

211. The preceding and foregoing paragraphs are incorporated by reference as if fully set forth herein.

212. By the actions and omissions described above, done under the color of state law, Defendants Spivey, Miller, and Legan violated 42 U.S.C. §1983 by depriving Plaintiff of the following clearly-established and well-settled constitutional rights protected by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution:

a. The right to be free from unreasonable searches and seizures as secured by the Fourth and Fourteenth Amendments;

b.  The right to be free from excessive and unreasonable force in the course of search or seizure as secured by the Fourth and Fourteenth Amendments;

c.  The right to be free from the use of unlawful deadly force as secured by the Fourth and Fourteenth Amendments;

d.  The right to be free of unlawful, reckless, deliberately indifferent, and conscience shocking deadly and/or excessive force as secured by the Fourteenth Amendment;

e.  The right to be free from malicious prosecution as secured by the Fifth and Fourteenth Amendments;

f.  The right to be free from deprivation of liberty and injury without substantive due process and free from state created danger as secured by the Fourteenth Amendment; and

g.  In such other particulars as may be learned through discovery.

213.  As a direct and proximate result of Defendant Spivey, Miller, and Legan's acts and/or omissions as set forth above, Plaintiff sustained damages as set forth in this Complaint and is entitled those damages in an amount later to be determined at trial.

214.  The conduct of Defendants Spivey, Miller and Legan in their individual capacities entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. §1983.

215.  Plaintiff is also entitled to reasonable costs and attorney fees pursuant to 42 U.S.C. §1988.

### FOURTH CAUSE OF ACTION
### Suit of Sheriff's Bond – N.C. Gen. Stat. § 162-8 & 58-76-5

216.  The preceding and foregoing paragraphs are incorporated by reference as if fully set forth herein.

217.  In all the actions and conduct set forth herein in all causes of action, the individually named Defendants Spivey, Miller and Legan were acting within the scope and course

of their authority as Deputy Sheriffs and under the color of their office as Deputy Sheriffs and employees of the Wake County Sheriff's Office.

218.    The actions of each individual Defendant, in each claim for relief described above constitute negligence, misconduct and misbehavior done in violation of their duties as Deputy Sheriffs and employees of the Sheriff of Wake County, North Carolina.

219.    The Plaintiff is entitled to recover the full amount of the Sheriff's bond as to the claims against each Defendant according to the provisions of N.C. Gen. Stat. § 58-76-5.

**FIFHT CAUSE OF ACTION**
**Negligence/Gross Negligence of Defendant Spivey**
**in his individual and official capacities**

220.    The preceding and foregoing paragraphs are incorporated by reference as if fully set forth herein.

221.    Defendant Spivey, individually and in his official capacity as a deputy for Wake County Sheriff's Office, was negligent at the time and place alleged hereinabove, and his acts and omissions of negligence include, but are not limited to the following:

    a.    He failed to investigate or confirm that Morgan was lawfully driving on his own property before attempting to place Morgan under arrest;

    b.    He failed to realize that Morgan was not in violation of any laws before attempting to place Morgan under arrest;

    c.    He failed to realize that he could have avoided the shooting encounter with Morgan by leaving the property after issuing Morgan the traffic citations;

    d.    He failed to realize that he could have exited Morgan's property at multiple exit points without approaching Morgan's vehicle;

    e.    He failed to realize that he could have safely driven around Morgan's vehicle to access the exit point where he entered the property;

34

f.   He failed to determine or adequately assess the situation prior to rapidly approaching Morgan's vehicle on foot with his ASP baton;

g.   He negligently approached Morgan's vehicle on foot in a rapid manner with his ASP baton in hand and failed to give Morgan an opportunity to comprehend the situation before using excessive force by striking Morgan in the head with the ASP baton and grabbing Morgan in an attempt to lift him out of the vehicle, through the window;

h.   He failed to ask Morgan to step out of the vehicle, or otherwise attempt to remove Morgan from the vehicle peacefully, before striking Morgan in the head with the ASP baton and grabbing Morgan in an attempt to lift him out of the vehicle through the window;

i.   He negligently failed to realize that if he attempted to lift Morgan out of the vehicle through the window that Morgan's foot would come off of the vehicle's brake pedal and the vehicle would move forward;

j.   He failed to let go of Morgan after realizing that he had lifted Morgan's foot off of the vehicle's brake pedal;

k.   He failed to step away from the vehicle after causing it to move forward;

l.   He failed to instruct Defendant Miller to not shoot Morgan;

m.   He failed to use less combative, provocative and aggressive methods of alerting Morgan that he was being placed under arrest;

n.   He failed to use less combative, provocative and aggressive methods of placing Morgan under arrest;

o.   He failed to act as a reasonable, careful and prudent officer would have under the same or similar circumstances;

p.   He used excessive force against Morgan when he knew, or reasonably should have known, that the use of force was not necessary or justified;

q. He negligently used excessive force against Morgan when such force was not justified under the circumstance and was in violation of written Wake County Sheriff's Office regulations regarding the use of force;

r. In committing some or all of the following criminal offenses: False Imprisonment; Criminal Conspiracy; Obstruction of Justice; Simple Assault and Battery in violation of the General Statutes of North Carolina and the common law of North Carolina (all of which are negligence within themselves);

s. He failed to possess the necessary training and experience to serve as a deputy in the Wake County Sheriff's Office; and

t. He was otherwise careless and negligent in such other ways as may be revealed by discovery or during trial of this action.

222. Defendant Spivey's actions were malicious, corrupt, intentional, illegal, excessive, unreasonable, willful and wanton, and Defendant Spivey acted outside the scope of his duties with the Wake County Sheriff's Office and with conscious and reckless disregard for the lives and safety of others, including Morgan. Based on Defendant Spivey's conduct, Defendant Spivey is not entitled to immunity from personal liability and may be sued in his individual capacity.

223. The negligent acts and omissions of Defendant Spivey, as described hereinabove, were a proximate cause of the shooting of Morgan by Defendant Miller, his wrongful arrest and prosecution, and the other damages alleged herein.

224. The acts and omissions of Defendant Spivey, as described hereinabove, were willful, wanton and/or reckless, and amount to gross negligence.

225. Defendant Spivey was aware of the probable consequences of his reckless conduct described above and was aware that his conduct was reasonably likely to result in injury or death to others, including Morgan.

36

226. The negligence of Defendant Spivey is imputed by law to Defendant County by reason of Defendant Spivey's agency relationship with, and employment by, Defendant County at the time and place that the incident occurred under the doctrine of *respondeat superior*.

227. Plaintiff is entitled to recover from the Defendants, jointly and severally, damages in excess of $25,000.00, the exact amount later to be determined at trial as a result of Defendant Spivey's negligence, gross negligence, and/or willful and wanton negligence.

## SIXTH CAUSE OF ACTION
### Assault and Battery by Defendant Spivey

228. The preceding and foregoing paragraphs are incorporated by reference as if fully set forth herein.

229. Defendant Spivey, individually and in his official capacity as a deputy for Wake County Sheriff's Office, unjustifiably used force against Morgan, which was objectively excessive and unreasonable under the circumstances.

230. Defendant Spivey's intentional acts as described more fully hereinabove, put Morgan in actual, subjective apprehension of imminent harmful or offensive contact.

231. Morgan's apprehension was objectively reasonable under the circumstances in that a person of ordinary care and prudence under the same or similar circumstances would have believed that harmful, or offensive contact was about to occur.

232. Defendant Spivey's intentional act of striking Morgan in the head with the ASP baton and grabbing Morgan in an attempt to lift him out of the vehicle through the window constituted a harmful or offensive contact with Morgan.

233. Defendant Spivey's actions proximately caused the harmful or offensive contact with Morgan.

234. Morgan did not consent to the contact with, from or by Defendant Spivey.

235.    The Defendants are jointly and severally liable for the malicious assault and battery of Morgan by Defendant Spivey for damages in excess of $25,000.00, the exact amount later to be determined at trial.

**SEVENTH CAUSE OF ACTION**
**Negligence/Gross Negligence of Defendant Miller**
**in his individual and official capacities**

236.    The preceding and foregoing paragraphs are incorporated by reference as if fully set forth herein.

237.    Defendant Miller, individually and in his official capacity as a deputy for Wake County Sheriff's Office, was negligent at the time and place alleged hereinabove, and his acts and omissions of negligence include, but are not limited to the following:

a.    He aimed his semi-automatic pistol at Morgan and deliberately fired two bullets into his body despite the complete lack of objective evidence that Morgan posed any threat to any of the Wake County Sheriff's Office personnel on the scene;

b.    He failed to recognize that Morgan was unarmed prior to aiming his semi-automatic pistol at Morgan and firing two bullets into his body;

c.    He failed to determine or adequately assess the situation prior to aiming his semi-automatic pistol at Morgan and firing two bullets into his body;

d.    He failed to realize that Morgan was not in violation of any laws during the encounter with Defendant Spivey where Spivey was attempting to lift Morgan out of the vehicle thorough the window;

e.    He failed to realize that Defendant Spivey's life was not threatened by Morgan and that the use of deadly force was unreasonable, excessive and unjustified;

f.    He negligently approached Morgan's vehicle on foot in an rapid manner with his firearm drawn and failed to give Morgan an opportunity to comprehend the

38

situation before using excessive and potentially deadly force by aiming his semi-automatic pistol at Morgan and firing two bullets into his body;

g.  He failed to ask Morgan to step out of the vehicle, or otherwise attempt to remove Morgan from the vehicle peacefully, prior to aiming his semi-automatic pistol at Morgan and firing two bullets into his body;

h.  He failed to act as a reasonable, careful and prudent officer would have under the same or similar circumstances;

i.  He failed to use his firearm as a reasonable, careful and prudent officer would have under the same or similar circumstances;

j.  He used excessive and potentially deadly force against Morgan when he knew, or reasonably should have known, that the use of force was not necessary or justified;

k.  He negligently used excessive and potentially deadly force against Morgan when such force was not justified under the circumstance and was in violation of written Wake County Sheriff's Office regulations regarding the use of force;

l.  In committing some or all of the following criminal offenses: False Imprisonment; Criminal Conspiracy; Obstruction of Justice; Simple Assault and Battery in violation of the General Statutes of North Carolina and the common law of North Carolina (all of which are negligence within themselves);

m.  He failed to possess the necessary training and experience to serve as a deputy in the Wake County Sheriff's Office; and

n.  He was otherwise careless and negligent in such other ways as may be revealed by discovery or during trial of this action.

238.    On July 5, 2013, Defendant Miller's actions were malicious, corrupt, intentional, illegal, excessive, unreasonable, willful and wanton, and Defendant Miller acted outside the scope of his duties with the Wake County Sheriff's Office and with conscious and reckless disregard for

39

the lives and safety of others, including Morgan. Based on Defendant Miller's conduct, Defendant Miller is not entitled to immunity from personal liability and may be sued in his individual capacity.

239.     The negligent acts and omissions of Defendant Miller, as described hereinabove, were a proximate cause of the shooting of Morgan by Defendant Miller, his wrongful arrest and prosecution, and the other damages alleged herein.

240.     The acts and omissions of Defendant Miller, as described hereinabove, were willful, wanton and/or reckless, and amount to gross negligence.

241.     Defendant Miller was aware of the probable consequences of his reckless conduct described above and was aware that his conduct was reasonably likely to result in injury or death to others, including Morgan.

242.     The negligence of Defendant Miller is imputed by law to Defendant County by reason of Defendant Miller's agency relationship with, and employment by, Defendant County at the time and place that the incident occurred under the doctrine of *respondeat superior*.

243.     Plaintiff is entitled to recover from the Defendants, jointly and severally, damages in excess of $25,000.00, the exact amount later to be determined at trial, as a result of Defendant Miller's negligence, gross negligence, and/or willful and wanton negligence.

## EIGHTH CAUSE OF ACTION
### Assault and Battery by Defendant Miller

244.     The preceding and foregoing paragraphs are incorporated by reference as if fully set forth herein.

245.     Defendant Miller, individually and in his official capacity as a deputy for Wake County Sheriff's Office, unjustifiably used potentially deadly force against Morgan, which was objectively excessive and unreasonable under the circumstances.

246.     Defendant Miller's intentional acts as described more fully hereinabove, put Morgan in actual, subjective apprehension of imminent harmful or offensive contact.

40

247. Morgan's apprehension was objectively reasonable under the circumstances in that a person of ordinary care and prudence under the same or similar circumstances would have believed that harmful, or offensive contact was about to occur.

248. Defendant Miller's intentional act of aiming his semi-automatic pistol at Morgan and firing two bullets into his body constituted a harmful or offensive contact with Morgan.

249. Defendant Miller's actions proximately caused the harmful or offensive contact with Morgan.

250. Morgan did not consent to the contact with, from or by Defendant Miller.

251. The defendants are jointly and severally liable for the malicious assault and battery of Morgan by Defendant Miller for damages in excess of $25,000.00, the exact amount later to be determined at trial.

## NINTH CAUSE OF ACTION
### Negligence/Gross Negligence of Defendant Legan
### in his individual and official capacities

252. The preceding and foregoing paragraphs are incorporated by reference as if fully set forth herein.

253. Defendant Legan, individually and in his official capacity as a deputy for Wake County Sheriff's Office, was negligent at the time and place alleged hereinabove, and his acts and omissions of negligence include, but are not limited to the following:

      a. He failed to investigate or confirm that Morgan was lawfully driving on his own property before attempting to place Morgan under arrest;

      b. He failed to realize that Morgan was not in violation of any laws before attempting to place Morgan under arrest;

      c. He failed to instruct or cause Spivey to have avoided the shooting encounter with Morgan by leaving the property after issuing Morgan the traffic citations;

d.  He failed to determine or adequately assess the situation prior to rapidly approaching Morgan's vehicle on foot with the purpose of using force against Morgan and arresting him;

e.  He failed to ask Morgan to step out of the vehicle, or otherwise attempt to remove Morgan from the vehicle peacefully, before Defendants used excessive and/or deadly force against Morgan;

f.  He failed to instruct Defendant Spivey to refrain from using force or excessive force against Morgan;

g.  He failed to instruct Defendant Miller to not shoot Morgan;

h.  He failed to act as a reasonable, careful and prudent officer would have under the same or similar circumstances;

i.  In committing some or all of the following criminal offenses: False Imprisonment; Criminal Conspiracy; Obstruction of Justice; Simple Assault and Battery in violation of the General Statutes of North Carolina and the common law of North Carolina (all of which are negligence within themselves);

j.  He failed to possess the necessary training and experience to serve as a deputy in the Wake County Sheriff's Office; and

k.  He was otherwise careless and negligent in such other ways as may be revealed by discovery or during trial of this action.

254.  On July 5, 2013, Defendant Legan's actions were malicious, corrupt, intentional, illegal, excessive, unreasonable, willful and wanton, and Defendant Legan acted outside the scope of his duties with the Wake County Sheriff's Office and with conscious and reckless disregard for the lives and safety of others, including Morgan.  Based on Defendant Legan's conduct, Defendant Legan is not entitled to immunity from personal liability and may be sued in his individual capacity.

255. The negligent acts and omissions of Defendant Legan, as described hereinabove, were a proximate cause of the shooting of Morgan by Defendant Legan, his wrongful arrest and prosecution, and the other damages alleged herein.

256. The acts and omissions of Defendant Legan, as described hereinabove, were willful, wanton and/or reckless, and amount to gross negligence.

257. Defendant Legan was aware of the probable consequences of his reckless conduct described above and was aware that his conduct was reasonably likely to result in injury or death to others, including Morgan.

258. The negligence of Defendant Legan is imputed by law to Defendant County by reason of Defendant Legan's agency relationship with, and employment by, Defendant County at the time and place that the incident occurred under the doctrine of *respondeat superior*.

259. Plaintiff is entitled to recover from the Defendants, jointly and severally, an amount in excess of $25,000.00, the exact amount later to be determined at trial, as a result of Defendant Legan's negligence, gross negligence, and/or willful and wanton negligence.

## TENTH CAUSE OF ACTION
### Acts of Malice, Acts of Corruption and Acts Outside the Scope of Official Duties

260. The preceding and foregoing paragraphs are incorporated by reference as if fully set forth herein.

261. The acts and omissions of Defendants Spivey, Miller and Legan described hereinabove were committed with such reckless and wanton disregard for the life and safety of Morgan that they were malicious, corrupt and beyond the scope of their official duties as Wake County Sheriff's Office deputies.

262. Plaintiff is entitled to recover from the Defendants, jointly and severally, an amount in an amount later to be determined at trial as a result of Defendants' acts of malice, corruption and acts outside the scope of official duties.

43

## ELEVENTH CAUSE OF ACTION
## False Imprisonment by Defendants Spivey, Miller and Legan

263.    The preceding and foregoing paragraphs are incorporated by reference as if fully set forth herein.

264.    Defendants Spivey, Miller and Legan, individually and in their official capacities as deputies for Wake County Sheriff's Office, illegally restrained Morgan.

265.    Specifically, Defendant Spivey illegally restrained Morgan by grabbing him with both hands and attempting to pull Morgan out of his driver-side window.  Thereafter, Defendants Spivey, Miller and Legan illegally restrained Morgan through an unlawful arrest of Morgan, without legal authority or probable cause.

266.    The illegal restraint of Morgan by Defendants Spivey, Miller and Legan was done by force, or by an express or implied threat of force.

267.    The illegal restraint of Morgan by Defendants Spivey, Miller and Legan was done against Morgan's will.

268.    The Defendants are jointly and severally liable for the false imprisonment of Morgan by Defendants Spivey, Miller and Legan, which proximately caused damages to Morgan in excess of $25,000.00, the exact amount later to be determined at trial.

## TWLEFTH CAUSE OF ACTION
## Malicious Prosecution by Defendants Spivey, Miller and Legan

269.    The preceding and foregoing paragraphs are incorporated by reference as if fully set forth herein.

270.    Defendants Spivey, Miller and Legan instituted criminal proceedings or caused criminal proceedings to be instituted against Plaintiff.

271.    When instituting criminal proceedings or causing criminal proceedings to be instituted against Plaintiff, Defendants Spivey, Miller and Legan acted with express, actual and/or implied malice.

44

272.     When instituting criminal proceedings or causing criminal proceedings to be instituted against Plaintiff, Defendants Spivey, Miller and Legan acted without probable cause.

273.     When instituting criminal proceedings or causing criminal proceedings to be instituted against Plaintiff, Defendants Spivey, Miller and Legan acted as part of a conspiracy and agreement to unlawfully arrest Plaintiff based on false pretenses with the intention to avoid criminal, civil or administrative consequences of their actions in the incident on July 5, 2013.

274.     The criminal proceedings instituted by or as a result of Defendants Spivey, Miller and Legan terminated in Plaintiff's favor.  Plaintiff won a unanimous "not guilty" verdict in his criminal trial related to those proceedings.

275.     The criminal proceedings instituted by or as a result of Defendants Spivey, Miller and Legan resulted in Plaintiff being wrongfully arrested and jailed on July 5, 2013.  A bail bond was set for Plaintiff that was outside of his financial ability to pay and he was forced to remain in jail for over four months of time, and on house arrest for many months following his release.

276.     The Defendants are jointly and severally liable for the malicious prosecution of Plaintiff by Defendants Spivey, Miller and Legan, which proximately caused damages to Plaintiff in excess of $25,000.00, the exact amount later to be determined at trial.

### THIRTEENTH CAUSE OF ACTION
**Civil Conspiracy by Defendants Spivey, Miller and Legan**

277.     The preceding and foregoing paragraphs are incorporated by reference as if fully set forth herein.

278.     Defendants Spivey, Miller and Legan formed an agreement to do an unlawful act or to do a lawful act in an unlawful way.  Specifically, Defendants Spivey, Miller and Legan agreed to unlawfully arrest Plaintiff based on false pretenses with the intention to avoid criminal, civil or administrative consequences of their actions in the incident on July 5, 2013.  In addition and/or in the alternative, Spivey, Miller, and Legan agreed to make false statements to investigators, their

supervisors, to the jury during their sworn testimony at Morgan's criminal trial, and to other third parties about Morgan's conduct leading up to the shooting incident on July 5, 2013.

279.    One or more of the three conspirators, Defendants Spivey, Miller and Legan, committed overt acts in furtherance of their conspiracy and agreement to unlawfully arrest Plaintiff based on false pretenses with the intention to avoid criminal, civil or administrative consequences of their actions in the incident on July 5, 2013.

280.    Defendants Spivey, Miller and Legan each committed overt acts in furtherance of their conspiracy and agreement to unlawfully arrest Plaintiff based on false pretenses with the intention to avoid criminal, civil or administrative consequences of their actions in the incident on July 5, 2013.

281.    As a direct and proximate result of the conspiracy of Defendants Spivey, Miller and Legan, Plaintiff has incurred damages in excess of $25,000.00, the exact amount later to be determined at trial for which Defendants are jointly and severally liable.

## FOURTEENTH CAUSE OF ACTION
### Punitive damages

282.    The preceding and foregoing paragraphs are incorporated by reference as if fully set forth herein.

283.    As a direct and proximate result of the grossly negligent, reckless, intentional and willful conduct of Defendants Spivey, Miller and Legan, as well as their conscious disregard of the health and safety of Morgan, and other members of the law abiding public as alleged herein Plaintiff is entitled to recover punitive and exemplary damages under both federal and state law to punish Defendants for their illegal, egregiously wrongful, reckless, willful, and/or wanton misconduct and to determine such conduct by others

284.    Plaintiff is entitled to recover punitive damages from Defendants, jointly and severally, in an amount later to be determined at trial.

## FIFTEENTH CAUSE OF ACTION
### Violation of the North Carolina Constitution by Defendants

285.    The preceding and foregoing paragraphs are incorporated by reference as if fully set forth herein.

286.    The actions of Defendants as set forth herein constitute a violation of Plaintiff's right to be free to partake in the enjoyment of the fruits of his own labor, and free from unreasonable searches and seizure, due process of law, and equal protection of the laws in violation of Article I, Sections 1 and 19 of the North Carolina Constitution.

287.    The actions of Defendants as set forth herein were malicious and corrupt in that they acted knowingly and contrary to their duty and manifested a reckless indifference to the rights of others.

288.    Plaintiff's right to due process of law and equal protection of law have been violated in one or more of the following respects:

      a.   Plaintiff was denied the right to a fair and impartial decision-maker prior to his warrantless and unlawful detention;

      b.   Plaintiff was denied the right to a fair and impartial decision-maker prior to and during the criminal proceedings initiated against him, including but not limited to his criminal indictments and criminal trial based upon Defendants' false and/or inaccurate statements;

      c.   Plaintiff was subjected to an unreasonable search of his property; and

      d.   Plaintiff was subjected to an unreasonable and improper use of force, detention, and arrest by Defendants;

289.    Plaintiff's rights to be free from unreasonable search and seizure, and to be free from arbitrary or lack of due process, was violated as his truck was improperly searched by Defendants, he was improperly detained and arrested by Defendants, when Defendants used

excessive and unlawful force upon his person, and when Defendants instituted criminal charges and proceedings against Plaintiff based up false and/or inaccurate statements.

290.    Plaintiffs are entitled to recover from Defendants compensatory damages in excess of $25,000.00 as a result of the violations of his rights as described hereinabove, the exact amount of damages to be calculated at trial.

291.    Defendants' conduct as set forth herein was egregiously wrongful, thereby justifying an award of punitive damages under Chapter 1D of the North Carolina General Statutes.

292.    Plaintiff is entitled to punitive damages from the individual Defendants.

293.    Plaintiff is further entitled to recover the costs and expenses of this action including reasonable attorney's fees and such interest as may be allowed by law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiff respectfully prays the Court for the following relief:

1.    That Plaintiff have and recover of Defendants, jointly and severally, an amount later to be determined at trial and exceeding the jurisdictional limit of this Court for the damages caused to Plaintiff;

2.    That Plaintiff have and recover of Defendants, jointly and severally, an amount later to be determined at trial and exceeding the jurisdictional limit of this Court for punitive and exemplary damages;

3.    That all issues of fact be tried by a jury;

4.    That Plaintiff recover from Defendants, jointly and severally, the costs of this action and reasonable attorney's fees to the fullest extent allowed by the laws of North Carolina and the United States; and

5.    That Plaintiff be granted all other relief, both legal and equitable, which the Court deems just and proper.

This the 10th day of June, 2016.

**ZAYTOUN LAW FIRM, PLLC**

/s/ Matthew D. Ballew
Robert E. Zaytoun
N.C. State Bar No.:  6942
Matthew D. Ballew
N.C. State Bar No.: 39515
John R. Taylor
N.C. State Bar No.: 43248
3130 Fairhill Drive, Suite 100
Raleigh, NC  27612
Telephone:  (919) 832-6690
Facsimile: (919) 831-4793

**OXENDINE BARNES & ASSOCIATES PLLC**

/s/ Ryan D. Oxendine
Ryan D. Oxendine - NCSB No.27595
James A. Barnes IV - NCSB No. 33356
6500 Creedmoor Rd., Ste. 212
Raleigh, NC 27613
Telephone: (919) 848-4333
Facsimile: (919) 848-4707

***Attorneys for Plaintiff***

49