IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:16-CV-365-FL

| | | |
|---|---|---|
| MICHAEL J. MORGAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RICKY J. SPIVEY, in his individual and | ) | |
| official capacities as a Wake County | ) | |
| Sheriff's Deputy, CASEY L. MILLER, in | ) | ORDER |
| his individual and official capacities as a | ) | |
| Wake County Sheriff's Deputy, JOSHUA | ) | |
| K. LEGAN, in his individual and official | ) | |
| capacities as a Wake County Sheriff's | ) | |
| Deputy, and THE OHIO CASUALTY | ) | |
| INSURANCE COMPANY, individually, | ) | |
| and as subsequent subsidiary of Liberty | ) | |
| Mutual Insurance Company, as Surety, | ) | |
| | ) | |
| Defendants.[1] | ) | |

This matter is before the court on motion for summary judgment (DE 110), filed by

defendants Ricky J. Spivey ("Spivey"), Casey L. Miller ("Miller"), and Joshua K. Legan ("Legan"),

(collectively, "Sheriff Defendants")[2] and Ohio Casualty Insurance Company ("Ohio Casualty"). The

issues raised have been fully briefed and are ripe for ruling. For the reasons that follow, the court

grants in part and denies in part defendants' motion.

---

[1] The court constructively amends the caption of this order to reflect the dismissal of formerly-named defendant Donnie Harrison, in his official capacity as Sheriff of Wake County, North Carolina.

[2] Although previously dismissed, formerly-named defendant Donnie Harrison joins in defendants' motion for summary judgment.

## STATEMENT OF THE CASE

Plaintiff commenced this action against Sheriff Defendants and Wake County, North Carolina on June 10, 2016, alleging various claims against the parties including: negligence, gross negligence, violation of civil rights pursuant to 42 U.S.C. §1983, suit on sheriff's bond, assault and battery, false imprisonment, malicious prosecution, and civil conspiracy. All claims stem from events that occurred on July 5, 2014, wherein, in part, defendant Spivey conducted a traffic stop of plaintiff and passenger Charles Johnson ("Johnson") and issued citations to plaintiff for traffic violations; an altercation ensued where defendant Miller shot plaintiff twice; and Sheriff Defendants arrested plaintiff on various charges that were eventually dismissed, some following criminal trial.

On September 6, 2016, defendant Wake County, North Carolina voluntarily was dismissed from this case. On September 15, 2016, Sheriff Defendants filed a motion for partial judgment on the pleadings, which plaintiff responded to on October 6, 2016, also filing a motion to amend complaint, in order to join Ohio Casualty. On November 14, 2016, this court granted plaintiff's motion to amend and denied as moot Sheriff Defendants' motion for partial judgment on the pleadings. On November 23, 2016, plaintiff filed amended complaint.

On January 20, 2017, defendant Ohio Casualty filed motion to dismiss. On February 15, 2017, Sheriff Defendants filed motion for partial judgment. On September 29, 2017, the court granted in part and denied in part both Ohio Casualty's motion to dismiss and Sheriff Defendants' motion for partial judgment, finding the following claims to remain:

> 1) claims against defendants Spivey, Miller, and Legan regarding violation of civil rights pursuant to 42 U.S.C. § 1983;
>
> 2) claims against Ohio Casualty to recover on sheriff's bond for any breaches of the bond accruing on or after October 6, 2013;

3) negligence and gross negligence claims against defendants Spivey, Miller, and Legan, in their individual capacity, except regarding their failure to possess the necessary training and experience to serve as deputies;

4) state-law assault and battery claims against defendants Spivey and Miller in their individual capacity;

5) false imprisonment claims against defendants Spivey, Miller, and Legan, in their official and individual capacities;

6) malicious prosecution claims against defendants Spivey, Miller, and Legan; and

7) civil conspiracy.

Plaintiff and defendants Spivey, Miller, and Legan filed consent motions for protective orders regarding production of plaintiff's tax returns and production of defendants Spivey, Miller, and Legan's personnel records, respectively. The court granted both motions on August 29, 2017. On October 16, 2017, defendants filed motion to compel, related to plaintiff's treatment at Western Wake Treatment Center, to which plaintiff responded in opposition with motion for protective order. On December 8, 2017, the court denied defendants' motion to compel and granted plaintiff's motion for protective order.

On March 28, 2018, defendants' filed the instant motion for summary judgment, relying on statement of material facts[3] as well as the following: plaintiff's amended complaint; excerpts of depositions from plaintiff, defendants Miller and Spivey, Johnson, plaintiff's son Kyle Cox ("Cox"), and expert witness Mike Sutton ("Sutton"); affidavits of Sheriff Defendants and Andrew Marshall,

---

[3] Eastern District of North Carolina Local Rules 56.1(a)(1) require that the same be submitted "by a separate statement, in number paragraphs, of the material facts as to which the moving party contends there is no genuine dispute." Defendants, however, have broken up their statement of material facts into sections, including the following sections: facts describing the general nature of the case; deposition testimony from plaintiff; deposition testimony of Johnson; deputy Spivey testimony from plaintiff's criminal trial and affidavit; deputy Miller deposition, criminal trial testimony and affidavit; deputy Legan criminal trial testimony and affidavit. In essence, instead of providing the court with a set of material facts as to which defendants contend there is no genuine dispute, defendants have provided a recounting of what occurred from multiple perspectives, including from the perspective of each Sheriff Defendant, not all of which are consistent.

assistant district attorney for Wake County; warrants, indictments, and order for arrest in underlying criminal case; excerpts from criminal trial tr., including testimony of Sheriff Defendants; letter from Colon Willoughby, district attorney for Wake County; dash cam video from patrol car of defendant Miller; expert report of Mike Sutton; and google maps image of the field where the alleged events took place.

Plaintiff filed opposition, relying on statement of material facts as well as the following: crime scene photos and drawing; illustrative demonstration videos and photos; dash cam video from patrol car of defendant Miller; various photos of the field where the alleged events took place; state bureau of investigation ("SBI") interview of defendant Legan; affidavits of James Smith, Sr., plaintiff's father in law, as well as affidavits from people who live or work in Apex, North Carolina and are familiar with defendant Spivey; expert reports of W. Ken Katsaris ("Katsaris"), Dave F. Cloutier ("Cloutier"), and Jimmy Henley, Jr. ("Henley"); arrest warrants for plaintiff; deposition excerpts including from plaintiff, Sheriff Defendants, Johnson, Cox, expert witnesses Sutton and John Combs, as well as people familiar with defendant Spivey; and excerpts from criminal trial tr., including testimony of Johnson and Sheriff Defendants.[4]

## STATEMENT OF THE FACTS

As defendants have moved for summary judgment, the court recounts the facts in light most favorable to plaintiff except as otherwise noted below.[5]

A.     Prior to Shooting Event on July 5, 2013

---

[4] Additionally, on September 10, 2018, plaintiff filed notice of subsequently-decided authority, citing Livingston v. Kehagias, No. 5:16-CV-906-BO, 2018 WL 3398113, at *1 (E.D.N.C. July 12, 2018).

[5] Few facts are undisputed, and plaintiff and defendants' versions of events stand in stark contrast, with both sides disputing the other side's account.

Plaintiff was the owner and chief operator of "Mike's Tree Service," a business which provides tree and brush removal services for customers in and around the Wake County area. (DE 111 ¶ 1; DE 115 ¶¶ 1, 107).

On July 5, 2013, plaintiff and his employee, Johnson, were working a tree and brush removal job for a customer who lived on Wimberly Road in Apex, North Carolina. (DE 111 ¶ 1; DE 115 ¶¶ 1, 108). This job required plaintiff and Johnson to cut down large amounts of tree limbs and brush and remove them from customer's property. (DE 115 ¶ 108). Plaintiff and Johnson were using a Dodge Ram diesel truck to haul loads of debris from the property to a large field located at 1116 Wimberly Road, a field plaintiff regularly uses for his business as a brush and debris dumping site. (DE 111 ¶ 2; DE 115 ¶¶ 2, 108).

Plaintiff did not have a valid driver's license on July 5, 2013, and the truck involved in the incident was not titled in plaintiff's name. (DE 111 ¶¶ 2, 9-10; DE 115 ¶¶ 2, 9-10, 108). Additionally, the truck involved in the incident was never titled in plaintiff's name, tags were never issued for the truck in plaintiff's name, and plaintiff did not have insurance on the truck. (DE 111 ¶ 11; DE 115 ¶ 11).

The field at 1116 Wimberly Road is private land, titled in the name of plaintiff's father in law, James Smith, and plaintiff is allowed use of the property "as if he is the title owner." (Aff. James Smith (DE 116-9) at 1; DE 111 ¶ 12; DE 115 ¶¶ 12, 108). This field is approximately 300 yards in length, with the south end being the widest part containing about 7,500 square feet of surface and the end where the two vehicles are found parked on the right-hand side in the distance in the below picture. (DE 115 ¶ 109).



(DE 116-7 at 14).[6]

Plaintiff alleges the field has multiple vehicle entrance points that were and are regularly used by cars and trucks, including a northern entrance, not pictured above, a middle entrance, and a southern entrance. (DE 115 ¶ 13; DE 111 ¶ 13). The parties agree that in order to access the northern entrance on the day in question, a ditch would have to be driven over, although plaintiff alleges this "grassy ditch is shallow and can be easily driven over by cars or trucks." (DE 111 ¶ 14; DE 115 ¶¶ 14, 110). Plaintiff additionally alleges that Sheriff Defendants were familiar with plaintiff, knew that he regularly utilized his family's private field on Wimberly road for his tree removal business, and knew of the multiple entrances and exit points to the field. (DE 111 ¶ 14; DE 115 ¶¶ 14, 111).

---

[6] Defendants contend that some of the photos submitted by plaintiff do "not depict the condition of the field as it was on July 5, 2013." (DE 111 ¶ 14).

As part of a several hour job on the day in question, plaintiff and Johnson hauled numerous loads of debris in the truck from the job site to the field for dumping. (DE 115 ¶ 112). During the tree removal job, a patrol car drove by plaintiff and Johnson multiple times driven by defendant Spivey. (Id. ¶¶ 112-13).[7]

B.     Traffic Stop by Defendant Spivey

At approximately 7:00 p.m., plaintiff was driving with passenger Johnson southeast on Wimberly Road, towards the field, when they passed defendant Spivey in his patrol car in the opposite lane of travel. (DE 111 ¶¶ 2, 18, 114; DE 115 ¶¶ 2, 18, 114). Defendant Spivey knew that plaintiff previously had his driving license suspended. (DE 111 ¶ 45; DE 115 ¶ 45). Plaintiff saw defendant Spivey slow down and begin to use a side road to turn around, and plaintiff proceeded around the curve in the road and turned onto the north end of the field. (DE 115 ¶ 114).

Defendant Spivey drove to the south end of the field in order to enter the field. (DE 111 ¶ 20; DE 115 ¶¶ 20, 115). Once on the field, defendant Spivey drove from the south end of the field to the north end where plaintiff and Johnson were already outside of the truck, unloading the bed of the truck. (DE 111 ¶ 20; DE 115 ¶¶ 20, 115-16). When defendant Spivey initiated the traffic stop, he informed the Wake County law enforcement dispatcher of the stop. (DE 111 ¶ 2; DE 115 ¶ 2).

When Spivey pulled his patrol car up to plaintiff's location, he told plaintiff to walk over and produce his license and registration, which plaintiff did. (DE 115 ¶ 116). Defendant Spivey,

---

[7] Plaintiff has additionally put forth evidence in the form of multiple depositions and affidavits submitted by fact witnesses in this case who lived and/or worked in the local area or know defendant Spivey, that defendant Spivey "has a reputation in his patrol community (which includes Plaintiff's residence) for being overly aggressive and mean toward citizens," has used "unnecessary and excessive force against citizens who live in Plaintiff's community," and has "a personal vendetta out against Plaintiff." (DE 115 ¶ 113).

plaintiff, and Johnson remained calm throughout the stop, in which defendant Spivey issued plaintiff

citations for an expired registration, expired inspection, driving while license revoked, and for

careless and reckless driving and went over court dates with plaintiff.  (DE 111 ¶¶ 3, 21; DE 115 ¶¶

3, 22, 116).

C.      Defendants Legan and Miller's Arrival

Defendants Legan and Miller were 20 miles away from the scene when they heard over their

radio systems that defendant Spivey was initiating a traffic stop with plaintiff.  (DE 115 ¶ 121;

Legan dep. (DE 116-23) at 41:1-2).  Defendants Legan and Miller got into their separate patrol cars

and drove through two-lane residential streets toward the Wimberly Road location, sometimes

exceeding 100 miles per hour, with numerous cars moving out of the way and pulling off the road

as defendants Legan and Miller drove past.  (DE 115 ¶ 121; dash cam footage (DE 116-6) at

7:25:30-35).

Defendants Legan and Miller parked their patrol cars along the side of the road next to the

field.  (Dash cam footage (DE 116-6) at 7:30:10-14).  While defendant Spivey was writing citations,

he instructed defendant Legan or both defendants Legan and Miller to search around plaintiff's

vehicle to see if any contraband had been thrown out of the vehicle.  (DE 111 ¶ 82; DE 115 ¶¶ 82,

122).[8]  Plaintiff alleges that thereafter Legan began a search of plaintiff's truck without the consent

of either plaintiff or Johnson, including a search of the truck's cab, consoles, and glove box, which

revealed no contraband, no evidence of any violation of law, and no weapons.  (DE 111 ¶ 82; DE

---

[8] Plaintiff additionally alleges that when plaintiff told defendant Legan that he did not consent to the search of his truck, defendant Legan responded by stating "shut the f*** up" and "when you go to law school you can tell us what we can and cannot do."  (DE 115 ¶ 122; Johnson dep. (DE 116-24) at 116:17-117:5; Morgan dep. (DE 116-20) at 163:10-23; criminal trial tr. (DE 116-37) at 370:1-371:7).

115 ¶¶ 82, 122-23). [9]

D.    Shooting Incident

After receiving his traffic tickets and misdemeanor criminal citation, plaintiff asked defendant Spivey if he was free to go; defendant Spivey responded "yes," telling plaintiff he was free to leave and was not under arrest.  (DE 111 ¶ 21; DE 115 ¶¶ 21, 124).  Plaintiff turned around and walked away from defendant Spivey's vehicle and toward his own truck, while defendants Miller and Legan remained standing by defendant Spivey's vehicle.  (DE 115 ¶ 124).

Plaintiff was upset he had received a citation for careless and reckless driving and told Johnson to wait outside while plaintiff got into his truck and began driving along the dirt road on the field, away from defendant Spivey's car and toward the south end of the field.  (DE 111 ¶ 22; DE 115 ¶¶ 22, 124).  Once plaintiff had driven away from the location of defendant Spivey's patrol car, he increased his speed and performed several "fishtails" and "donuts," while remaining completely on the field.   (DE 111 ¶¶ 4, 22; DE 115 ¶¶ 4, 22, 125; dash cam footage (DE 116-6) at 7:42:00-44).[10]

Defendant Spivey performed a three-point turnaround and drove in the direction of plaintiff's truck at the south end of the field, not exiting the field via the middle entrance. (DE 111 ¶¶ 5, 23; DE 115 ¶¶ 5, 23, 126; dash cam footage (DE 116-6) at 7:41:52-42:46).  Johnson also walked down the field towards plaintiff while defendants Miller and Legan walked towards their patrol cars parked on the side of the highway.  (Dash cam footage (DE 116-6) at 7:42:33-48).

---

[9]  Defendants do not respond to these allegations specifically, but instead argue that defendant Legan had probable cause to search plaintiff's vehicle.  (See DE 113 at 5-7).  It thus appears these facts are undisputed.

[10]  Plaintiff further alleges that Johnson heard one of the defendant deputies say, "Are we going to get him? We can't do anything to him on his own property. If his ass touches the road he is ours, but if he doesn't touch the road there is nothing we can do." (DE 115 ¶ 125; criminal trial tr. (DE 116-37) at 375:1-10).

Plaintiff stopped his truck, reversed into the path of defendant Spivey's car with his truck pointed towards the tree line, and then pulled his truck forward a few feet, as defendant Spivey pulled forward and came to a stop, with both vehicles coming to a resting point as seen below. (DE 111 ¶¶ 6, 23; DE 115 ¶¶ 6, 23, 127; dash cam footage (DE 116-6) at 7:42:46).



As alleged by plaintiff, "[t]he south end of the field where Plaintiff stopped his truck is a very large open area, with substantial and obvious room to drive a vehicle around the location of Plaintiff's truck." (DE 115 ¶ 24).

After plaintiff stopped his truck, the truck was in gear during the entire ensuing transaction with defendant Spivey. (DE 111 ¶ 25; DE 115 ¶ 25). Plaintiff alleges that "[a]s Spivey stopped his patrol car he immediately yelled through his open driver's window for [plaintiff] to move his truck"; in response plaintiff yelled "Go the f*** around me" and "This is f*****g private property." (DE 111 ¶¶ 6, 23, 27; DE 115 ¶¶ 6, 23, 27, 129; Johnson dep. (DE 116-24) at 66:24-67:6; criminal trial tr. (DE 116-37) at 377:20-24).

Plaintiff alleges that defendant Spivey, without issuing any orders and "within seconds of stopping his [] car instantly exited his vehicle in an aggressive manner,[11] extended his ASP baton," and began approaching the driver side of plaintiff's truck "in an obviously hostile manner."  (DE 115 ¶ 129; Morgan dep. (DE 116-20) at 294:10-11 ("It all happed so fast and I – I weren't given no commands"); dash cam footage (DE 116-6) at 7:42:46-43:02; Johnson dep. (DE 116-37) at 378:10-14 ("He jumped out of his vehicle, slung that baton . . run around . . . to the driver's side"); Legan dep. (DE 116-23) at 47:13-17 ("Q. You testified in this case that you saw that Deputy Spivey had an ASP baton on July 5th, 2013?  A. Yes, sir.  Q. You saw him actually extend it?  A. I believe so, yes, sir")).

Plaintiff alleges first that defendant Spivey "forcefully struck Plaintiff in the head with the baton." (DE 115 ¶ 131; see also Johnson dep. (DE 116-37) at 379:18-20 ("it looked to me like he slung that baton and actually hit Michael upside the head two times with it"); Morgan dep. (DE 116-20) at 188:13-16, 300:7-13).  Plaintiff additionally alleges that defendant Spivey, "who was 6'2" and 270 pounds at the time . . . grabbed onto the chest and t-shirt of Plaintiff, who in contrast was only 5'6" and 145 pounds at the time . . . and Spivey began forcefully pulling him literally out of the window of Plaintiff's truck."  (DE 115 ¶ 131).[12]

_____

[11] At this point, the subsequent interaction among plaintiff and Sheriff Defendants occurred outside the view of the dash cam, where defendant Miller was in the process of moving his vehicle.  (See dash cam footage (DE 116-6) at 7:42:48-52).

[12] Although it appears all parties agree that "Deputy Spivey grabbed Plaintiff by his shirt" and "his shirt ripped," defendants state that "Deputy Spivey did not pull Plaintiff out of the truck." (DE 111 ¶ 28; DE 115 ¶¶ 28, 131)  However, it appears undisputed that defendant Spivey attempted to pull plaintiff out of the truck.  (See Legan dep. (DE 116-39) at 158:19-21 ("And at that point Deputy Spivey had already engaged the defendant and grabbed ahold of him and was attempting to extract him from the vehicle."); id. at 167:14-22 ("Q: And do you recall letting the State Bureau of Investigation know that when you were approaching the truck Deputy Spivey had Michael Morgan maybe a third of the way through the window? A. If that is coming from the report, I would say that is fair to say. Like I said, he had his hands on him and he was attempting to extract him from the vehicle and I believe as Deputy Spivey testified earlier, at some point he may have had him out of the seat and partially through the window . . . ."); DE 116-8 at 2 ("Spivey started to attempt to pull Morgan out of the truck . . . .")).

During this time, defendants Legan and Miller had gotten into their patrol cars, drove quickly and briefly down the road to the southern end of the field, stopped their patrol cars, exited, and ran towards the truck. (Dash cam footage (DE 116-6) at 7:42:46-43:02). Defendant Legan drew his Taser weapon, and defendant Miller drew his service pistol. (DE 115 ¶ 133; criminal trial tr. (DE 116-38) at 188:16-24). Defendant Miller ran to the passenger window of the truck with his pistol loaded, cocked, and pointed at plaintiff. (DE 115 ¶ 133; Johnson dep. (DE 116-24) at 72:8-22; criminal trial tr. (DE 116-37) at 389:21-25). Defendant Legan approached the vehicle from the driver's side and positioned himself directly behind deputy Spivey, and in position to view the entire event within arm's length of defendant Spivey. (DE 115 ¶ 133; criminal trial tr. (DE 116-39) at 158:17-25, 159:1-16).

As defendant Spivey pulled plaintiff from the driver's seat, plaintiff's foot came off the brake of the truck, and it began idling forward. (DE 115 ¶ 134; see also DE 111 ¶ 28; Johnson dep. (DE 116-24) at 142:17-143:22 (Johnson testifying he never heard the engine rev, that the truck was "sitting there idle," and the rear tires did not spin); Morgan dep. (DE 116-20) at 289:15-290:3 ("That truck rolled forward. Spivey – Spivey knows as well as I do, I mean, he grabbed ahold of me, pulled me up, truck rolled forward.").[13] Defendant Legan testified plaintiff "was maybe 1/3 through the

---

[13] Although providing somewhat different details about the moments surrounding the shooting, defendants Spivey, Miller, and Legan each testified at plaintiff's criminal trial that instead plaintiff hit the gas in such a way that the tires of the truck spun and this in turn caused defendant Spivey to be drug alongside the vehicle. (See DE 111 ¶¶ 7, 53-56, 62, 88; DE 112-8 at 105:14-106:16; DE 112-11 at 191:3-21; DE 112-13 at 159:14-16). Including the testimony cited above, plaintiff submits photographic evidence and expert testimony disputing defendants' characterization. (See, e.g. Katsaris expert report (DE 116-13) at 13 ("It is the combined testimony of the officers, that Morgan 'floored' the accelerator and caused the trucks dual wheels to spin, and the vehicle to throw up dirt from the spinning wheels. This description of the 'spinning wheels' is not supported by the very clear and close up photos that reveal no tire marks consistent with the tires spinning . . . . Thus, the movement of the truck, testified to as approximately seven (7) feet by Spivey, does not support that he was dragged by the accelerating vehicle either."). As stated by plaintiff's expert witness Cloutier:

Spivey indicated at Morgan's criminal trial that he was dragged approximately 7-8 feet and that he felt his feet go underneath him as he was being dragged. However, there were no reviewed photos or

window and the truck started moving . . . ." (DE 116-8 at 2; criminal trial tr. (DE 116-39) at 167:14-24). Plaintiff alleges at no time did he receive any commands from any of the Sheriff Defendants. (Morgan dep. (DE 116-20) at 294:20-25; Johnson dep. (DE 116-24) at 137:17-138:9 (testifying he never heard or saw Sheriff Defendants give instructions stating he did not "ever see or hear these deputies, any three of them, ever give Mr. Morgan a chance to get out of the truck in any way before Deputy Spivey reached in.")).

When the truck started moving, defendant Spivey dropped plaintiff back into the driver's seat where he landed with his right hand back on the steering wheel; plaintiff pushed his foot back on the brake to stop the truck. (DE 115 ¶ 135; Morgan dep. (DE 116-20) at 179:15-16 ("I noticed the truck was rolling, so obviously I started to get on the brake"); id. at 192:6-13).

Defendant Miller was standing right next to the passenger window of plaintiff's truck and, when he saw the truck moving forward, he took aim and fired his revolver twice at close range, hitting plaintiff both times, first in plaintiff's left leg and second through plaintiff's right hand that was holding on to the steering wheel. (DE 115 ¶ 139). Defendant Miller moved alongside the

---

other documentation, which indicated any scratches, scrapes or tears to shoes or clothing or any dirt adhering to shoes, socks, trousers or other clothing worn by Spivey which could have been indicative of being dragged based upon Spivey's description . . . . However, the statements of all three defendant officers that Morgan floored the accelerator and began spinning the rear tires are directly contradicted based upon review of the scene photographs which documented the area of the field where this event transpired. The immediate area 7-8 feet and farther behind the rear tires of the final resting location of Morgan's truck revealed no indication of tires being spun or ruts produced due to spinning tires. In contrast, review of the video revealed Morgan's truck spinning tires, throwing up dirt from the rear tires and creating ruts on numerous occasions as Morgan performed the "donuts" . . . . Based upon these observations, the absence of evidence indicative of spinning tire ruts would more likely than not indicate that Morgan's truck moved forward at a much slower rate of acceleration than described by the defendant officers. Moreover, it would appear unlikely that Miller would have been able to raise his weapon and fire two accurate shots at Morgan through the open passenger window if, in fact, Morgan accelerated the truck's engine to the degree that it caused the tires to spin while the truck was in drive.

(Cloutier expert report (DE116-14) at 11-12).

vehicle the seven to eight feet it rolled while taking the two shots in immediate succession; after the shots, the vehicle stopped after rolling another foot. (DE 115 ¶ 140; criminal trial tr. (DE 116-38) at 193:12-16, 22-25 (defendant Miller testifying truck rolled seven to eight feet and stopped within a foot thereafter); criminal trial tr. (DE 116-40) at 106:15 (defendant Spivey testifying truck rolled seven to eight feet); see also criminal trial tr. (DE 116-37) at 410:4-8 (witness Johnson testifying "[a]nd then the truck started rolling forward, and so the truck was on past me when it started rolling forward. The truck had rolled forward, it looked to me like five or six feet when the shots were fired, but they are saying seven or eight, but it looked to me like five or six.")).

Plaintiff was able to put the truck in park with his left hand, open his driver door, and collapse on the ground, calling out "I need EMS! I need an ambulance!" (DE 115 ¶ 142). Defendant Miller turned his revolver to Johnson and told Johnson to "Get the f*** down." (Id. ¶ 143; Johnson dep. (DE 116-24) at 142:8-12, 145:7-21). Johnson complied, was handcuffed, and left face down on the ground. (DE 115 ¶ 143).[14]

E.      Charges Against Plaintiff

Defendants Spivey, Miller, and Legan began talking amongst themselves until other personnel arrived on scene in response to their radio call that shots had been fired. (DE 115 ¶ 144). Morgan was taken into custody and transported to Duke University Medical Center for emergency treatment. (Id. ¶ 145). Plaintiff had gunshot wounds and two large lumps on his head. (Id.; criminal trial tr. (DE 116-37) at 380:6-21). Following his medical treatment at Duke, plaintiff was then transferred to the Wake County Jail, Central Prison and Craven County Correctional Institute where

---

[14]  Plaintiff additionally alleges that defendant Spivey walked around the truck and said to the handcuffed Johnson, who was asking where plaintiff had been shot and expressing that plaintiff needed medical help, "It doesn't f*****g matter. That's what happens when you play with the big dogs." (DE 115 ¶ 143; Johnson dep. (DE 116-24) at 147:17-19; criminal trial tr. (DE 116-37) at 390:6-8).

he was incarcerated for over four months. (DE 115 ¶ 145).

Plaintiff was charged with assault with a deadly weapon on a law enforcement officer; assault inflicting serious injury on a law enforcement officer; assault on a law enforcement officer; assault; felony habitual assault; and kidnaping a law enforcement officer. (DE 111 ¶ 8; DE 115 ¶¶ 8, 145).[15]

On July 6, 2013, a Wake County magistrate judge issued warrant for plaintiff's arrest for assault with a deadly weapon on a law enforcement officer, and thereafter a grand jury on October 8, 2013, issued a true bill of indictment against plaintiff for assault with a deadly weapon on a law enforcement officer and assault inflicting physical injury on a law enforcement officer. (DE 112-4).[16] On July 9, 2013, a Wake County magistrate judge issued warrant for plaintiff's arrest for felony habitual assault, and thereafter a grand jury on October 8, 2013, issued a true bill of indictment against plaintiff for assault on a law enforcement office and felony habitual assault. (DE 112-5). On August 19, 2014, a grand jury issued a true bill of indictment against plaintiff for kidnaping a law enforcement officer, and an order for plaintiff's arrest was issued on August 20, 2014 for kidnaping a law enforcement officer. (DE 112-6). After his pre-trial release from his four-month imprisonment, plaintiff was placed under house arrest during the entire period leading

---

[15] On November 13, 2013, all charges related to the traffic citations issued by defendant Spivey to plaintiff were dismissed by assistant district attorney for Wake County. (DE 112-7; DE 111 ¶ 36; DE 115 ¶ 36).

[16] It appears the parties disagree whether plaintiff was additionally charged with "resist[ing], delay[ing], and obstruct[ing]" defendant Spivey as defendant Spivey "was discharging and attempting to discharge a duty of his office, namely the release of the Defendant and the disengagement of a traffic stop after issuing citations to the Defendant" in violation of N.C. Gen. Stat. § 14-223. (Indictment (DE 112-4); DE 113 at 3 (defendants stating plaintiff was charged with the offense of Resist, Dely, Obstruct); DE 115 ¶ 146 (plaintiff denying he was so charged)). Although defendants have submitted the quoted indictment above, the section regarding the charge of Resist, Delay, Obstruct is missing information, as noted by the trial judge in plaintiff's criminal case, and agreed to by the prosecutor. (Criminal trial tr. (DE 116-35) at 3:17-4:16). The prosecutor also stated "[t]hat was not originally an original charge" and moved to dismiss the charge before the commencement of trial, which the court allowed, stating "it doesn't allege an offense" and "I think it will just show that the State voluntarily is dismissing that." (Id.).

up to and through his criminal trial in June 2015. (DE 115 ¶ 145).

Plaintiff pleaded "not guilty" to all charges and a jury trial was held in Wake County Superior Court. (DE 115 ¶ 146). At the close of the government's case, the court granted plaintiff's motion for directed verdict as to the kidnaping charge. (DE 111 ¶ 106; DE 115 ¶ 106). At the close of the trial, plaintiff was acquitted by unanimous jury verdict on June 4, 2015, as to the remaining charges. (DE 111 ¶ 106; DE 115 ¶¶ 106, 148).

## DISCUSSION

A.     Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal quotation omitted). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence

and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.     Analysis

Defendants argue that plaintiff's claims brought pursuant to § 1983 for violations of plaintiff's Fourth Amendment rights fail as a matter of law and that Sheriff Defendants are entitled to qualified immunity.[17] Defendants additionally argue that plaintiff's state-law claims fail as a

_____

[17] Although defendants argue generally that "individual defendants did not violate any constitutional right" but if the court determines otherwise "the defendants are entitled to qualified immunity because such right was not clearly established in the law," (DE 113 at 17), defendants only offer specific argument and case support regarding defendants Miller and Spivey's use of force against plaintiff, (id. at 19-21; DE 118 at 2-5, 8-9). However, plaintiff addresses defendants' qualified immunity defense for additional applicable claims. (DE 114 at 8 (regarding defendant Spivey's traffic stop), 15-16 (regarding defendant Spivey's arrest of plaintiff)). The court will address all qualified immunity

matter of law and, where applicable, Sheriff Defendants are entitled to public officer's immunity. The court addresses each set of arguments in turn below.

1. Plaintiff's Fourth Amendment Claims Brought Pursuant to § 1983

Plaintiff's Fourth Amendment claims brought pursuant to § 1983 allege the following violations: 1) defendant Spivey's illegal traffic stop, 2) defendant Legan's illegal search of plaintiff's truck during the traffic stop, 3) defendant Spivey's illegal arrest of plaintiff, 4) defendant Spivey's excessive use of force against plaintiff, 5) defendant Miller's excessive use of deadly force against plaintiff, and 6) defendant Legan's bystander liability. The court addresses each in turn below.[18]

a. Defendant Spivey's Traffic Stop

The temporary detention of an individual during a traffic stop constitutes a Fourth Amendment seizure. Whren v. United States, 517 U.S. 806, 809-10 (1996). Because a routine traffic stop is more like an investigative detention than a custodial arrest, the court evaluates a traffic stop under the test set forth in Terry v. Ohio, 392 U.S. 1 (1968). United States v. Green, 740 F.3d 275, 279 (4th Cir.). Under this inquiry, the officer's decision to stop the vehicle must be both "justified at its inception" and adequately "limited both in scope and duration." United States v. Digiovanni, 650 F.3d 498, 506-07 (4th Cir. 2011). A police officer is entitled to initiate a Terry stop

---

arguments made, as needed, where, as here, plaintiff has had the opportunity and has taken the opportunity to address this issue. See Noel v. Artson, 297 F. App'x 216, 219 (4th Cir. 2008) (declining to entertain defendants interlocutory appeal denying qualified immunity where "plaintiffs would suffer prejudice because they had no chance to address the issue in their opposition to summary judgment.").

[18] Although plaintiff's complaint names defendants Spivey, Miller, and Legan individually and in their official capacities, plaintiff's federal claims pursuant to § 1983 are against defendants in their individual capacity only in that the court previously dismissed plaintiff's claims regarding Sheriff Defendants' failure to possess the necessary training and experience to serve as deputies, (DE 96 at 34), and in that plaintiff's complaint does not allege that defendants acted pursuant to a regulation, policy, or practice authorizing unconstitutional action against him, (see Am. Compl. (DE 61) ¶¶ 199-200; see also Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 335 n.11 (4th Cir. 2009) (citing Jackson v. Long, 102 F.3d 722, 731 (4th Cir.1996)).

only where it is "supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." United States v. Foster, 634 F.3d 243, 246 (4th Cir. 2011) (internal quotation marks omitted).

It is undisputed that prior to initiating the traffic stop at issue, defendant Spivey knew that plaintiff previously had his driving license suspended at some point in the three weeks prior to the incident. (DE 111 ¶ 45; DE 115 ¶ 45 ("At that time, the most Defendant Spivey can say is that he claims to have had knowledge of a past suspension of Plaintiff's license or out of date registration"); Spivey dep. (DE 118-1) 200:1-18)).[19]

Defendant Spivey's knowledge of plaintiff's past license suspension is sufficient to support a finding of reasonable suspicion. Although the Fourth Circuit has not directly addressed this situation in published opinion, the Fourth Circuit's unpublished opinions as well as the weight of other circuit's law support a holding that defendant Spivey acted with reasonable suspicion in initiating a traffic stop based on less than three-week old information that plaintiff was driving with a revoked license. See United States v. Trappier, 447 F. App'x 463, 465 (4th Cir. 2011) (holding "given the agents' knowledge that Trappier's driver's license was suspended [based on an arrest that occurred eight days prior], the agents had probable cause to effect the traffic stop . . . ."); United States v. Spivey, 64 F. App'x 905, 906 (4th Cir. 2003) ("Our review of the record of the suppression hearing convinces us that the officers possessed reasonable suspicion that [defendant] was driving on a suspended license, and were justified in pursuing and stopping him," where the officer had

---

[19] Defendants additionally appear to argue that defendant Spivey initiated the traffic stop based on his belief that plaintiff had "an expired registration," (DE 113 at 5); however, it is undisputed that when defendant Spivey saw plaintiff on the road, they were driving in opposite lanes of traffic, (DE 111 ¶¶ 2, 18, 114; DE 115 ¶¶ 2, 18, 114), and defendant Spivey further testified that when he passed plaintiff, he "couldn't see any of his tag information to know the details of it," such as whether "the sticker on the tag [was] up to date," (Spivey dep. (DE 116-22) at 194:22-195:7).

confirmed at some point in the prior two months before the traffic stop that defendant's license was suspended); see also United States v. Irons, 537 F. App'x 221, 223 (4th Cir. 2013) ("In his investigation, the officer learned that Irons had a revoked driver's license, and Irons was observed driving a car without a valid license along the anticipated route the informant had provided. Thus, we conclude that the stop did not violate Irons' Fourth Amendment rights.").[20]

The undisputed evidence establishes defendant Spivey had reasonable suspicion to stop plaintiff and, accordingly, the court grants defendants' motion for summary judgment regarding the traffic stop.[21]

b. Defendant Legan's Search of Plaintiff's Truck

During a routine traffic stop, an officer "may request a driver's license and vehicle registration, run a computer check, and issue a citation." United States v. Rusher, 966 F.2d 868, 876-775 (4th Cir.1992). "[O]nce the driver has demonstrated that he is entitled to operate his vehicle, and the police officer has issued the requisite warning or ticket, the driver 'must be allowed to proceed on his way.'" United States v. Branch, 537 F.3d 328, 336 (4th Cir.2008) (citations omitted). "Any further investigative detention . . . is beyond the scope of the Terry stop and therefore illegal unless the officer has a reasonable suspicion of a serious crime or the individual

---

[20] Other circuits have held similarly. See, e.g., United States v. Sandridge, 385 F.3d 1032, 1036 (6th Cir.2004) (holding three-week old information about the status of a driver's license sufficiently current to provide reasonable suspicion regarding the commission of the offense of driving with a suspended license); United States v. Pierre, 484 F.3d 75, 84 (1st Cir.2007) (finding information about a suspended license five months old was sufficient for reasonable suspicion based in part on "testimony suggest[ing] that Pierre's license was suspended on an ongoing basis, rather than for a short period of time, making the suspicion that it was still inactive some five months later more reasonable"); see also United States v. Laughrin, 438 F.3d 1245, 1248 (10th Cir. 2006) (22-week-old information about a defendant driving on a suspended license was too dated without additional indicia of reliability).

[21] Given the court's holding above, it is unnecessary to address the defendants' additional argument, that defendant Spivey observed plaintiff's "truck leave the road and cross a ditch in a reckless manner" and saw "limbs and trees falling from Plaintiff's truck," (DE 113 at 5), facts plaintiff disputes at length, (see, e.g., DE 115 ¶ 45). It is additionally unnecessary to address plaintiff's arguments concerning whether defendant Spivey is entitled to qualified immunity. (DE 114 at 8).

consents to the further detention." United States v. Farrior, 535 F.3d 210, 217 (4th Cir. 2008), abrogated on other grounds by Rodriguez v. United States, 135 S.Ct. 1609 (2015) (citations omitted).

Defendants appear to argue first that defendant Legan's warrantless search which took place as defendant Spivey issued citations to plaintiff was "conducted incidentally to a lawful arrest,"(DE 113 at 6), and second that the search was legal because when defendant Spivey turned to follow plaintiff, he "suddenly and without warning drove off the right side of the paved road, across a ditch and into a field," and "displayed erratic and avoidance-type behavior once Deputy Spivey intended to stop him," by "running around the back of the truck, as if hiding something," (id. at 6-7).[22]

First, this was not a search incident to arrest. Search incident to lawful arrest require a custodial arrest. United States v. Robinson, 414 U.S. 218, 235 (1973) (holding that law enforcement officers are authorized to conduct a full search of every lawful custodial arrestee). It is undisputed that plaintiff was not arrested during the traffic stop. Following the issuance of citations, defendant Spivey informed plaintiff that he was "free to go." (DE 111 ¶ 21). Defendants' arguments concerning vehicle searches incident to a lawful arrest are unavailing.

Second, even if the facts as recounted by defendants supported a finding of reasonable suspicion of a serious crime, such facts are disputed. Plaintiff has put forth evidence including testimony from Johnson and plaintiff that plaintiff was driving carefully when entering the field and plaintiff and Johnson did not run around the back of the truck as defendant Spivey was driving towards them. (DE 115 ¶¶ 114, 116; Morgan dep. (DE 116-20) at 161:2-21; Johnson dep. (DE 116-

---

[22] It is undisputed that at no point did plaintiff or Johnson give consent for the truck to be searched. (See DE 115 ¶ 122).

24) at 58:20-23).[23]  Thus, taking facts in light most favorable to plaintiff, no probable cause existed for defendant Legan to conduct a warrantless search of plaintiff's vehicle.

Accordingly, defendants' motion for summary judgment regarding defendant Legan's search is denied.[24]

### c.    Defendant Spivey's Arrest of Plaintiff

An "arrest is a seizure of the person, and . . . the general rule is that 'Fourth Amendment seizures are 'reasonable' only if based on probable cause.'" Rogers v. Pendelton, 249 F.3d 279, 290 (4th Cir. 2001) (quoting Dunaway v. New York, 442 U.S. 200, 213 (1979)).  Thus, to establish a Fourth Amendment claim based on unlawful arrest or false imprisonment, plaintiff must show the arrest was not supported by probable cause.  Miller v. Prince George's Cnty., Md., 475 F.3d 621, 627 (4th Cir. 2007).[25]  "For probable cause to exist, there need only be enough evidence to warrant the belief of a reasonable officer that an offense has been or is being committed; evidence sufficient to convict is not required."  Brown v. Gilmore, 278 F.3d 362, 367 (4th Cir. 2002).

Government officials are entitled to qualified immunity from civil damages so long as "their

---

[23] Defendants' argument that defendant Legan's search was allowed because defendant Spivey told him to do it is without merit. Under the "collective knowledge doctrine," an officer may act on the instruction of another officer only "if the instructing officer had sufficient information to justify taking such action herself; in this very limited sense, the instructing officer's knowledge is imputed to the acting officer."  United States v. Massenburg, 654 F.3d 480, 492 (4th Cir. 2011).  As stated above, when viewing the evidence in lights most favorable to plaintiff, defendants had insufficient information to justify searching plaintiff's truck; therefore, defendants' argument on the collective knowledge doctrine must also fail.

[24] The parties do not offer any argument or case law applicable to a qualified immunity defense regarding defendant Legan's search of the truck.  Thus the court does not address this issue.

[25] A "malicious prosecution claim under § 1983 is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort."  Lambert v. Williams, 223 F.3d 257, 261 (4th Cir. 2000).  "To state such a claim, a plaintiff must allege that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor."  Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012).  Here, plaintiff clarifies he has asserted such a claim against defendants.  (See 114 at 11 n.3).

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, a government official is entitled to qualified immunity when 1) the plaintiff has not demonstrated a violation of a constitutional right, or 2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 232 (2009).

"Ordinarily, the question of qualified immunity should be decided at the summary judgment stage"; however, qualified immunity "does not . . . override the ordinary rule applicable to summary judgment proceedings." Willingham v. Crooke, 412 F.3d 553, 558–59 (4th Cir. 2005). "Thus, while the purely legal question of whether the constitutional right at issue was clearly established 'is always capable of decision at the summary judgment stage,' a genuine question of material fact regarding '[w]hether the conduct allegedly violative of the right actually occurred . . . must be reserved for trial.'" Id. (citations omitted).

Defendants argue defendant Spivey was entitled to arrest plaintiff without a warrant "because he witnessed Plaintiff commit a criminal offense when Plaintiff blocked him from leaving the field – a violation of N.C. Gen. Stat. § 14-223 (regarding obstructing an officer)." (DE 113 at 7). Defendants further argue the evidence establishes that defendant Spivey was blocked by plaintiff because there was no room for defendant to Spivey to go around the front or the back of plaintiff's truck, as supported by the dash-cam video. (Id. at 7-8).

North Carolina law makes it unlawful to "willfully and unlawfully resist, delay or obstruct a public officer in discharging or attempting to discharge a duty of his office[.]" N.C. Gen. Stat. § 14–223. "The general rule is that merely remonstrating with an officer . . . or criticizing or

questioning an officer while he is performing his duty, when done in an orderly manner, does not amount to obstructing or delaying an officer in the performance of his duties." State v. Leigh, 278 N.C. 243, 251 (1971). The statute "is concerned with acts threatening a public officer with injury only insofar as they interfere with the performance of his official duties" and "[v]iolence or direct force is not necessarily an element of the crime of resisting an officer." State v. Hardy, 298 N.C. 191, 197 (1979); see also State v. Sinclair, 191 N.C. App. 485, 488-89 (2008) (holding elements of resisting a public officer are: "1) that the victim was a public officer; 2) that the defendant knew or had reasonable grounds to believe that the victim was a public officer; 3) that the victim was discharging or attempting to discharge a duty of his office; 4) that the defendant resisted, delayed, or obstructed the victim in discharging or attempting to discharge a duty of his office; and 5) that the defendant acted willfully and unlawfully, that is intentionally and without justification or excuse.").

Here, plaintiff has put forth sufficient evidence to create a triable issue of fact as to whether plaintiff willfully delayed or obstructed defendant Spivey in discharging a duty of his office. See N.C. Gen. Stat. § 14–223.

Taking facts in light most favorable to plaintiff, plaintiff's alleged "obstruction"-- preventing defendant Spivey from exiting the field following defendant Spivey's issuance of traffic citations to plaintiff – did not occur. Plaintiff submits numerous pictures, video re-enactments, and expert reports indicating defendant Spivey could have, and knew he could have, exited the field via the middle entrance or could have easily avoided plaintiff's truck by driving around and exiting the field from the entrance which he previously used to enter the field. As alleged by plaintiff, and further illustrated in the photo reenactment below, "[t]he south end of the field where Plaintiff stopped his

truck is a very large open area, with substantial and obvious room to drive a vehicle around the location of Plaintiff's truck." (DE 115 ¶ 24).







(DE 116-4 at attachment 1; Katsaris expert report (DE 116-13) at 11-12 ("While it is Spivey's testimony that he could not exit the private property, specifically because Morgan placed his truck in a manner to block Spivey's patrol car, photos and the dash cam video refute this testimony . . . Spivey's vehicle is <u>obviously not</u> blocked in a manner that he could not drive safely around Morgan's truck"); Cloutier expert report (DE 116-14) at 7 ("review of the scene photographs and videos produced on the date of this current event as well as subsequent photographs and videos produced by the plaintiff, clearly indicated more than sufficient distance in which Spivey could have merely driven around Morgan")).[26]

Even if plaintiff did obstruct defendant Spivey, defendants have failed to put forth undisputed evidence that plaintiff did so willfully, with the intention of impeding defendant Spivey in the course of his duties. (<u>See</u> Morgan dep. (DE 116-20) at 172:22-173:16 ("Once again, didn't want to throw dirt, gavel on the patrol car, knew that'd be a charge, give him a reason to mess with me . . . ."); <u>id.</u> at 177:18-24 ("I wanted him to go on around me and leave my field.")). "Only those communications intended to hinder or prevent an officer from carrying out his duty are discouraged by [N.C. Gen.Stat. § 14-223]." <u>Burton v. City of Durham</u>, 118 N.C.App. 676, 681(1995); <u>Sowers v. City of Charlotte</u>, 659 F. App'x 738, 740 (4th Cir. 2016) (same).

The situation before the court stands in contrast to the limited number of cases addressing violation of this statute in applicable context by the North Carolina Supreme Court.[27] For example,

---

[26] Defendants' argue that plaintiff yelling "Go the F around!" contradicts plaintiff's claim that there was sufficient room for defendant Spivey to exit the field. (DE 113 at 7). However, taking facts in light most favorable to plaintiff, plaintiff's word indicates, as stated above, that defendant Spivey had room to drive around plaintiff.

[27] The North Carolina Supreme Court has addressed the statute in other contexts. <u>See, e.g.,</u> <u>Fowler v. Valencourt</u>, 334 N.C. 345 (1993) (addressing the sole issue of applicable statue of limitations); <u>State v. Hardy</u>, 298 N.C. 191 (1979) (holding resisting an officer is not a lesser included offense of assaulting an officer).

in Leigh, evidence showed that a defendant's loud, raucous, and abusive language directly interfered with an officer's attempt to continue an investigation for several minutes and where defendant physically followed the officer which "forced the officer to leave the scene" in order to continue his investigation. 278 N.C. at 248-49; see also State v. Sparrow, 276 N.C. 499, 514 (1970) (holding defendant did not resist or obstruct a police officer where she kicked the officer due to her "resentment" at her husband's arrest where she did not prevent the officer from completing an arrest because the arrest had already taken place).

Notwithstanding, defendants argues that "[e]ven if there was room for Deputy Spivey to go around him, there can be no doubt Plaintiff delayed him in doing so" and that defendant Spivey was "no doubt . . . hindered." (DE 118 at 7-8). In support, defendants cite State v. Cornell, 222 N.C. App. 184, 188 (2012), where the court found that a defendant had delayed or obstructed an officer under the following circumstances:

> The officers, members of the Greensboro Police Department's Gang Unit, observed individuals they identified as members of the Latin Kings yelling gang sLegans and signaling gang signs to a group of rival gang members. In an attempt to prevent any potential conflict during the festival, the officers approached the Latin Kings. Defendant came from behind Officer Watkins and stepped between Officer Watkins and the Latin Kings saying, "[t]hey was (sic) waving at me[,]" and "you wanna arrest me 'cuz I'm running for City Council." Officer Watkins admonished Defendant's intervention, saying, "[n]o, don't get in my face[,]" and "[g]et away. You get away from me." Officer Watkins further warned Defendant, "I'm talking to them, not talking to you" to which Defendant responded, "[y]ou don't gotta talk to them! They (sic) fine!" Defendant refused Officer Watkins' instructions to step away. Accordingly, we find that there was sufficient evidence for the jury to conclude that Defendant obstructed and delayed the officers in the performance of their duties.

This case is readily distinguishable because in Cornell, like in Leigh to which the Cornell court cites, there was an ongoing delay wherein an officer was trying to perform his duty of investigating and where a defendant refused to heed the officer's repeated warnings. Here, in

contrast, and taking facts in light most favorable to plaintiff, plaintiff was not obstructing the work of defendant Spivey nor failing to heed repeated warnings. Indeed defendant Spivey has not identified any official duty he was prevented from taking such as completing an investigation or arrest. At most, plaintiff momentarily inconvenienced defendant Spivey, and defendants do not cite to, nor is the court aware of any cases where momentary inconvenience supports a finding of obstruction or provides probable cause for arrest. Cf. Wilson v. Kittoe, 337 F.3d 392, 401 (4th Cir. 2003) ("While it may be inconvenient to a police officer for a neighbor to stand nearby and watch from his driveway as the officer works, inconvenience cannot, taken alone, justify an arrest under the Obstruction Statute," Va.Code. § 18.2–460(A)).

Therefore, when the facts are viewed in light most favorable to plaintiff, defendant Spivey lacked probable cause to arrest plaintiff for violating N.C. Gen. Stat. § 14-223 and therefore violated plaintiff's Fourth Amendment rights to be free from unreasonable seizure. The court therefore next addresses whether this rights was clearly established on the date in question, July 5, 2013, and the court finds that such right was.

Plaintiff alleges the traffic stop had been fully completed, he was free to go, and defendant Spivey was exiting defendant's land. According to plaintiff, instead of taking another exit off of plaintiff's field, defendant Spivey stopped behind plaintiff's truck, where plaintiff's truck was partially in defendant Spivey's way in "a very large open area, with substantial and obvious room to drive a vehicle around the location of Plaintiff's truck." (DE 115 ¶ 24). Thereafter, defendant Spivey immediately tried to arrest plaintiff with no warning. Were a reasonable jury to find plaintiff's testimony credible, it could conclude no reasonable officer would have believed that plaintiff was willfully and unlawfully resisting, delaying or obstructing a public officer in

discharging or attempting to discharge a duty of his office in violation of N.C. Gen. Stat. § 14-223.[28]

It was clearly established on the date in questions that an officer violates the Fourth Amendment if he effects a warrantless arrest knowing he lacks probable cause. See, e.g., Devenpeck v. Alford, 543 U.S. 146, 152 (2004) ("a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed"); Rogers, 249 F.3d at 290 ("If a person is arrested when no reasonable officer could believe, in light of the contours of the offense at issue, that probable cause exists to arrest that person, a violation of a clearly established Fourth Amendment right to be arrested only upon probable cause ensues.").[29]

Accordingly, the court denies defendants' motion for summary judgment as to plaintiff's claim for Fourth Amendment violation concerning defendant Spivey's arrest of plaintiff and finds defendant Spivey is not entitled to qualified immunity on this issue at this time.[30]

### d.    Defendant Spivey's Use of Force Against Plaintiff

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386,

---

[28] Defendants do not allege and the record does not reveal any other support for a finding of probable cause that plaintiff was engaging in a criminal offense.

[29] Additionally, whether or not plaintiff blocked defendant Spivey is a disputed material fact. "If a plaintiff has alleged a clearly established right, summary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants." Buonocore v. Harris, 65 F.3d 347, 359–60 (4th Cir. 1995); see also Schultz v. Braga, 455 F.3d 470 (4th Cir. 2006) (genuine issue of material fact as to whether passenger was making a dangerous, noncompliant movement just before agent shot him precluded summary judgment on agent's claim of qualified immunity); Clem v. Corbeau, 284 F.3d 543 (4th Cir. 2002) (officer not entitled to qualified immunity at the summary judgment stage where trial was necessary to resolve disputed facts as to whether Clem posed an immediate threat of serious bodily harm).

[30] For the same reasons, plaintiff's "malicious prosecution" claim under § 1983 survives. See Lambert, 223 F.3d at 261; Evans, 703 F.3d at 647.

395 (1989).  In determining whether the use of force was unreasonable and, therefore, whether it constitutes a constitutional violation, the court must carefully balance the "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. at 396 (citation omitted).  In doing so, the court must apply a test of reasonableness, and "[p]roper application [of this test] requires careful attention to the facts and circumstances of each particular case, including 1) the severity of the crime at issue, 2) whether the suspect poses an immediate threat to the safety of the officers or others, and 3) whether he is actively resisting arrest or attempting to evade arrest by flight." Id. (numbers added).  These factors are referred to as the Graham factors.  Jones v. Buchanan, 325 F.3d 520, 528 (4th Cir. 2003). Additionally, the court may also consider the extent of the injuries suffered by the plaintiff in determining whether the force used was excessive.  Id. at 530.

The intentions of the police officer have no bearing on the reasonableness inquiry, as the reasonableness inquiry is an objective one.  Graham, 490 U.S. at 397.  Furthermore, the objective reasonableness of a particular incident "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[,]" keeping in mind that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." Id. at 396–97.  "The court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection." Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996); see Greenidge v. Ruffin, 927 F.2d 789, 792 (4th Cir. 1991) (citation and emphasis omitted) (stating that an officer's liability must "be determined exclusively upon an examination and weighing of the information the officers possessed immediately prior to and at the very moment they fired the fatal shots").

Plaintiff alleges that defendant Spivey, without issuing any orders and "within seconds of stopping his [] car instantly exited his vehicle in an aggressive manner, extended his ASP baton," and began approaching the driver side of plaintiff's truck "in an obviously hostile manner." (DE 115 ¶ 129; Morgan dep. (DE 116-20) at 294:10-11 ("It all happed so fast and I – I weren't given no commands"); dash cam footage (DE 116-6) at 7:42:46-43:02; Johnson dep. (DE 116-37) at 378:10-14 ("He jumped out of his vehicle, slung that baton . . run around . . . to the driver's side); Legan dep. (DE 116-23) at 47:13-17 ("Q. You testified in this case that you saw that Deputy Spivey had an ASP baton on July 5th, 2013? A. Yes, sir. Q. You saw him actually extend it? A. I believe so, yes, sir")).

Plaintiff alleges first that defendant Spivey "forcefully struck Plaintiff in the head with the baton." (DE 115 ¶ 131; see also Johnson dep. (DE 116-37) at 379:18-20 ("it looked to me like he slung that baton and actually hit [plaintiff] upside the head two times with it"); Morgan dep. (DE 116-20) at 188:13-16, 300:7-13). Plaintiff additionally alleges that defendant Spivey, "who was 6'2" and 270 pounds at the time . . . grabbed onto the chest and t-shirt of Plaintiff, who in contrast was only 5'6" and 145 pounds at the time . . . and Spivey began forcefully pulling him literally out of the window of Plaintiff's truck." (DE 115 ¶ 131).

The court considers the Graham factors in turn regarding plaintiff's claim of excessive force against defendant Spivey. First, regarding the severity of the crime at issue, viewing facts in light most favorable to plaintiff, plaintiff committed no crime. As discussed above, plaintiff momentarily inconvenienced defendant Spivey. Additionally, plaintiff's alleged traffic violations had concluded with the issuance of traffic citations and defendant Spivey informing plaintiff he was free to go. See Bailey v. Kennedy, 349 F.3d 731, 743 (4th Cir. 2003) (citing Jones v. Buchanan, 325 F.3d 520, 528

(4th Cir.2003) ("Starting with the first factor, the severity of the crime at issue, Michael committed no crime. In fact, as discussed above, the police officers did not even have probable cause to seize Michael. When we considered this factor in Jones, we noted that '[i]n recent years, we have twice confronted situations in which a plaintiff, subjected to police force, had committed no crime; in each, we held that the plaintiff had stated a claim for violation of his constitutional right to be free from excessive police force.'"). Accordingly, the first factor "weighs heavily" in plaintiff's favor. See id.[31]

Turning to the second factor, whether a reasonable officer could have perceived plaintiff to be an immediate threat to the safety of the officers or others, this factor also weighs in favor of plaintiff. At the time defendant Spivey approached plaintiff to allegedly arrest him, it is undisputed that plaintiff was not armed and was sitting in his truck at a full stop.

Defendants argue, however, that plaintiff posed a threat to deputies in that plaintiff "had a recorded history of violence and obstruction of law enforcement activities and the deputies knew of his history." (DE 113 at 12). Additionally, "Deputy Spivey reasonably believed Plaintiff would use physical means to resist arrest" in that "Plaintiff was irritated he had been stopped, and Deputy Spivey reasonably believed Plaintiff blocked his exit from the field by his truck," and "Verbal exchanges between Plaintiff and Deputy Spivey only increased the exigency of the situation." (Id. at 15).

Here, the circumstances did not justify the level of force applied by defendant Spivey, hitting

---

[31] Even assuming plaintiff committed the crime alleged, violation of N.C. Gen. Stat. § 14-223, this factor would weigh in plaintiff's favor in that this alleged violation and the way in which plaintiff allegedly violated it is "a minor one." See Jones, 325 F.3d at 528 ("Even in a case in which the plaintiff had committed a crime, when the 'offense was a minor one,' we have found that the first Graham factor weighed in plaintiff's favor and upheld the denial of summary judgment to the defendant police officer.").

plaintiff twice with a baton and attempting to pull him out of the window of the vehicle. Although "[i]f an officer reasonably, but mistakenly believed, that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed," <u>Brown</u>, 278 F.3d at 369 (citation omitted), such a belief is not reasonable where facts in light most favorable to plaintiff only support a conclusion that plaintiff was "irritated," that he was not actually blocking defendant Spivey, and that defendant Spivey yelled at plaintiff to which plaintiff yelled back, both from their respective vehicles. Sheriff Defendants alleged knowledge of plaintiff's history does not translate into an <u>immediate</u> threat, particularly where under plaintiff's version of events he did not make any sudden movements or otherwise suggest that he would resist defendant Spivey's efforts to arrest him as defendant Spivey approached the truck. A reasonable jury could conclude that plaintiff did not pose an immediate threat to defendant Spivey or anyone else.

Turning to the third factor, whether plaintiff was actively resisting arrest, this factor also favors plaintiff. When viewing facts in light most favorable to plaintiff, plaintiff did not know defendant Spivey sought to arrest him and had no time in which to resist. (<u>See</u> DE 115 ¶ 131 (Plaintiff "testified that he never resisted, and he never even had a chance to do anything or become verbal with Deputy Spivey because of how quickly Deputy Spivey engaged him . . . . [If] Defendant Spivey instructed Morgan to get out of the vehicle or told him that he was under arrest . . . Morgan would have complied."); <u>see also</u> Morgan dep. (DE 116-20) at 179:6-25; 188:2-16; 193:1-23; Johnson dep. (DE 116-24) at 136:9-19 ("Q: Did you ever hear him say, stop, you're under arrest? A: No, sir. Q: Did you . . . ever see or hear him – tell Mr. Morgan to get out of the . . . truck? A:

No, sir.")).[32]

Defendants argue that plaintiff's "own testimony and the undisputed record evidence suggest he resisted arrest." (DE 113 at 21). However, when turning to defendants' citations, plaintiff testified that when "Deputy Spivey attempted to pull him out of the truck, Plaintiff never said 'I give or anything like that'" because, as further testified by plaintiff as follows:

> Like I said, I was shocked. When he jerked me and I ripped loose and fell down, we both looked at each other with a pause look like – I guess he didn't expect my shirt to tear and I didn't expect him to grab ahold of me. I didn't know what was going on, didn't think I was doing nothing wrong, and then, like I said, I hear pow and I heard pow again and watched my hand explode.

(DE 111 ¶ 30; DE 115 ¶ 30)

Defendants argue it is undisputed that "Plaintiff never complied as Deputy Spivey tried to arrest him," and that defendant Spivey "grabbed the truck's door, but it was locked" and therefore "reached in and grabbed hold of Plaintiff's shirt to extract him from the vehicle and place him under arrest." (DE 111 ¶ 52). However, even if true, these are not facts that support a conclusion that plaintiff was attempting to flee or resist defendant Spivey in any way where plaintiff had no opportunity to comply with defendant Spivey's efforts to arrest him. See Yates v. Terry, 817 F.3d 877, 886 (4th Cir. 2016) (holding third Graham factor favors plaintiff where "Terry [did not] warn Yates that he would be tased or that he could not move any part of his body. Indeed, Yates asserts that Terry never gave 'any commands.'").

Although plaintiff alleges limited injuries as a result of defendant's Spivey's use of force,

---

[32] Plaintiff additionally testified in response to the question, "[d]id you resist [defendant Spivey's] efforts to be pulled out of the truck," as follows: "By choice, no, sir. I mean -- no. I mean, the answer's no. I mean, there was nothing I could do about it. It -- it was quick. He come around and said, come here and grabbed me. I didn't have a choice one way or the other. I was snatched out of my seat and that was that. I didn't have a choice." (Morgan dep. (DE 116-20) at 192:17-25).

that fact alone is not dispositive. The above analysis of the <u>Graham</u> factors when measured against the level of force alleged to have been employed by defendant Spivey, where defendant Spivey struck plaintiff in the head with his baton and tried to remove plaintiff from his truck, leads to the conclusion "that such force was not objectively reasonable in light of the totality of the circumstances of this case." <u>See</u> <u>id.</u> at 886; <u>see also</u> <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 38 (2010) (holding one "does not lose his ability to pursue an excessive force claim merely because he had the good fortunate to escape without injury").[33]

As stated above, defendants' assert the defense of qualified immunity regarding plaintiff's excessive force claims. Thus the court having concluded that plaintiff's constitutional rights were violated must now determine whether those rights were clearly established at the time of defendant Spivey's conduct. Defendants argue that "The Wake Sheriff Defendants have not located any binding case putting Deputy Spivey on notice that he could not use physical force with a baton against a subject resisting arrest." (DE 113 at 21).

Defendants' characterization of the appropriate inquiry is incorrect in that, as stated above, there is no undisputed evidence that plaintiff was resisting arrest. Since at least 2003, it has been clearly established in the Fourth Circuit that an officer is not entitled to use "unnecessary, gratuitous, or disproportionate force" against a nonviolent misdemeanant who poses no threat to safety. <u>See</u> <u>Meyers v. Baltimore Cty., Md.</u>, 713 F.3d 723, 734–35 (4th Cir. 2013). As further clarified by the

---

[33] Regarding injuries, plaintiff testified that he received "two knots on my head" and while in the hospital "the doctors looked at them, but it didn't like break nothing." (Morgan dep. (DE 116-20) at 188:13-24). Plaintiff additionally argues that further damages may be due plaintiff as a result of defendant Spivey's alleged use of excessive force in that "Spivey's totally improper conduct placed Plaintiff in a forseeable and dangerous position of peril," which lead to plaintiff's shooting injuries. (DE 114 at 18 (citing <u>Cty. of Los Angeles, Calif. v. Mendez</u>, 137 S. Ct. 1539, 1549 (2017) ("On remand, the court should revisit the question whether proximate cause permits respondents to recover damages for their shooting injuries based on the deputies' failure to secure a warrant at the outset."))).

Fourth Circuit:

> The fact that the force used in the present case emanated from a taser, rather than from a more traditional device, is not dispositive. The use of any "unnecessary, gratuitous, and disproportionate force," whether arising from a gun, a baton, a taser, or other weapon, precludes an officer from receiving qualified immunity if the subject is unarmed and secured.

Id. (emphasis added). As the Fourth Circuit has further stated:

> In this case, it was clearly established in 2008 that a police officer was not entitled to use unnecessary, gratuitous, or disproportionate force by repeatedly tasing a nonviolent misdemeanant who presented no threat to the safety of the officer or the public and who was compliant and not actively resisting arrest or fleeing . . . . Although our decisions in Meyers, Bailey, and Jones dealt with individuals who were secured when they were subjected to excessive force, our precedent nonetheless provided Terry with fair notice that the force he used against Yates under the facts of this case was unconstitutionally excessive . . . . Even though Yates was not handcuffed, our precedent makes clear that a nonviolent misdemeanant who is compliant, is not actively resisting arrest, and poses no threat to the safety of the officer or others should not be subjected to "unnecessary, gratuitous, and disproportionate force."

Yates, 817 F.3d at 887-88.

Accordingly, the court denies defendants' motion regarding claims of excessive force used against plaintiff by defendant Spivey and finds defendant Spivey not entitled to qualified immunity at this time.[34]

> e.    Defendant Miller's Use of Deadly Force Against Plaintiff

"A police officer may use deadly force when the officer has sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others." Elliott, 99 F.3d at 642. "Officers need not be absolutely sure . . . of the nature of the threat or the suspect's intent to cause

---

[34] Given the court's holding above, it is unnecessary to address plaintiff's argument that any amount of force used during an unlawful arrest is unreasonable. (See DE 114 at 11, 16 (citing Bailey, 349 F.3d at 742 ("Because, given the facts as the district court viewed them, there was no probable cause to seize Michael for an emergency mental evaluation, the police officers also committed both false arrest and false imprisonment under state law."))).

them harm—the Constitution does not require that certitude precede the act of self protection." Id. at 644. "We assess the reasonableness of their conduct based on the totality of the circumstances, and based on the information available to the Deputies immediately prior to and at the very moment they fired the fatal shots." Hensley on behalf of N. Carolina v. Price, 876 F.3d 573, 582 (4th Cir. 2017) (citations omitted).

Plaintiff alleges that as defendant Spivey pulled plaintiff from the driver's seat, plaintiff's foot came off the brake of the truck, and it began idling forward. (DE 115 ¶ 134; see also DE 111 ¶ 28; Johnson dep. (DE 116-24) at 142:17-143:-22 (Johnson testifying he never heard the engine rev, that the truck was "sitting there idle," and the rear tires did not spin); Morgan dep. (DE 116-20) at 289:15-290:3 ("That truck rolled forward. Spivey – Spivey knows as well as I do, I mean, he grabbed ahold of me, pulled me up, truck rolled forward."). Defendant Legan testified plaintiff "was maybe 1/3 through the window and the truck started moving . . . ." (DE 116-8 at 2; criminal trial tr. (DE 116-39) at 167:14-24). Plaintiff alleges at no time did he receive any commands from any of the Sheriff Defendants. (Morgan dep. (DE 116-20) 294:20-25; Johnson dep. (DE 116-24) at 137:17-138:1-9 (testifying he never heard or saw Sheriff Defendants give instructions stating he did not "ever see or hear these deputies, any three of them, ever give Mr. Morgan a chance to get out of the truck in any way before Deputy Spivey reached in.")).

When the truck started moving, defendant Spivey dropped plaintiff back into the driver's seat where he landed with his right hand back on the steering wheel; plaintiff pushed his foot back on the brake to stop the truck. (DE 115 ¶ 135; Morgan dep. (DE 116-20) at 179:15-16 ("I noticed the truck was rolling, so obviously I started to get on the brake"); id. at 192:6-13).

Defendant Miller was standing right next to the passenger window of plaintiff's truck and,

when he saw the truck moving forward, he took aim and fired his revolver twice at close range, hitting plaintiff both times, first in plaintiff's left leg and second through plaintiff's right hand that was holding on to the steering wheel. (DE 115 ¶ 139). Defendant Miller moved alongside the vehicle the seven to eight feet it rolled while taking the two shots in immediate succession; after the shots, the vehicle stopped within a foot. (DE 115 ¶ 140; criminal trial tr. (DE 116-38) at 193:12-16, 22-25 (defendant Miller testifying truck rolled seven to eight feet and stopped within a foot thereafter); criminal trial tr. (DE 116-40) at 106:15 (defendant Spivey testifying truck rolled seven to eight feet); see also criminal trial tr. (DE 116-37) at 410:4-8 (witness Johnson testifying "[a]nd then the truck started rolling forward, and so the truck was on past me when it started rolling forward. The truck had rolled forward, it looked to me like five or six feet when the shots were fired, but they are saying seven or eight, but it looked to me like five or six.")).

As in the case of defendant Spivey, the first Graham factor weighs in favor of plaintiff. As stated, no undisputed evidence is presented that defendant Spivey had probable cause to arrest for obstruction of an officer in the course of his duties. Additionally, even if defendant Spivey had reasonable cause to arrest plaintiff for obstruction, as stated above, no undisputed evidence is presented that plaintiff resisted defendant Spivey's efforts to arrest him. Accordingly, the first Graham factor, the severity of the crime at issue, and the third Graham factor, whether a plaintiff is actively resisting arrest or attempting to evade arrest by flight, weighs in favor of plaintiff.

Turning to the second Graham factor, whether plaintiff posed an immediate threat to the safety of the officers on the scene or others, defendants argue that plaintiff posed a threat to defendants because when the truck started moving, and plaintiff and defendant Spivey were "physically 'locked up' with each other," defendant Spivey "faced serious bodily injury or death by

being run over by the truck." (DE 113 at 12). More specifically, defendants argue again defendant Miller was aware of plaintiff's prior history of violence and resistence to law enforcement and plaintiff's response to receiving the traffic citations, such as by performing "donuts," coupled with defendant Miller's knowledge that "Deputy Spivey was in contact with Plaintiff and the truck started moving," support defendant Miller's reasonable belief that plaintiff posed a threat of serious physical harm to defendant Spivey. (Id. at 13).

Plaintiff does not dispute that defendant Spivey and plaintiff were somehow physically engaged and that the truck began to move, stating the "truck simply began to idle forward slowly when Spivey pulled Plaintiff off the brake pedal, and that it never moved in any way or with any speed to drag anyone." (DE 114 at 21; see also Katsaris expert report (DE 116-13) at 14 ("any suggestion that the vehicle could have 'dragged' Spivey is not supported by the evidence.")).

Taking facts in light most favorable to plaintiff, that plaintiff's truck was idling forward because his foot had been pulled off the brake as plaintiff was a third of the way outside of the truck window while defendant Spivey continued to in some way make physical contact with plaintiff, without more, is insufficient for the court to find that plaintiff posed an immediate threat to the safety of defendant Spivey. Defendant Legan testified that one third of plaintiff's body was outside of the truck window. See Legan dep. (DE 116-39) at 158:19-21 ("And at that point Deputy Spivey had already engaged the defendant and grabbed ahold of him and was attempting to extract him from the vehicle."); id. at 167:14-22 ("Q: And do you recall letting the State Bureau of Investigation know that when you were approaching the truck Deputy Spivey had Michael Morgan maybe a third of the way through the window? A. If that is coming from the report, I would say that is fair to say. Like I said, he had his hands on him and he was attempting to extract him from the vehicle and I believe

as Deputy Spivey testified earlier, at some point he may have had him out of the seat and partially through the window . . . ."); DE 116-8 at 2 ("Spivey started to attempt to pull Morgan out of the truck . . . .")).  Additionally Johnson, who testified he was approximately the same physical size and stature as plaintiff, testified that if he were pulled through the window of plaintiff's truck, he would not be able to reach the pedals with his foot.   (Criminal trial tr. (DE 116-37) 387:11-13; 399:24-400:2).  Here, with regard to the facts specific to this case, plaintiff was not a danger to anyone else and was instead only in danger himself, danger created by defendant Spivey's alleged actions, as allegedly witnessed by defendant Miller.

This set of facts stands in contrast to those where courts have found immediate threat of harm where a plaintiff was intentionally using his or her vehicle as a potential weapon.  See Waterman v. Batton, 393 F.3d 471, 477 (4th Cir. 2005) ("When Waterman's vehicle lurched forward, the officers were forced to immediately decide whether Waterman was attempting to assault the officers ahead of him or whether he intended only to drive by them, leaving them unharmed.") (emphasis added).  Here, as testified by defendant Legan, defendant Spivey was pulling plaintiff out of his car window,  and as testified by Johnson, plaintiff could not reach the pedals.  Although defendant Miller testified otherwise, taking facts in light most favorable to plaintiff, defendant Miller was not confronted with a situation where he had to decide whether plaintiff was attempting to assault defendant Spivey.

Finally, with regard to plaintiff's injuries, it is undisputed they are significant.  (See DE 115 ¶¶ 139, 142 ("The first bullet pierced Morgan's flesh and became lodged in the bones of his left leg. The second shot ripped through Morgan's right hand that was holding onto the steering wheel . . . . Morgan watched as three fingers on his right hand exploded in front of him.")).

Taking the facts in light most favorable to plaintiff and taking into account all factors, a reasonable jury could conclude that defendant Miller violated plaintiff's Fourth Amendment right to be free from excessive force. Having determined a constitutional violation, the court considers whether defendant Miller's conduct violated a constitutional right that was clearly established at the time the conduct occurred. In other words, the court must determine whether on July 5, 2013, a reasonable officer would have known that shooting a suspect as he was being pulled out of the window of a vehicle by another officer, thus setting that vehicle in motion, would violate clearly established statutory or constitutional rights.

Defendants cite the Fourth Circuit decision Brown v. Elliott, 876 F.3d 637 (4th Cir. 2017), as definitively answering this issue. In that case, the Fourth Circuit confronted the following:

> The traffic stop at the center of this case occurred on February 28, 2012, around 8:23 p.m. That evening, officers with the Kershaw County Sheriff's Office, including Deputy Elliott, received a tip from a confidential informant that Melvin Lawhorn would be purchasing and transporting a large quantity of cocaine in a truck along a given rural road and that Lawhorn "usually carr[ies] a gun . . . when he goes and picks up dope." The detectives set up a perimeter along the route. When the truck passed Deputy Elliott, it was speeding and crossed the center line, so he initiated a traffic stop by activating his blue lights. The truck pulled over. Deputy Elliott approached the truck from the passenger side, where Lawhorn, the suspect, was sitting with his window halfway down. Deputy Mickey Sellers approached the truck from the driver's side. The driver, Darryl Herbert, kept his foot on top of the accelerator with the truck's engine still running.
>
> As Deputy Elliott arrived at the passenger door, Lawhorn jumped toward the driver's seat, put his left foot on top of the driver's foot on the gas pedal, and attempted to shift the truck into drive. The deputies shouted "freeze" and "don't move." Deputy Elliott leaned inside the passenger-side window to grab Lawhorn. However, Lawhorn successfully shifted the truck into drive, and the truck began moving forward. Moments later, Deputy Elliott, who stated that he feared for his life and that of the other officers, reached for his gun and fired one shot into the truck, striking Lawhorn in the back and killing him.

Id. at 640.

In addressing the arguments made by the parties, the Fourth Circuit determined in relevant part that "viewing the evidence in the best light for Ms. Brown, for purposes of summary judgment Deputy Elliott was neither 'stuck' in the truck nor 'dragged' by it, but the evidence was undisputed that Deputy Elliott's torso was inside the truck when he fired the fatal shot," and "With these 'circumstances of the case' in mind, we turn to the question of whether any controlling authority clearly established that an officer must abstain from employing deadly force when a suspect puts a vehicle in motion while the officer is leaning into it," holding "Ms. Brown does not cite, nor have we found, a single case that so holds." Id. at 643 (emphasis added). The court held that as of the date of the incident in question on February 28, 2012, "[n]o existing precedent placed the conclusion that [Deputy Elliott] acted unreasonably in these circumstances beyond debate" and "[n]or has Ms. Brown suggested that Deputy Elliott's actions were so extreme to place him on notice that [his] conduct violated established law even in novel factual circumstances," thus defendants were entitled to qualified immunity. Id. at 644.

The facts here, taken in light most favorable to plaintiff, are different than those confronting the Fourth Circuit in Brown, where in Brown 1) the officer received a tip that plaintiff was moving large amounts of cocaine and may be armed, 2) plaintiff put the vehicle in motion, not the officer, by jumping towards the driver's seat and eventually shifting the truck into drive, 3) plaintiff ignored commands by officers to not move, 4) the officer, not plaintiff, was in the window of the moving vehicle, and 5) the officer who employed deadly force was the officer in danger. Here, defendant Spivey allegedly put the vehicle in motion by pulling plaintiff a third of the way out of the truck window causing plaintiff' foot to be removed from the brake, defendant Spivey never issued any commands, and defendant Miller, not defendant Spivey, shot plaintiff twice as the truck "idled

forward." Based on these factual differences, Brown does not hold that the right at issue in this case was not clearly established at the time of the events in question. See id. at 643 (defining the right at issue in Brown as whether "an officer must abstain from employing deadly force when a suspect puts a vehicle in motion while the officer is leaning into it")).

Here, defendant Miller is not entitled to qualified immunity against plaintiff's excessive force claim for the same reason the court denied defendant Spivey's assertion of qualified immunity. As stated by the Fourth Circuit, "our precedent makes clear that a nonviolent misdemeanant who is compliant, is not actively resisting arrest, and poses no threat to the safety of the officer or others should not be subjected to 'unnecessary, gratuitous, and disproportionate force.'" Yates, 817 F.3d at 887-88. Before defendant Spivey allegedly hit plaintiff with his baton, plaintiff was sitting in his vehicle giving no indication of resisting arrest. Before defendant Miller allegedly shot plaintiff, he was a third outside of his truck window, pulled by defendant Spivey, could not reach the pedals to his vehicle, as the truck idled forward. In neither situation as alleged by plaintiff was anyone threatened except plaintiff. In the latter situation, as in Yates, it was defendant Spivey who created "a commotion attributable to [defendant's] excessive and unjustifiable use of force, which unnecessarily escalated tension during what can at best be described as a routine traffic stop." Id. at 889.

Defendants argue that "[n]o one disputes . . . that Deputy Spivey was in danger when the truck started to move," (DE 118 at 2) and that "[a]ll Deputy Miller knew – and all any reasonable officer in his shoes would know – is that the vehicle was moving while Deputy Spivey was entangled with Plaintiff," (DE 113 at 20), arguing also who set the vehicle in motion is irrelevant, (see id. at 20-21 ("The danger to the officer is the fact of the vehicle moving, not the reason why the

vehicle was moving)).[35]

These material facts, however, are in dispute. First, whether defendant Spivey was in danger is a fact in stark dispute.[36] (Compare Johnson dep. (DE 116-24) at 142:17-143:22 (Johnson testifying he never heard the engine rev, that the truck was "sitting there idle," and the rear tires did not spin); Morgan dep. (DE 116-20) at 289:15-290:3 ("That truck rolled forward. Spivey – Spivey knows as well as I do, I mean, he grabbed ahold of me, pulled me up, truck rolled forward."); (criminal trial tr. (DE 116-37) 387:11-13; 399:24-400:2 (Johnson testifying he was approximately the same physical size and stature as plaintiff and that if he were pulled through the window of plaintiff's truck, he would not be able to reach the pedals with his foot) with criminal trial tr. (DE 116-38) at 191:5-17) (Miller testifying that "Deputy Spivey was able to pull him up a little bit off the seat, and every time he pulled, Mr. Morgan would obviously resist down and try to put his foot down towards the gas pedal . . . . I actually gave a command to Mr. Morgan to put the vehicle in park and about the time I got done with the word park, his foot made contact with the gas pedal. He pushed it all the way to the floor. Pushed it all the way to the floor. At that point, the wheels on the truck started to spin.")).

Second, defendant Miller testified not that the parties were "entangled" but that he "could see that Deputy Spivey's hands were around Mr. Morgan's chest" and that "I know I saw both hands about Mr. Morgan's person," (criminal trial tr. (DE 116-38) at 190:11-15), meaning a reasonable

---

[35] The parties dispute what verb should be employed to describe the physical interaction of plaintiff and defendant Spivey at this instance, with plaintiff objecting to defendants use of the word "entangle," stating "[e]ntangled implies that Plaintiff was actively fighting with or resisting Spivey," but that "this was not the case" and "instead he was pulled at least one-third of the way out of the window under the total control of Spivey's force." (DE 114 at 21).

[36] Here, similar with regard to whether plaintiff blocked defendant Spivey's patrol car with his truck, material facts are in dispute precluding grant of qualified immunity. See Buonocore, 65 F.3d at 359-60; Schultz, 455 F.3d 470; Clem, 284 F.3d 543.

officer in defendant Miller's shoes would know defendant Spivey was holding onto plaintiff and, more importantly, could let go.[37]

In order to grant qualified immunity to defendant Miller at this time, defendants seek the court to hold there is a threat of serious physical harm to an officer who is pulling a compliant driver out of the window of a vehicle, causing that vehicle to idle forward, who could not reach the pedals, such that deadly force could be employed against the driver by another officer. See Elliott, 99 F.3d at 642 ("the question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force"). At this juncture, given the disputed nature of the relevant facts, the court cannot so hold.

Given the facts viewed in light most favorable to plaintiff, it is difficult to see how the plaintiff in this situation was a threat to anyone, as he was being pulled out of his truck window, much less such a threat as to justify employing deadly force. Cases cited by defendants do not hold otherwise and instead highlight the disputed nature of this encounter. See Pittman v. Nelms, 87 F.3d 116, 118 (4th Cir. 1996) (upholding grant of qualified immunity where "Banks leaned into the open window to speak to Hudson, but Hudson started to drive away. Banks's arm became caught inside the window of the car, which carried him for twenty-five to thirty feet before it swerved to the right and released his arm. Nelms then fired at the car and the bullet struck Pittman, who was seated in the back seat."); White v. Leonhardt, 1995 WL 26696 (4th. Cir. Jan. 25, 1995) (finding "lurching vehicle" controlled by suspect to pose "an immediate, direct threat of serious harm" to the officer).

Under plaintiff's version of events, defendants violated his clearly established right to be free

---

[37] Although defendants allege that as the vehicle moved forward "Deputy Spivey felt he had two choices: pull and hang on or if he let go, he would go under the wheels of the truck," (DE 111¶ 54), this fact is disputed like all other facts alleging defendant Spivey was in danger, for the same reasons already discussed in that it is alleged that the truck only "rolled forward," (Morgan dep. (DE 116-20) at 289:15).

from the use of deadly force during an arrest. Accordingly, the court denies defendants' motion regarding claims of excessive force used against plaintiff by defendant Miller and finds defendant Miller not entitled to qualified immunity at this time.

        f.     Defendant Legan's Bystander Liability

The Fourth Circuit has held that "an officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." Randall v. Prince George's Cty., Md., 302 F.3d 188, 204 (4th Cir. 2002). Bystander liability in this context "recognizes that, in certain limited situations, bystanding officers are obliged to act." Id.[38]

Plaintiff argues that defendant "Legan testified that he had his taser drawn and was standing directly behind Spivey the entire time that Spivey allegedly ordered Plaintiff out of the truck and he refused; at the time Spivey allegedly told Plaintiff he was under arrest; and during the time that Spivey physically grabbled Plaintiff and literally pulled his entire body a third of the way out of the driver's window," and therefore "a reasonable jury could conclude that Legan has bystander liability to intervene and prevent harm, and despite this he chose [to] not . . . stop Spivey in any way." (DE 114 at 26 (emphasis in original)).

Defendants argue only that the "undisputed facts and video evidence show this is not a case involving clearly egregious behavior or police misconduct." (DE 118 at 6). Defendants have failed to carry their burden on this claim necessary for a grant of summary judgment. As stated above,

---

[38] Defendants incorrectly assert that "[t]o the extent Plaintiff alleges Deputy Legan should have intervened, the failure to act is not cognizable under § 1983." (DE 113 at 10 n.3). In support, defendants cite Safar v. Tingle, 859 F.3d 241, 246 (4th Cir. 2017), wherein the Fourth Circuit held that it was not clearly established at the time in question that an officer had an affirmative duty "after a magistrate issued the arrest warrants based on probable cause," to "take steps to withdraw the warrants upon learning that the charges were meritless." Safar is inapposite to the present case.

taking facts in light most favorable to plaintiff, a reasonable juror could find that defendant Spivey used excessive force in attempting to arrest plaintiff. Additionally, taking facts in light most favorable to plaintiff, a reasonable juror, for example, could find that defendant Legan was in a position to evaluate the correctness of defendant Spivey's conduct because defendant Legan was present, had specific knowledge of defendant Spivey's allegedly unconstitutional conduct, and could have had a reasonable opportunity to prevent the harm.[39]

Accordingly, the court denies defendants' motion for summary judgment as to plaintiff's claim against defendant Legan under the theory of bystander liability.[40]

2.      Plaintiff's State-Law Claims

Defendants argue that where applicable, Sheriff Defendants are entitled to public officer's immunity and on plaintiff's state law claims of assault and battery, false imprisonment, malicious prosecution, claim on sheriff's bond, and civil conspiracy. The court will address each in turn below.

1.      Assault, Battery, and False Imprisonment

Because the court has held above that plaintiff's claims against defendants Spivey and Miller for excessive force and against defendant Spivey for unlawful arrest under the Fourth Amendment survive summary judgement and these defendants are not entitled to qualified immunity, the court finds plaintiff's state-law assault and battery claims against defendants Spivey and Miller in their individual capacities as well as false imprisonment claim against defendants Spivey, Miller, and

---

[39] As stated previously, the parties offer no argument nor case law applicable to a qualified immunity defense regarding defendant Legan's bystander liability. Thus the court does not address this issue.

[40] Because some of plaintiff's § 1983 claims against defendants Spivey, Miller, and Legan in their individual capacities survive summary judgment, plaintiff entitlement to punitive damages based on those claims survive as well.

Legan in their individual and official capacities also survive summary judgment and that these defendants are not entitled to public officer's immunity.[41] See Rowland v. Perry, 41 F.3d 167, 174 (4th Cir. 1994) (holding no qualified immunity for excessive force claim and "[t]he parallel [North Carolina] state law claim of assault and battery is subsumed within the federal excessive force claim and so goes forward as well."); Bailey, 349 F.3d at 742 ("The police officers concede, and we agree, that public officers' immunity, at the least, is unavailable to officers who violate clearly established rights because an officer acts with malice when he does that which a man of reasonable intelligence would know to be contrary to his duty."); id. (holding that the facts, viewed in favor of plaintiff as the district court viewed them, were insufficient to establish probable cause to detain plaintiff for an emergency mental evaluation, thus plaintiff's Fourth Amendment rights to be free from unreasonable seizure were violated because "[s]everal of the Baileys' other claims are intertwined with Michael's Fourth Amendment unlawful seizure claim [and because] . . . there was no probable cause to seize Michael for an emergency mental evaluation, the police officers also committed both false arrest and false imprisonment under [North Carolina] state law.").

2. Malicious Prosecution

Turning to plaintiff's state-law claim of malicious prosecution against defendants Spivey, Miller, and Legan in their individual and official capacities, the court holds this claims survives summary judgment as well. To establish malicious prosecution, a plaintiff must show that the defendant 1) initiated or participated in the earlier proceeding, 2) did so maliciously, 3) without

---

[41] The Fourth Circuit has noted that "the issue of whether public official immunity can apply to intentional tort claims, like the plaintiffs' assault claim, splits courts in North Carolina. Hensley, 876 F.3d at 587 (citing Hawkins v. State, 117 N.C.App. 615, 453 S.E.2d 233, 242 (1995) (holding that public official immunity does not apply to intentional tort claims); Campbell v. Anderson, 156 N.C.App. 371, 576 S.E.2d 726, 730 (2003) (concluding otherwise)). Because the court finds public official immunity inapplicable in this case, it is unnecessary for the court to resolve this issue at this time.

probable cause, and 4) the earlier proceeding ended in favor of the plaintiff. <u>Turner</u>, 369 N.C. at 425.[42]

Defendants Spivey, Miller, and Legan initiated and participated in the prosecution of defendant. Taking the facts in light most favorable to plaintiff, as previously determined by the court, defendants did so without probable cause and, the court finds, maliciously. <u>See</u> <u>Cook v. Lanier</u>, 267 N.C. 166, 170 (1966) ("Although a want of probable cause may not be inferred from malice, the rule is well settled that malice may be inferred from want of probable cause, e.g., as where there was a reckless disregard of the rights of others in proceeding without probable cause."). Finally, it is undisputed the earlier proceedings ended in favor of plaintiff.

Defendants argue that plaintiff's claims for false imprisonment and malicious prosecution are supported by probable cause as evidenced by the arrest warrants issued by a neutral magistrate and the true bills of indictment returned by the Wake County grand jury. (DE 113 at 25). However, all cases cited by defendants address instances where officers sought arrest warrants and indictments <u>prior</u> to executing an arrest. <u>See</u> <u>Gerstein v. Pugh</u>, 420 U.S. 103, 117 n.19 (1975) (holding "an indictment, 'fair upon its face,' and returned by a 'properly constituted grand jury,' conclusively determines the existence of probable cause and requires issuance of an arrest warrant without further inquiry"); <u>Durham v. Horner</u>, 690 F.3d 183, 189 (4th Cir. 2012) (same); <u>Wardrett</u>, 2016 WL 1408091, at *3 (holding "[i]n instances where arresting officers take the additional procedural step

---

[42] As clarified by the Supreme Court, "a false imprisonment ends once the victim becomes held pursuant to such process—when, for example, he is bound over by a magistrate or arraigned on charges," and thereafter, "unlawful detention forms part of the damages for the 'entirely distinct' tort of malicious prosecution, which remedies detention accompanied, not by absence of legal process, but by wrongful institution of legal process." <u>Wallace v. Kato</u>, 549 U.S. 384, 389–90 (2007). Here, plaintiff alleges, and the court has found for summary judgment purposes, that plaintiff's warrantless arrest was unsupported by probable cause and thus supports a false imprisonment claim. Thereafter, plaintiff became subject to the process as discussed in <u>Wallace</u>, where arrest warrants were issued for plaintiff's arrest and grand juries returned indictments.

of seeking an arrest warrant, the defendant is then arrested not upon what the officers believed, but upon the warrant that the magistrate issued," "[i]f there is valid probable cause for an arrest, it follows that there is probable cause for an arrest warrant," and "there was ample probable cause for the officers to seek an arrest warrant."); see also Turner, 369 N.C. at 425-26 ("grand jury's action in returning an indictment is only prima facie evidence of probable cause and that, as a result, the return of an indictment does not as a matter of law bar a later claim for malicious prosecution").[43]

Additionally, the Fourth Circuit has rejected defendants' argument in the context of a North Carolina malicious prosecution claim. Evans, 703 F.3d at 657 ("On appeal, the officers urge us to hold—as we do in the § 1983 context—that Prosecutor Nifong's decision to seek indictments against the Evans plaintiffs broke the causal chain between their acts and the indictments. Certainly, no North Carolina court has adopted the attenuated view of causation espoused by the plaintiffs.").[44]

Accordingly, plaintiff's state-law malicious prosecution claim is allowed to proceed against defendants Spivey, Miller, and Legan in both their individual and official capacitates.

    c.    Civil Conspiracy Claim

North Carolina law does not recognize a civil action for conspiracy. There is, rather, an

---

[43] Defendants additionally argue probable cause is established by "the officers' observations" of plaintiff committing a crime and "the denial of the directed verdict motions." (DE 113 at 26). However, the court has rejected the former argument when viewing evidence in light most favorable to plaintiff, and defendants have provided no case law in support of the latter proposition.

[44] Nor does Evans holding disturb the court's above holding that plaintiff's "malicious prosecution" claims grounded in Fourth Amendment claims brought pursuant to § 1983 survive summary judgment. As stated by the Evans court, "a police officer is not liable for a plaintiff's unlawful seizure following indictment 'in the absence of evidence that [the officer] misled or pressured the prosecution.'" 703 F.3d at 648. Here, plaintiff has maintained that defendants Spivey, Miller, and Legan "reported the same material facts to Wake County investigators, prosecutors, and the criminal trial jury" that were not true. (DE 114 at 28). For the same reasons, the court finds defendants are not entitled to public officer's immunity in that, taking facts in light most favorable to plaintiff, defendants Spivey, Miller, and Legan undertook the prosecution of plaintiff maliciously as defined in the immunity analysis context, by "wantonly do[ing] that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." Grad v. Kaasa, 312 N.C. 310, 313 (NC 1984). The North Carolina Supreme Court classifies an act as wanton, in part, by "manifesting a reckless indifference to the rights of others." Id.

action for damages caused by acts committed pursuant to a formed conspiracy. See Reid v. Holden, 242 N.C. 408 (1955). "A conspiracy has been defined as 'an agreement between two or more individuals to do an unlawful act or to do a lawful act in an unlawful way," Harris v. Matthews, 361 N.C. 265, 284 (2007), and the agreement for conspiracy "may be established by circumstantial evidence," as long as it is not founded on baseless speculation or conjecture, Dickens v. Puryear, 302 N.C. 437, 456 (1981).

Here, plaintiff argues that "there is ample circumstantial evidence from which a reasonable jury could find that Plaintiff has established a civil conspiracy claim," in that 1) "[t]he stories of all three Defendants 'lined up' perfectly in that they reported the same material facts to Wake County investigators, prosecutors, and the criminal trial jury regarding their claims that Plaintiff intentionally floored the gas pedal of his truck, causing the tires to spin and kick up dirt, and that he intentionally dragged Deputy Spivey with the truck as a deadly weapon," and 2) "minutes immediately following the shooting, all three Defendants huddled together in the field before other personnel arrived and discussed what had just transpired." (DE 114 at 28-29).

Although plaintiff overstates what the evidence reveals in that, for example, no evidence has been put forth as to what defendants Spivey, Miller, and Legan discussed while standing in the field following the shooting, (see DE 115 ¶ 144 (stating defendants "continued to talk privately and without Morgan or Johnson being able to hear")), the undisputed evidence reveals that defendants Spivey, Miller, and Legan each testified at plaintiff's criminal trial that plaintiff hit the gas in such a way that the tires of the truck spun and this in turn caused defendant Spivey to be drug alongside the vehicle. (See DE 112-8 at 105:14-106:16; DE 112-11 at 191:3-21; DE 112-13 at 159:14-16). Plaintiff has put forth evidence in opposition, alleging that defendant's version is inaccurate and that

they agreed to lie to investigators to cover their misconduct. (DE 115 ¶ 134; <u>see also</u> DE 111 ¶ 28; Johnson dep. (DE 116-24) at 142:17-143:-22 (Johnson testifying he never heard the engine rev, that the truck was "sitting there idle," and the rear tires did not spin); Morgan dep. (DE 116-20) at 289:15-290:3 ("That truck rolled forward. Spivey – Spivey knows as well as I do, I mean, he grabbed ahold of me, pulled me up, truck rolled forward.")).

Given the disputed nature of these material facts and taking facts in light most favorable to plaintiff with all reasonable inferences therefrom drawn in plaintiff's favor, a reasonable jury could conclude that defendants Spivey, Miller, and Legan entered into an agreement to do an unlawful act, namely to lie to investigators, prosecutors, and the criminal trial jury concerning the events of July 5, 2013, in order for defendants' actions to appear justified.

Accordingly, plaintiff's claim for civil conspiracy against defendants' Spivey, Miller, and Legan in their individual capacities survive defendants' motion for summary judgment.[45]

3.       Claim on Sheriff's Bond

Plaintiff's claim on sheriff's bond is a derivative claim that rises and falls with claims against defendants in their official capacities. Because plaintiff's claims against defendants Spivey, Miller, and Legan in their official capacities for state-law false imprisonment and malicious prosecution survive defendants' motion to dismiss, plaintiff's claim on sheriff's bond also survives. As stated previously by the court, plaintiff may recover on sheriff's bond for any breaches of the bond

---

[45] Under North Carolina law, a municipality's employees cannot be sued in their official capacities for conspiracy, as that would amount to a claim that the municipality itself has conspired. <u>Houpe v. City of Statesville</u>, 128 N. C. App. 334, 351-52 (1998); <u>Iglesias v. Wolford</u>, 539 F. Supp.2d 831, 835-836 (E.D.N.C.2008) (dismissing claim of civil conspiracy because "under North Carolina law, a municipality ordinarily cannot be a party to a conspiracy, and a municipality's employees therefore cannot be sued [for civil conspiracy] in their official capacities"); <u>Turner v. Randolph County</u>, 912 F. Supp. 182, 186 (M.D.N.C.1995) (dismissing conspiracy claim because "all of the named defendants are agents of Randolph County and it is not possible for Randolph County to conspire with itself").

accruing on or after October 6, 2013, up to the $20,000.00 amount of the bond.[46]

## CONCLUSION

Based on the foregoing, defendants' motion for summary judgment (DE 110) is GRANTED

IN PART and DENIED IN PART. Accordingly, plaintiff's claim pursuant to § 1983 for violations

of plaintiff's Fourth Amendment rights regarding defendant Spivey's traffic stop of plaintiff is

DISMISSED.

The following claims remain:

1) Plaintiff's claims pursuant to § 1983 for violations of plaintiff's Fourth Amendment rights

regarding defendant Legan's search of plaintiff's truck; defendant Spivey's arrest of plaintiff and

use of force; defendant Miller's use of deadly force; and defendant Legan's bystander liability;

2) Plaintiff's state-law claims against defendants Spivey and Miller in their individual

capacities for assault and battery;

3) Plaintiff's state-law claims against defendants Spivey, Miller, and Legan in their

individual and official capacities for false imprisonment and malicious prosecution;

4) Plaintiff's state-law claims against defendants Spivey, Miller, and Legan in their

individual capacities for civil conspiracy; and

5) Plaintiff's claim on sheriff's bond.

---

[46] The court previously held that plaintiff's claims for negligence and gross negligence against defendants Spivey, Miller, and Legan, in their individual capacity, except regarding their failure to possess the necessary training and experience to serve as deputies (applicable to plaintiff's fourth, sixth, and eighth causes of action) survived Sheriff Defendants motion for partial judgment and Ohio Casualty's motion to dismiss. (DE 96 at 34). Defendants argue their motion for summary judgment addresses all remaining claims, (see DE 113 at 28), and plaintiff does not argue otherwise. Neither party address any negligence claims. Thus, the court considers any potential negligence claims to either be abandoned or to have not been originally asserted by plaintiff. See Crosby v. City of Gastonia, 635 F.3d 634, 638 n.3 (4th Cir. 2011) ("Thus, the district court quite evidently considered the plaintiffs to have forgone their state constitutional claims, see, e.g., Forrest Drive Assocs. v. Wal–Mart Stores, Inc., 72 F. Supp.2d 576, 586 n.5 (M.D.N.C. 1999) (allegations neither argued nor briefed at summary judgment stage deemed abandoned), and therefore did not address those claims in its final Order.").

The parties are DIRECTED to confer and file within 21 days from date of entry of this order a joint status report specifying the estimated length of the trial, three alternative suggested trial dates, and suggested alternative dispute resolution techniques to be employed prior to trial in attempt to resolve the issues between the parties. Upon receipt of the parties' report, unless advance conference with the court is requested therein, the court will enter such further order as is warranted regarding pretrial and trial scheduling.

SO ORDERED, this the 2nd day of January, 2019.

LOUISE W. FLANAGAN
United States District Judge