UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

_____
                                )
MICHAEL J. MORGAN,              )
            Plaintiff           )
                                )   5:16-CV-00365-FL
        vs.                     )
                                )
RICKY J. SPIVEY, et al,         )
            Defendants.         )
_____)


SEPTEMBER 24, 2019
CLOSING ARGUMENTS
BEFORE THE HONORABLE LOUISE FLANAGAN
UNITED STATES DISTRICT JUDGE


<u>On Behalf of the Plaintiff</u>:

MATTHEW BALLEW, Esq.
ROBERT ZAYTOUN, Esq.
ZAYTOUN LAW FIRM, PLLC
3130 Fairhill Drive, Suite 100
Raleigh, North Carolina  27612

<u>On Behalf of the Defendants</u>:

J. NICHOLAS ELLIS, Esq.
POYNER SPRUILL, LLP
P.O. Box 1801
Raleigh, North Carolina  27602

PAUL G.GESSNER, Esq.
WAKE COUNTY SHERIFF'S OFFICE
P.O. Box 550
Raleigh, North Carolina  27602

J. MATTHEW LITTLE, Esq.
TEAGUE CAMPBELL DENNIS & GORHAM
P.O. Box  19207
Raleigh, North Carolina  27619

AMY M. CONDON, CRR, RPR, CSR
Official Court Reporter
United States District Court
Raleigh, North Carolina
Stenotype with computer-aided transcription

1          (Tuesday, September 24, 2019, commencing at 11:12 a.m.)

2                        P R O C E E D I N G S

3              THE COURT:  Okay.

4              Let's go ahead and get our jury in.

5          (The jury entered the courtroom at 11:13 a.m.)

6              THE COURT:  Ladies and gentlemen, the parties have

7     diligently and thoughtfully presented their cases to you.  And

8     now we've reached the part of the trial where each side comes

9     forward to present closing argument to you based on the

10    evidence that's been presented and the law, as the parties

11    understand it.

12             And you'll hear first from the plaintiff, then the

13    defendants will have the opportunity, and then plaintiff will

14    come forward as, again, it bears the burden, it will present

15    its -- his final closing arguments to you.  And then, I will

16    instruct you as to the law.  And then, I will recess and you

17    will retire to the jury room and that's when you can begin to

18    talk about the case.

19             All right.  Counsel, I welcome you forward.

20             MR. ZAYTOUN:  Thank you, Your Honor.

21             Good morning.  I'm Robert Zaytoun, the Law Firm of

22    Zaytoun, Ballew & Taylor.  You saw two-thirds of that firm at

23    trial; Mr. Ballew.  Mr. Taylor you didn't actually see, but he

24    actually took the deposition of Mr. Sutton.

25             And I'm often asked:  What is the average height of

1  your firm, Mr. Zaytoun?  Because Mr. Ballew is about 6'8 and
2  Mr. Taylor is a lanky, sort of an Abe Lincoln type 6'4 and you
3  see me.  So I say, we average about 6'2.
4         You're probably wondering, then, why am I going
5  first?  It's not because of my height.  Maybe it's because of
6  my gray hair.  But actually, there's an order to this process.
7  And you're going to hear from me first, then you're going to
8  hear from two lawyers for the defendants, and then you're going
9  to hear from Mr. Ballew at the end.  And that's going to be a
10 lot of talking.
11        Members of the jury, this is a very important case.
12 It's a historic case that's been tried here in historic New
13 Bern, in this historic courtroom, this majestic courtroom, but
14 history can be made by this jury in this case.  This building
15 used to be the post office in New Bern.  I know that because I
16 used to get my granddad's mail from the bottom of floor box
17 987.
18        To be here now in front of you is an honor and it is
19 an honor for our team to represent Mike Morgan.  And we are a
20 team.
21        Now, this thing right here, you probably have seen me
22 writing a lot in this.  This is sort of like my diary of the
23 trial.  And you've probably seen a lot of sticky notes passing
24 between us.  You know, in this age of technology it's still
25 important to write.  And we write a lot because we are a team.

1 And we send messages to each other very openly through those
2 sticky notes; they're important.

3        Why do I tell you this?  Because, as a team, we began
4 years ago representing Mike Morgan in a tragic incident that
5 happened in 2013.  And we are now six years and plus past that
6 event.  And we have come to the point at the end of this trial,
7 and at the end of this journey for Mr. Morgan, where you can
8 write the final chapter.  You can determine what is just, what
9 is true.

10       The word "verdict" comes from the old Latin term to
11 seek the truth.  And that's what this function has been for the
12 jury over the last week-and-a-half, to hear facts and for you
13 to decide:  What is the truth?  What happened out there?  Who
14 is telling the truth?  Credibility.  That is solely within the
15 province of you, the jury.  You decide the facts.

16       Now, His Honor -- "His Honor."  Well, that's not the
17 first time.  Judge Flanagan, as you can probably see, is an
18 excellent jurist.  She is the keeper of the law.  And I'm going
19 to talk to you in a few minutes about the law because you've
20 got to combine the truth, the facts, with the law to determine
21 what the true verdict is.  And that's called the justice of
22 what we're doing.

23       It's pretty simple equation, but it's not as simple
24 as just one, two, three because there are 10 of you individuals
25 and each one of you brings to that jury box your own lives,

perceptions, ways that you hear things, believe things. Each one of you, though, has common sense.

And we're going to ask you to put that common sense to work as you hear this evidence reviewed that you've heard over the last week-and-a-half. Because the guiding polar star for you is what makes sense. Does it make sense what they said over there? Does it jive with the physical evidence? Is it corroborated?

Those are the kinds of things that you and your power -- and it is power. Our democracy places in that jury box power. And we are very unique on this planet for this process. And I'm not trying to patronize you. I'm simply trying to tell you at this point we're going to give the case to you. Mr. Morgan is going to give his case to you. That's the way it works.

So I want to get right down to it. And sometimes to go forward you got to go backward. And I'm going to do that. Because, as you recall with the lawyers, this started with opening statements. And the judge told you it's not evidence, et cetera, but it's the opportunity for the lawyers to give you a roadmap of what they project you're going to hear from their evidence, kind of a blueprint.

Well, I look at an opening statement as actually a series of promises that a lawyer makes to the jury. And I want you to ask yourself as you recall -- and I'm going to recall

1  some of the things that Mr. Ellis said in his opening

2  statement -- did he produce?  Did he keep his promise?  Did he

3  produce the evidence he said he was going to produce?  And I

4  tell you -- and we can argue now; in the opening statement we

5  can't argue, but now we can.  I argue to you that you should

6  say a resounding no, he did not.

7         Never have we seen, witnessed such a Herculean effort

8  to construct a chair to support their version.  Well, let's say

9  it's a four-legged chair.  What happens when you remove two

10 legs?  It's going to topple over.  What if you remove all four?

11        I submit to you that Mr. Ellis and his team

12 constructed a wobbly chair that you will find you would not

13 want to sit on after he makes his presentation.  And that's not

14 just a metaphor I'm using.

15        Think about this just for four -- four legs of the

16 chair.  Deputy Spivey was trapped.  He was pinned down by

17 Mr. Morgan.  He couldn't go around.  We're going to talk a

18 little bit more about that, but you know he could have -- you

19 know he could have gone to the left or the right.  Even their

20 own expert showed you that, very clearly on the program.

21        No tire marks.  Leg number two, gone.  Where are the

22 tire marks behind Mr. Morgan's wheels?  Now, you think about

23 this:  This thing happened, it's still daylight, but then it

24 went into the night.  And what did they do?  It became a crime

25 scene.  Now, when everybody got out there to create the crime

scene, the three deputies and Mr. Johnson were there, right
there, could have been interviewed separately and taken around
that field and shown everything that they said was important
that corroborated their version of what happened.  They didn't
do that.

         But as law enforcement does, they brought in the
investigators.  They had complete control of that field.  They
had a generator.  They had lights -- the kind of lights you see
at a football field; it was so bright.  Not one single
photograph taken from behind the wheels of Mr. Morgan's truck.
Why?  The officers all testified -- Mr. Sutton confirmed that
in his last few questions, they all testified he floored it, he
stomped on the accelerator, those tires were digging in and
spitting up dirt, leaving grooves and going down until it
stopped after Deputy Miller shot him.

         Where are the grooves?  That is the most profound
piece of physical evidence that you are entitled to have if
you're going to accept their version of what happened.  Don't
you know they would have taken those photographs if they were
there?  Oh, they took plenty of photographs.  They made sure
that they documented how wild and crazy Mr. Morgan was
fishtailing around there.  You saw how clear those photos were
of those grooves.

         But you also saw the back of Mr. Morgan's truck.  You
didn't see one single photo, from point A until it stopped at

the tree line, that would corroborate what they say, and we all know and your common sense knows what would happen if you floored that vehicle with those profile tires with the ripples on them in the dirt, not on a tightly-mowed grass field like their experts did his experiments.

Fourth chair, leg of the chair, no brush. Now, you did see some brush coming off the truck when Mr. Morgan was fishtailing, but that was after they'd removed the ties and put them in the side pocket of the truck, like they always do. Did you hear anybody testify that they looked in those compartments and they weren't there?

You saw the dash cam video from the point where they were doing the tree work until they got to the field. That's quite a distance. Not a single branch on the road. And that was their fourth delivery. But, yet, Deputy Spivey says Mr. Morgan carelessly and recklessly left the road.

And we're not quite sure now, after Deputy Spivey testified, where he left the road, where he's saying he left the road. Because on cross-examination he seemed to suggest that he left the road at the middle entrance, but at the trial he testified that he left the road at the north end where things first started happening.

But the bottom line is, there is no brush on that road. And that was his basis for charging Mr. Morgan with careless and reckless driving.

1      And he tried his best to put brush into your set of

2  facts.  Remember when he drew those blue circles?

3      Can we get that up on the screen?

4      I'm out of order.  So if you can't find it, we'll

5  come to it.

6      MR. BALLEW:  Just give us a moment.

7      (Video played in open court.)

8      MR. ZAYTOUN:  Take it up to the place where you

9  recall Mr. Spivey was on that witness stand and he was being

10 asked about the brush that he said fell out of the truck.

11      Stop right there.

12      And even though his blue circles were removed -- you

13 recall your memory -- where did he draw circles to show the

14 brush in that photograph?  I would suggest that he drew the

15 circles where those two dark spots are, which is where the

16 middle entrance is and where the culverts are.

17      That doesn't take common sense, to know that that's

18 not true.  There was no brush that fell off that truck.  They

19 secured that load.  They drove normally.  They didn't speed up

20 when they saw Deputy Spivey go by them.  They didn't go down to

21 Mr. Morgan's home and try to drive into the back and hide.

22 They went to deliver their load, to unload their truck.

23      Then, they saw him come by and come back down to

24 where they were.  And the first thing that Deputy Spivey said

25 was, boy, let me see your driver's license.  Did he say:  You

just trashed out the road?  You failed to secure your load,
which is a traffic offense you can be charged with if you fail
to secure your load?  No.  Because they did secure the load.

That's four legs right there.

Now, let's -- let me give you some more to show you
just how Mr. Ellis -- I'm not picking on him.  He stood up here
and he told you what he told you, and I'm just going to comment
on it.  He said, "There will be no evidence that defendants are
rookies and didn't know what they were doing.  Thirty years of
law enforcement officers' service and thousands of hours of
training."

Now, did he tell you that included the training that
Deputy Miller had to get after he got kicked off the force for
lying?  Went into a car business.  And then, tried to come
back -- after his deposition, he came back to get his law
enforcement certification.  And the sheriff went over and
vouched for him so that he could be a law enforcement officer
when he got into this courtroom.  But did Sheriff Harrison
rehire him at the sheriff's department?

This one.  "You're going to find no evidence that
these defendants were cowboys doing whatever they wanted to
do."

Can we get the dash cam video up of the --

Now, you remember Deputy Miller and Legan were
getting ready to sit down for dinner.  They were waiting for

1  Mr. Spivey to meet them.  All three of them, the three area
2  deputies were going to be in the same place eating dinner that
3  night.  It's okay.  And they heard the call on the radio by
4  Deputy Spivey; normal voice, didn't say mayday, mayday, I need
5  backup, backup.  He just said I've got a traffic stop here and
6  I've got Mike Morgan in the traffic stop.

7            Now, what did they do?  You would have thought they
8  were responding to an armed robbery in progress.  They
9  jumped -- they left the table, if they were at the table,
10 jumped into their cars and you saw the entire dash cam video of
11 their racing, NASCAR style, through the country roads to get to
12 where Deputy Spivey was.

13           At one point -- and they didn't show this to you when
14 they were showing the dash cam of the traveling between the Two
15 Guys Restaurant -- Two Boys Restaurant and the scene.  But at
16 one point I saw them -- remember, Miller is not high-speed
17 certified.  Legan was.  But the camera was in Miller's car.  So
18 everything we see is Miller.  And we see Deputy Legan up in the
19 front.  At one point, I saw Miller cross a double yellow line
20 on a two-lane road and another vehicle is coming toward him.
21 Was that really necessary to endangerer potentially motorists
22 on the road?

23           Can you show that section?
24     (Video played in open court.)
25           MR. ZAYTOUN:  Right there.  That would have been

Miller on the double yellow line with a car coming forward.

I recall another point, they got up to 100 miles an hour on a two-lane road. All to get to where Deputy Spivey was because they were worried about weapons. Their computer screen said Mike Morgan had weapons and they were concerned.

And members of the jury, I do not want to downplay one officer's concern for his fellow officer or female officer. This is not an anti-law enforcement case. This is anti-rogue law enforcement. We need law enforcement. We need -- or we'd be in anarchy. We need to be kept safe. They put their lives on the line, that is absolutely true.

Did they need to put their lives on the line with that 100-mile-an-hour NASCAR -- where Deputy Spivey was and jeopardize the lives of somebody coming out of a driveway or a child on a bicycle?

Why did they do that? Well, they said because Mike Morgan had weapons and they were concerned for Deputy Spivey, who had not called for back up. And you saw what happened when they got there. They pulled up, flashers going. They think they killed their sirens down the road, they said. Flashers were going. And then they get out of their car and they walk over to where their conversation is happening.

Deputy Legan says he didn't have a Maglite in his hand. I saw a big, long black thing in his hand. I don't know. It didn't look like a radio. But the bottom line is,

when they got to the scene worried about Mr. Morgan with
weapons, what did they do?

Did they ask -- did they frisk Mr. Morgan to see if
he had weapons?  If they had, they didn't need to frisk him
because he was wearing a knife on his belt, a pocketknife that
he uses climbing trees.  So the whole time they are out there
with Mr. Morgan he has a visible weapon, a knife in the sheath,
in the case, so it doesn't fall out when he goes into a tree.

Well, Deputy Legan, what did he do out there?  The
whole thing is calm.  Deputy Spivey didn't say I'm glad you-all
are here, man, it's getting tense here.  No.  He was in his
squad car.  You saw -- you heard Jimmy Henley talking about
where everybody was initially before Miller and Legan got
there.  And was that a position that a law enforcement officer
would have two persons, particularly one known to have weapons,
around him?  No.  That was a calm -- Deputy Spivey wasn't
worried one bit about weapons.  He had one on each side of him
and he was in his car on his computer.

Now, when they arrived, they joined into the banter
while Deputy Spivey was still on his computer.  And what did
Deputy Legan decide to do when it came up about the
registration?  Well, he heads over and just starts willy-nilly
going into the car.  And Mr. Morgan says, you don't have the
right to go in my car and search my car; I'll go look at it.
Now, we've got three armed officers right there.  What would

be -- what possibly could Mike Morgan do but go into his car
and look for his registration?  How would that be dangerous?
But, no.

Deputy Legan -- Deputy Legan.  Interesting, two
incidents with Deputy Legan where he uses this unusual phrase,
when you go to law school you can tell me what to do.  Now,
Deputy Legan have a law degree?  I don't know.  I don't think
so.  He had a lot of advanced training, I agree.  He's now with
the highway patrol.  But he said, when you-all get a law degree
you can tell me what to do.  And then he proceeded to go right
through that car and he searched it, up one side and down the
other.

Did he pull out a bunch of weapons?  No.  In fact,
the condition of that car -- can we go to the -- I think it's
Exhibit 312 -- no.  Exhibit 312.  And pages 86 -- 75, 86 and
98.  Let's go to 75 first.

This is the photograph taken of Mr. Morgan's vehicle.
It had to be after the events happened because it was taken by
CCBI.  I'll call this the before photograph.  Look in that
front compartment.  Do you see a bunch of stuff piled up in
there, a bunch of weapons?

Now, let's go to page 98 of Exhibit 312.

This also was created, staged, I would submit, after
the event.  And, oh, there's that knife.  It's hard to see it.
It's right there near you on the seat, below that black case,

that -- they called it a tactical knife.  Do you think they

were trying to create an impression that this was an armed

truck because Mr. Morgan was supposedly a person who had

weapons?

Go, if you would, to page 86 of that same exhibit,

312.

Now, if you look at the position of that wheel chunk,

which is what Mr. Morgan uses it for -- he puts it behind the

wheels to keep the chipper from rolling backwards.  That's not

the way he keeps it.  He puts it in that little pocket and it

slips down on the floor of it.  Who propped it up with what

looks like a water bottle or some plastic bottle so you can see

it clearly?

Why were they doing that?  Because they had control

of the crime scene.  Were they trying to create an impression

that Mr. Morgan was armed and dangerous when they spent 15 to

20 minutes back at the north end of the property with him

wearing a knife on his belt and they didn't ask him to remove

it?  Why would they do that?

A few more things from Mr. Ellis' opening.

But I'll lead with this one, with -- Deputy Spivey

drives up to where Mr. Morgan is.  They're eye-to-eye because,

remember, Mr. Morgan said he pulled up so that he could still

see Deputy Spivey, but still knew he had enough room to go

around him.  And what did Deputy Spivey say to Mr. Morgan?  And

this is a person -- and there is evidence you can consider from
Lorraine who testified that Deputy Spivey said he was going to
get Mike. He said (inaudible). And I submit to you that Mike
was close enough to read those lips, "Move the F'ing truck" is
what he said.

Earlier they're watching Mike. And there is no
question of fact established -- is that when Mike Morgan saw
that he had been ticketed for careless and reckless driving on
his own property, he got upset. But he didn't get upset and
slap the ticket away and say, you're not giving me that ticket,
I ain't going to take it, let's get it on. No. He took the
ticket. He said, am I free to go, are we free to go? They
said, you're free to go. At that point, it was over.

And what did he do? He went into the next room to
blow off some steam. He got in his truck and he drove to the
other end of the field, well away from them, where if he kicked
up any dirt or rocks it wouldn't bounce on one of their cars
and they'd be on him like that for damage to State property.
But he was kicking off some steam. He says, I'll show you what
careless and reckless driving is.

Now, all 10 of you, would any of you have done that?
I would submit probably not. But was he doing anything
illegal? Did he remove himself from the officers so that he
didn't have a scene with them? Was he on private property?
Was he commanding his truck skillfully, I would say, doing

1  those doughnuts?

2          They didn't like it.  What did they say?  Was it

3  Legan or Miller, I can't remember, one of them said you going

4  to go get him?  And Spivey says, if he touches that highway,

5  he's mine.  He didn't touch the highway.

6          So they're leaving the field.  And Deputy Spivey on

7  one of the rickety, rickety legs of that chair is trying to

8  tell you that he was -- that all he wanted to do was just leave

9  the field, just get back on the road to his duties.  What you

10  see -- I'm not going to run the dash cam again because you've

11  seen it.

12          He drove right up to where Mike was.  You can't see

13  his lips on the dash cam.  Mike said, go around, go F'ing

14  around.  All right?  That's what he said.  And that's what he

15  expected him to do.  He immediately jumped out of his squad

16  car.  Did he turn on his lights, his flashers to say this is

17  now an official encounter?  No.  But he did have time to go

18  back to his car and grab his stick, that he extended.  And then

19  you heard Mr. Morgan testify he was on him like a bull rush.

20  He was mad.  He was mad that Mr. Morgan had not pleased him and

21  he didn't like Mr. Morgan.

22          You heard Jimmy Henley testify.  And you know the

23  policies of the Wake County Sheriff's Department addresses this

24  directly.  And it's tough, it's tough out there when people

25  aren't nice to you, they don't respect you.  That's part of the

1 job. It's going to happen.

2 And what did Jimmy Henley say? Don't let yourself

3 get bigger than your badge, you be the big person, don't let

4 your temper take over, don't let that person take over you,

5 that's as much a part of addressing the citizen out on the --

6 in the field as anything else they do, don't escalate.

7 One of the rules that you have heard, an officer

8 should never needlessly escalate a situation. And you ask

9 yourself this question as you collect your factual quell

10 together of what happened. At that moment, did Officer Spivey

11 escalate? I submit to you he escalated needlessly.

12 He had so many options. First of all, within seconds

13 he had two other deputies with him. So we have three very,

14 very tall, very, very large armed and dangerous -- potentially

15 dangerous deputy sheriffs surrounding Mr. Morgan, 5'7, in his

16 truck.

17 They had so many options. Mr. Spivey himself could

18 have said, okay, I'll go around. He could have easily driven

19 around him. He could have done that, to the right or to the

20 left, but I think it would have been easier to go to the left.

21 You saw Mr. Henley's reenactment. And did you see

22 the exemplar vehicle of the squad car? It's the same kind of

23 car except it had that lower trimmings on it that a Wake

24 Sheriff's deputy's car didn't have. So it's just lower to the

25 ground. Did you see how easy it traversed that ditch?

So a big issue about the middle entrance. Mr. Ellis said the middle entrance, nobody knew where it was. Well, it was visibly a flat area. But from where Deputy Spivey's perspective was with Mr. Morgan's truck, he had a cone that went from the middle entrance all the way up to underneath the guide wires to leave that field.

How many times -- use your common sense -- have you been out on the highway, I-40 or somewhere, and you see a highway patrolman parked in your direction and you go by him and, the next thing you know, he's crossing the median and you're going, oh, gosh, I hope he's not going to come get me? But they are going to do something official. Maybe they're going to answer a call. Maybe they're going to catch a speeder. They use the ditches all the time. Common sense.

The issue of whether Deputy Spivey was boxed in and trapped and obstructed and delayed is not true. The issue is: Did Deputy Spivey escalate? Was he really upset with somebody he was going to get eventually that he jumped out and bull rushed Mike Morgan? We trust your common sense will answer that question.

Just a couple of other things I remember. I don't know why they caught my memory. He said John Combs, you know, their expert who -- good man, trains law enforcement officers, but his job in appearing in cases like this is to take the version of the officers and consider it true. That's not an

objective review exactly, but that's his job. He's prohibited from taking an opposite position from law enforcement. And so he took the version of the officers, he assumed it was true and he said they acted reasonably.

Did he consider what 12 members of the Wake County jury considered? Consider the testimony of Charlie Johnson?

To get to that trial was quite an ordeal for Mr. Morgan. He was shot. He was hospitalized. He was in pain. He was literally dragged out of the hospital by the Wake Sheriff's Department two days into his hospitalization, maybe the third day, put in a wheelchair, taken down and put into a Crown Victoria where they dragged him into the Victoria, they knocked the cast off his leg that was protecting his wound in his leg. And where did they take him? To the hospital? To another hospital? No. They took him to the magistrate's office and booked him in his wheelchair, in his hospital gown.

And that is the photograph, the mugshot that Mr. Ellis showed you in his opening statement. Is that not amazing, they would show you that mugshot? They booked him in a wheelchair. Where was he going? What was the urgency of doing that? And then, they took him up to the jail.

And then, later, you heard he was shipped to Central Prison where, yes, there is better medical care than the Wake County Jail, but he was there for two-and-a-half months; no telephone, no visitors. He was treated like a death row

inmate.  While he still didn't get the care that his surgeon
said he should have gotten.  Because when his surgeon had saw
him in followup he was upset, his bandages weren't changed.
But that's not what this case is about.

The point is, what it took Mr. Morgan to get to this
trial, that criminal trial.  And you recall Rob Lane
testifying, his attorney.  Now, I don't practice criminal law.
Lawyers who do are very good at it.  They should be, if they're
representing people whose freedom is at stake.  And what did he
tell the prosecutor?  Did he go begging for a plea bargain?
No.  He told David Saacks, dismiss this case.  Mr. Morgan was
not going to plead guilty to anything because he hadn't done
anything wrong or anything illegal.  And if convicted -- and
you saw how they loaded up the charges.

By the way, did he ever get tried for resisting
arrest?  What happened to the resisting arrest, the crime that
Deputy Spivey said he was committing and was arresting him for?
I recall even the warrants that were drawn by Ms. Moore --

MR. BALLEW:  Ms. Bell.

MR. ZAYTOUN:  Ms. Bell, excuse me, who was the
investigator, they didn't mention resisting arrest.  They
ramped up the assault charges on the law enforcement officer,
two of them.

Now, there was a resisting arrest on one of the first
indictments, but it didn't even describe a crime; it had no

elements. You read it. It didn't say anything, which a charging paper must articulate. But eventually, the prosecutor, Mr. Saacks, dismissed that charge because they took Mr. Morgan to trial on the serious charges.

And, in fact, after his lawyer said dismiss these charges, they're not valid, and Mr. Saacks said no for whatever reason, he went back to the Grand Jury a year later and got him indicted for kidnapping.

So he goes to trial on the two aggravated indictments for assaulting a law enforcement officer and the aggravated assault based upon the 2005 single incident where Mr. Morgan was convicted of two misdemeanor assaults, where the assaults consisted of him going like that (indicating) to the officer and as he did he touched the deputy that was to the left of him. Technically, those were assaults.

But Mr. Ellis told you in his opening you're going to find that he was convicted of having a knife. He was not found guilty of having a knife. Otherwise, it would not have been misdemeanor assault.

But he did serve his time for that in 2005. And those two misdemeanors growing out of one incident formed the aggravation to boot up the assault on a law enforcement officer on the second indictment.

But Mr. Morgan went to trial on serious charges, including kidnapping. And why did he do that? Because he

1  was -- believed innocent until proven guilty, he did not do

2  anything wrong, he knew they had done wrong to him.  And 10 law

3  enforcement officers testified against him in that trial.

4         These three defendants and then the CCBI and the SBI

5  and all of those.  But the three people that were there

6  testified.  And all three of them have said they testified in

7  this trial and in their depositions the same way they testified

8  at the Wake County trial.

9         Now, here we are in a criminal trial in Wake County

10  involving assaulting Wake County deputy sheriffs.  Charlie

11  Johnson.  You heard Charlie Johnson testify, just like he was

12  sitting in that chair.  He was this close to you.  You had a

13  chance to watch him, to observe his face, his demeanor, how he

14  acted under cross-examination.  And he testified exactly here

15  in front of you as he did in that criminal trial.

16         And I don't know if there's any kind of statistics

17  kept on it, but usually the jury -- you will have to do this.

18  You're instructed to go into the jury room.  And the first

19  thing you do is you elect a foreman to speak for you.  A

20  foreperson to speak for you if you have questions or something.

21  That usually takes, you know, a few minutes.  In 20 minutes

22  they came back not guilty on all charges.  And they heard the

23  same evidence you heard.

24         And Mr. Morgan faced a lot of active time.  You know

25  they would have loaded him up if he got convicted.  But he

said, no, I believe in the system of justice, I'm going to

trial, I'm innocent until proven guilty.  And he believes in

now the civil justice system where now you, as I said, can

write the final chapter on justice in this case.

        Yes, he was acquitted.  Mr. Ellis said -- I wrote it

down -- "the evidence is going to show you that this hasn't

cost Mike a single dollar going forward."  Did it cost him his

freedom?  Did it cost him his right hand?  Now, he has a right

hand.  He showed you.  And you saw, quite frankly, a very

talented surgeon.  He was extremely fortunate that that surgeon

was there on-call, the trauma surgeon to do the surgery that he

did.  But now he's got the equivalent of a crab claw.

        He can pinch.  He can hold something.  He can hold a

glass.  I'm not saying his hand was amputated, but for the rest

of his life he will live with that hand -- even the surgeon

himself said it is very iffy if he can do anything with this --

not an experimental surgery, but a highly specialized surgery,

which Mr. Morgan may or may not -- well, he's going to listen

to his surgeon.  And if his surgeon says, well, I can't really

promise you too much -- he's learned to live with that hand.

And I think you saw that he's going to live the best he can

with it.

        Do you remember the video they showed you of the Bass

Pro shop?  Now, Mr. Morgan, he loved to hunt.  He lived in the

country.  He loved to hunt.  He loved to fish.  These are the

1  things he had a passion for.  His passion was climbing trees.
2  And he can still -- I guarantee you, he will put those spikes
3  on and try to climb a tree.

4          And can he do it safely?  Did the surgeon say that
5  would be a safe thing for him to do?  You need the strength of
6  two hands, you need the strength of two knees when those spikes
7  go into the tree and you have to go up that tree.  I wouldn't
8  do it.  I mean, I'm not saying I'm afraid of heights, but 120,
9  30 feet up in the air with all that equipment and a chainsaw
10  when you're cutting branches and then you're very carefully
11  lowering those branches with ropes to the bottom, that's a lot
12  of physicality.  He tried to do that after he got out of jail.
13  He tried to run his business.

14          He's tried -- he's not going to -- he's not going to
15  not fish with his son.

16          But you remember Mr. Ellis said, well, now,
17  Mr. Morgan, I saw you cast with your right hand.  And Mike was
18  up there and he said, no, Mr. Ellis, I wasn't casting with my
19  right hand, I was casting with my left hand, but I was using my
20  right -- he can use his pinchers to brace the rod.  He said,
21  can you roll back the tape and I'll show you?  Mr. Ellis said,
22  no, we don't need to do that.

23          We are not contending Mike Morgan doesn't have a hand
24  and doesn't have some use of that hand.  But he has the hand
25  that he showed you in front of the jury box for the rest of his

life.

So when Mr. Ellis told you it hadn't cost Mike
anything, it's cost him his passions, his happiness.  It's cost
him a lot.

Let's flip this around.  What did we produce to you?
What does your common sense tell you that we showed you about
what happened that day?  I submit to you that we gave you the
truth.  And we gave it to you based upon credible evidence and
the lack of evidence that they had control of.  If there were
tire tread marks behind that truck showing that he had
accelerated, stomped on the accelerator with three armed
deputies around him, maybe we wouldn't be here.  But who would
do that anyway?  Who would do that?

Instead, Deputy Spivey, and Deputy Legan corroborated
it, had him within seconds a third of the way out of his truck.
And you saw Deputy Spivey.  He's a big, big guy.  He could lift
him out.  Mike was not -- Mike was about 145 pounds back then.
He had him out and up.  And when that truck was sitting there
idling Mike had his foot on the brake.  And when Spivey bull
rushed him and lifted him out of that truck, his foot came off
that brake.  And what did you see from their own expert, even
though he did this reenactment in a field that had no dirt, it
was all grass, all that, not the same kind of tires?  That's
okay.  It doesn't matter.  Everybody agrees that diesel truck
is going to move forward on idle if your foot is not on the

brake. And when Spivey jerked him up so hard that his shirt
tore and he fell back down, Mike is trying to find the brake to
stop it, boom.

But before that first shot was fired, I want you to
think about everything Mr. Miller testified he did and saw. He
said he had time to see their faces interact. He had time to
see Mike's foot go back on the accelerator. He had to time to
see Mike put his hand on the steering wheel or on the gear
shift. I don't know. There is two different ways for them.
He had time to move along as the truck was moving. He showed
you that. He didn't need to shoot. It was unreasonable for
him to shoot.

And they are going to get up here and tell you, oh,
my gosh, that Deputy Spivey was about to die, get dragged to
death and I had to shoot to keep that from happening.

And, you know, Deputy Miller said we're trained to
shoot center mass, but I couldn't shoot center mass. In other
words, shoot at the body because Deputy Spivey was right there
on the other side of the door. So I shot at his foot and his
hand.

Well, he missed his foot, but he hit his left knee.
How did he hit his left knee at an angle going down? He didn't
need to shoot. It didn't need to happen. It didn't need to
get escalated. It was over, free to go until Deputy Spivey
escalated it.

 1          Now, I cannot sit down without talking a little bit

 2   about the law.  And you're going to get the Judge's jury

 3   instructions.  You're going to have them.

 4          Your Honor, I believe -- will the jury get the

 5   instructions?  Yes.

 6          So -- but I'm not going to make a mistake about

 7   trying to remember the instructions.  I'm going to read from

 8   them on what you're going to get.  But you're also going to get

 9   a verdict sheet.

10          Can you put that up on the screen now?

11          And you're going to be asked as jurors to answer a

12   series of questions.  And they're yes-or-no questions.  And

13   these questions go with each of the claims that this jury is

14   going to consider that have been brought.

15          The first one is:  Was Mr. Morgan's Constitution

16   rights -- now, we are dealing with constitutional law, the

17   Fourth Amendment.  It keeps us all free from unreasonable

18   search and seizures.  It's a long body of law under our Bill of

19   Rights.  That's the first question you're going to be asked, to

20   address Mr. Morgan's claim for unlawful search.  And I'd like

21   to read the law that the Judge is going to tell you that you

22   consider.

23          This is what you're going to get.  "The Fourth

24   Amendment prohibits unlawful vehicular searches without a

25   warrant by officers during traffic stops.  Generally, an

officer cannot search a stopped vehicle unless the officer
obtains consent" -- no, no consent -- "secures a warrant" -- no
warrant -- "develops a probable cause to believe the vehicle
contains evidence of criminal activity." No. That element is
not met.

Is it a search incident to a lawful arrest?
Mr. Morgan was not arrested in that first go around. They
can't claim they searched incident to an arrest.

And was there any evidence that the vehicle was going
to suddenly flee away? They call that exigent circumstances,
where you have to stop it and search it before evidence
disappears. Not a single one of those elements are met.

And I submit to you that you should answer that
question yes, he was subjected to an unconstitutional search.

The next question: "Did Defendant Spivey violate
plaintiff's Constitutional rights by committing an unlawful
arrest?"

Now, I've kind of talked about that quite a bit. I'm
not going to go back over it. But do you remember Mr. Henley
talking about officers and how they shouldn't let their badge
get bigger than their badge, they should be the biggest guy on
the field, should control their tempers? He said that one of
the most abused charges in law enforcement is resisting,
obstructing, delaying. When officers are trying to come back
and justify what they did, they slap that charge on there.

It is a crime to resist and obstruct and delay an
officer.  But from the evidence you've heard, did Mike Morgan
obstruct Mr. Spivey so that he was trapped, he couldn't leave
that field and return to his duties?  I think your common sense
tells you no, he had not committed a crime.

Now, there's going to be conflicting testimony for
you to consider about what was said to Mr. Morgan.  And
Mr. Morgan says not a single thing was said to him, such as
step out of the vehicle, you're under arrest for resisting and
obstructing an officer, with two other officers right there.
You're just going to have to weigh the credibility.  Mr. Morgan
says all he knew is Spivey went around the back of his truck
and the next thing you know he hit it and he's pulling him out
of the truck.  He used force on him.

Was that a lawful arrest?  I would submit that you
answer that question it was not lawful and that Mike's
Constitutional rights were violated by committing an unlawful
arrest, and that you should answer that question yes.

Third question:  "Did Defendant Spivey violate
plaintiff's Constitutional rights by using excessive force
during an arrest?"

Well, first of all, it wasn't a lawful arrest.  Even
if it was, did Detective Spivey need to run up, grab Mr. Morgan
and start yanking him out of his truck, knowing the truck was
running, to arrest him?  Did he not have other options?  Wasn't

Legan right behind him with a TASER? Why didn't he just step
back and say, Mr. Morgan, come on out of the truck, turn it
off, we're going to have to TASER or pepper spray you or
something. There is three officers there. No. He didn't give
Mr. Morgan time to do anything but try to hold on for dear life
as he's pulling him out of the window of his truck.

I would submit that you answer that question, that
Detective Spivey violated plaintiff's Constitutional rights by
using excessive force during the arrest, yes.

Next question: "Did Defendant Legan violate
plaintiff's constitutional rights by failing to stop Defendant
Spivey from using excessive force during the arrest?"

Now, when we went back to the search, that is a claim
against Deputy Legan. He's the one that searched. He's the
one that said when you get a law degree, you can tell me what
to do, I'm going in. Isn't that interesting, how that
paralleled with what he did with Mr. Kyle, Mr. Morgan's son,
when he went to the house looking for Mr. and Mrs. Morgan?
Remember, he said there were two incidents?

But in that one, Deputy Spivey wasn't there. And
Legan was there. And Legan was going to search that house.
And he said step outside in your underwear and sit with these
female officers while he went through the house. No warrant,
no exigent circumstance, nothing. He's just going to do it.
And what did he tell Kyle? When you have a law degree, you can

1   tell me what to do.

2         So did Defendant Legan violate plaintiff's

3   Constitutional rights by failing to stop Defendant Spivey from

4   using excessive force during the arrest? Now, you might think,

5   hmm, that's a tough one, Mr. Zaytoun. Did you see how tall

6   Mr. Legan is and how big he is? And he said in the criminal

7   trial he's three feet behind Deputy Spivey when Deputy Spivey

8   was pulling on Mike. And he corroborated that Mike was

9   halfway -- a third of the way out of the window.

10        Under Wake County Sheriff's deputy policies and

11   training, you have a duty to intervene and stop one of your

12   fellow officers if they are effectuating an unlawful arrest and

13   using excessive force.

14        What would have stopped Deputy Legan? Just grabbing

15   Mr. Spivey and saying let's chill out here, we don't need to do

16   this, let's step back here, let's talk about this. What did he

17   do? He stood there. He did nothing. He had his TASER and he

18   did nothing. Could he have intervened? He certainly could

19   have intervened. Should he have intervened? Yes. He had a

20   duty to intervene at that point. But Deputy Spivey was running

21   that show at that point. And he didn't intervene. And I

22   submit, you should answer that question yes.

23        "Did Defendant Miller violate the plaintiff's

24   constitutional rights by using unjustified deadly force against

25   him?"

I've talked a little bit about Defendant Miller already.  I won't go back over that.  But Defendant Miller -- even Mr. Sutton said -- he picked two seconds sort of as the time when they say things happened quickly, but you remember the testimony about what Deputy Miller did.  First of all, he goes around to the passenger's side and he's pulling his weapon and he's aiming it into that passenger side.  That's his first response.  Not a TASER, not a pepper spray.  He pulls out his deadliest of weapons.  And then he proceeds to talk about all that he observed happened during that time as he's moving, as the truck is starting to move.  It wasn't a split second.

Mr. Cloutier and Mr. Henley both said that Deputy Miller should not have pulled the trigger.  Remember when -- I remember this.  When Mr. Henley was doing the demonstration of what he, himself, as an undercover officer, found himself confronted with, he was in the back seat, undercover, his fellow officer was in the front seat, had a suspected male prostitute in the front seat, and he had us come out here -- and he didn't tell me we were playing musical chairs.  So I sat down here and Mr. Ballew sat down over here.  And Mr. Henley said in that encounter when he got out of the car to say, okay, the gig is up, you're under arrest, what happened?  That suspect in the front seat reached for a little knife he had in his pocketbook, I guess, and slashed across the front of Jimmy Henley's shirt.  Fortunately, he had on a lighter vest under

his shirt because he was undercover, but it literally cut his shirt. He was directly assaulted by that individual. And he said, I had my hand on the trigger, I could feel my hand on the trigger, but I didn't shoot because if I had shot I might have hit my fellow officer. So instead of using deadly force, he managed to disarm the suspect and then placed him under arrest. But he certainly had been assaulted with a knife. Mr. Miller wasn't assaulted with anything. He didn't squeeze the trigger.

Now, why is that important? Because when you get to the point where you consider whether a reasonable officer -- when confronted with what Mr. Ellis is going to tell you is the totality of the circumstances, would a reasonable officer have fired, you got to consider a lot of things about Mr. Miller, including that he says he saw Mr. Morgan put his foot on the accelerator and was accelerating as he was moving across.

Now, the recreation by Mr. Sutton showed an accelerating vehicle. Use your common sense. And even Mr. Sutton can see to this. It would be pretty darn hard to run at almost a sprint as that vehicle is being accelerated and gain target acquisition and fire, especially safely.

But when he showed the idling vehicle moving forward, wasn't that, in your common sense and what you actually saw on the screen, more likely than not what happened? The vehicle was idling as Deputy Miller was moving and reflecting and thinking what a reasonable officer should do, but, yet, he says

he was reasonable in shooting because he put his foot on the accelerator.

So you've got to gauge his testimony about shooting Mr. Miller on whether that's credible; that that vehicle was under full acceleration. And I submit to you, the evidence, the physical evidence, the credible evidence is that that vehicle was not accelerating; and if it had been, Mr. Miller would not have been able to -- he'd been out of breath before he fired.

Their own evidence shows that Mr. Miller was not shooting into an accelerating vehicle under full throttle.

You should answer that question yes, Defendant Miller did violate Michael's Constitutional rights.

Now, this last one is framed against each deputy as: "Did Defendant Spivey" -- and it goes on to restate the same claim against Legan and Miller -- "violate plaintiff's Constitutional rights by causing criminal prosecution to occur against him without probable cause?"

Now, have you ever seen a legal team try so hard to keep those officers away from the process of issuing that warrant, getting that indictment, getting that second indictment? They didn't have anything to do with that. That was the investigator.

The Judge is going to tell you -- and bring this up on the charge, jury instruction -- that if the prosecuting

agency is deceived at the front end by the officers and then
that carries its way through the pipeline of the system, which
is what that investigator did -- as you recall her testimony,
the investigator, was that she interviewed Miller and Legan.
Now, Spivey and Legan. She didn't interview Miller, I believe,
because he was the shooter. She interviewed Charlie Johnson.
And they tried every way they could make it appear that she
went in and just argued the case neutrally, argued Charlie
Johnson's position, but, yet, on the warrants that she typed
out and that were in the system when she went over to get the
warrants issued, the two witnesses listed -- and you can look
at those warrants; I won't bring them up now -- were Spivey and
Legan, not Mr. Johnson.

Have you ever heard the term garbage in, garbage out?
Well, that's what happened. She got their version and she took
it and it worked its way through the system. There was no
objective, neutral determination. The magistrate stamped out
those warrants, those two warrants.

And on those two warrants were the language
Mr. Morgan accelerated the vehicle. Where did that come from?
I asked her. This language on the warrant about accelerating
the vehicle, who told you that? She said, Deputy Spivey told
me that.

Now, is that what Mr. Johnson said? The eyewitness,
who testified in front of a Wake County jury; that found

1   Mr. Morgan not guilty.  No.  He said, he didn't hear the engine

2   roaring, he didn't see any dirt jumping up, he didn't hear

3   any -- the sound of acceleration, foot on the pedal, metal to

4   the pedal, metal to the metal, whatever it is.  No, he didn't

5   see that at all.  And that's what he told the jury in Wake

6   County.  And that's what he told you.

7           But to believe Deputy Miller and Deputy Spivey and

8   Deputy Legan gave truthful information, which could have been

9   corroborated by controlling the crime scene that night -- they

10  could have said, okay, you say he accelerated and he dug in,

11  let's go out there and let's take pictures of those grooves.

12  No pictures because it didn't happen.

13          But their whole foundation for their case is that

14  Mike Morgan accelerated that truck when he was being yanked out

15  of the truck by Deputy Spivey who never should have been there

16  to begin with.

17          You should answer that question garbage in, garbage

18  out, causing criminal prosecution to occur.  They caused it by

19  their information at the headwaters of that river.  It ran all

20  the way through the criminal justice system until it finally

21  came to the day of reckoning in a jury trial in Wake County.

22  That's where the buck stopped.

23          But until then, oh, probable cause.  Mr. Ellis is

24  going to tell you, probable cause by the magistrate, probable

25  cause by the Grand Jury.  Where did that probable cause come

from?  Where did that suit get made from?  And -- what those deputies put in it at the beginning.

I'm done.  Sorry I've taken this long, but every lawyer who makes an argument like this in a case that's important doesn't want to go over there and sit down and say, oh, I forgot something; gosh, I wish I said that.

I just want to say this to you:  I'm going to say it again, this is not an anti law enforcement case.  We should respect our law enforcement officers, but we should expect our law enforcement officers to act according to their training, to restrain themselves when they should because they're the -- in this incident, they had the deadly force.

Each one of you drove here in a vehicle.  Mr. Ellis is trying to tell you that you got a deadly weapon under you. Well, you know, under the right circumstances, any vehicle can be a deadly weapon.  But Mr. Morgan was not using his truck as a deadly weapon out there.  The deadly weapons were in the hands and in the custody of those law enforcement officers.

And they left a legacy for Mr. Morgan that will last him a lifetime.  And Mr. Ballew is going to talk more about that when he comes back and speaks with you at the end of this case.

But your verdict, it will be final.  It will last everybody in this courtroom a lifetime.  And I ask you to do this:  Each one of you, go to that place where nobody else can

1    go in you and ask yourself, what is the truth?

2            I know the truth.  Have the courage.  Like that Wake

3    County jury, stand up for the truth, even if it means ruling

4    against these three law enforcement officers and all of their

5    lawyers, have the courage to do the right thing.

6            Thank you.

7            THE COURT:  Thank you, Counsel.

8            Ladies and gentlemen, the Court has made arrangements

9    for your lunch.  I'm going to discharge you back to the jury

10   room.  And when the food is finally set up -- and shouldn't be

11   more than a minute or two -- someone will knock on the door and

12   let you know.  And we'll take a 45-minute lunch break.

13           Everybody stay seated as our jurors leave the room.

14       (The jury exited the courtroom at 12:31 p.m.)

15           THE COURT:  So we'll close the courtroom -- rather,

16   the second floor.  And when the jurors have finished their

17   meal, the Court security officer will let the spectators know.

18           Counsel, if you need to move about, just bear in mind

19   that the jury is in the break room.

20           There will be time to look at the exhibits another

21   time, I can tell you.  So take your 45 minutes.  And we'll see

22   you back at 1:15.

23       (The proceedings were recessed at 12:32 p.m. and

24   reconvened at 1:15 p.m.)

25           THE COURT:  Let's get our jury in.

1          Thank you.

2          Who is going first?

3          MR. LITTLE:  I am, Your Honor.

4          THE COURT:  And second?

5          MR. LITTLE:  Mr. Ellis.

6          THE COURT:  Okay.

7      (The jury entered the courtroom at 1:16 p.m.)

8          THE COURT:  You've heard a part of the plaintiff's

9   closing argument and now I invite defense counsel to come

10  forward and offer you theirs.

11         MR. LITTLE:  Thank you, Judge.

12         Good afternoon, ladies and gentlemen.  I'm Matt

13  Little, and I'm from Raleigh.  And I have the privilege of

14  representing Josh Legan, Rickey Spivey and Casey Miller.

15         First thing I want to do is thank you for your time.

16  You guys all have families, you have jobs, you have lives.

17  You've taken time away from those things to be here with us

18  this week.  I appreciate it and my clients appreciate it.

19         I usually am the most direct person in the room.

20  That's my nature.  I'm going to be very direct with you-all

21  today.  I will respect your time and I would appreciate if

22  you'd listen to me for the next 30 minutes, and then I will sit

23  down.

24         Judge Flanagan is going to talk to you about the law,

25  but your job as jurors is to use the common sense and find the

facts.  That's your job.  When you really get down to brass
tacks, your job is to decide what are the facts and who do you
believe.

I'm not going to spend a whole lot of time talking
about things Mr. Ballew said or Mr. Zaytoun said or anybody
else.  I want to talk to you about what the evidence shows and
what we believe you should find at the end of the day.

So let's start off with where this story begins for
Mr. Legan or John Legan and Casey Miller.

Can you put up the first image?

They are sitting at a restaurant about 12 miles -- is
it coming up?  I don't -- oh, there it is.  Okay.

They're sitting there at that mall, that strip mall,
at a restaurant, 12 miles away.  And they have worked in
western Wake County for a number of years.  They've all been
trained.  They've all gone through the BLET training.  They
have had all of the stuff required to be deputies.  And they
worked for Sheriff Donnie Harrison, who was the sheriff at the
time.

They also worked in that part of the county with
Ricky Spivey.  And you have to understand, Wake County is one
of the biggest physical counties.  The deputies are very spread
out.  And those are the only three deputies on duty in that
chunk of the county.

And they hear Ricky Spivey come on the radio and say,

hey, I'm making a traffic stop.  And unlike his normal course
of conduct, he says I'm stopping Mike Morgan and Charlie
Johnson.  And that language means something, ladies and
gentlemen.  It means that he's putting their names out there to
his fellow law enforcement officers, letting them know who he
was with.  And why did he do that?  Because he knows about Mike
Morgan.

            Now, if we could go to the next page, the CAD alert,
please.

            You all have seen this.

            Sorry; we got a little bit of lag time.

            There we go.

            That's the opening page of the CAD alert.

            And if you can go to the next page, please.  The
shot.

            That is, indeed, Mr. Morgan in several of his
mugshots; two different ones.

            And if we can go to the language page, please.

            And if you-all can see that, it says, "This is the
residence of Mr. Morgan, who is known to have weapons and be
assaultive of law enforcement."

            They are not the only ones on the CAD system, ladies
and gentlemen.  The fire departments are on the CAD system.
EMS people are on the CAD system.  Anybody that goes to Michael
Morgan's residence, or that field across from it, is warned you

need to be careful with this gentleman.

Why are they warned?

If you can put Exhibit 93A up, please.  There we go.

They are warned because Mr. Morgan has had a long history of violent encounters with people, including law enforcement.

Now, you heard testimony from the deputies about what they knew about him.  Mr. Morgan assaulted a State trooper and a Wake County deputy and was convicted; served 150 days for that.

You also heard that he had an encounter with a repo man who showed up to repossess one of his vehicles and he shot an AK-47 rifle at him.

You heard other testimonies from the deputies about things he's done in the past.  Mr. Morgan has a hot temper.  And we'll talk about that in a little bit.  It's obvious he does, both from his history and from the way he behaved on the day we are here to talk about.

He's somebody they need to be careful of.  So Josh Legan, Deputy Legan, and Casey Miller hear this and they think, okay, we're going to stop dinner right now, we're going to get in our cruisers and we're going to drive there.

And I'm not going to play the video of the transit from the mall to the field.  Yes, they were driving fast.  Why were they driving fast?  Because they were concerned about

Ricky Spivey; they did not want him alone with Charlie Johnson and Michael Morgan in that field.

There was one high-speed driving instructor in this courtroom this week, ladies and gentlemen. One and only. And that's Josh Legan. Mr. Cloutier is not a high-speed driving instructor. Mr. Henley is not a high-speed driving instructor. No other witness in the case or anybody who set foot in the courtroom is. And Mr. Legan testified that he's the one who instructs other State troopers how to drive safely at high speeds. They got there safely. No one was hurt. It was not reckless. And he's the only one in a position to even say.

Now, when they got there, about a half mile from the scene they cut off the lights and they cut off the sirens. So they arrive and they assess the situation. All right. Now, if they jump out of the vehicle with their guns drawn or with TASER or something and rush out there -- they've got a situation when they arrive that appears calm.

And you can see them -- and if you can cue up the video -- when they get there, the situation is calm, which is a good thing; not a bad thing. So they get there.

And you'll see them in just a moment here.

(Video played in open court.)

MR. LITTLE: They get out and they walk across to help figure out what's going on, okay?

Every bit of testimony is that they had a

professional, calm interaction with Michael Morgan and Charlie
Johnson. Mr. Morgan said it. Deputy Spivey said it. Deputy
Legan said it. Deputy Miller said it. That's a good thing.
They were not doing anything to needlessly aggravate the
situation.

When they're there, Mr. Morgan is asked for his
driver's license and he's asked for the registration of the
vehicle. Mr. Morgan knows he does not have a valid driver's
license; it has been revoked. How does he know that? Because
he was stopped by Deputy Legan in 2011. It was revoked from
that stop, but he had been stopped in March of 2013 by the Cary
Police Department and given another ticket for having a revoked
license. So not less than three months before Mr. Morgan was
told, you don't have a good license. He knew it.

Mr. Morgan also did not have a registration for that
vehicle. He didn't have it titled in his name. He didn't have
the tags in his name. He didn't have the insurance in his
name. And he did not have it registered. So he's asked for
the registration. He says it's in the console. Deputy Legan
says, okay, I'll go get it from the console. And he did, went
and looked in the console, said it's not there. Mr. Morgan
said look in the glove box. He looks, it's not there. Those
are the only two places in that vehicle where Deputy Legan
looked.

And one of the things that we're going to talk about

is the instructions that Judge Flanagan is going to read to
you.  And I'm going to read a small section of the language
that she'll read to you-all in a little bit.  And this is about
the search.

        And she will read:  "Probable cause to search a
vehicle exists where the known facts and circumstances are
sufficient to warrant a person of reasonable prudence in the
belief that contraband or evidence of a crime will be found."

        All right.  So that language says that Deputy Legan
can look where there's evidence of a crime.  In this particular
case, in 2013, driving with no registration was a misdemeanor
offense under Chapter 20.  Dave Cloutier said it was an
arrestable offense.  Mr. Henley said it's an arrestable
offense.  The deputy said it was an arrestable offense.

        Deputy Legan is allowed to go look for the one place
where that registration would be located according to
Mr. Morgan.  So there is no problem with that.  But even more
basically, he did not search that vehicle.  He just didn't do
it.  If he had searched the vehicle thoroughly, he would have
been looking for weapons.  CCBI did indeed search the vehicle
and did document what they found.

        And if you could put up the picture, please.

        All right.  Mr. Zaytoun is right that they did search
the vehicle after Mr. Morgan had been arrested.  And they did
so and they documented what they found.  There's a picture of a

knife there in that picture.  They did find it.  They took a
photograph of it.

Next picture, please.

On the other side there's another knife that they
found on that seat.

And the third picture.

And there's this wooden club in the door that
Mr. Morgan claims is a wheel chuck.

If Josh Legan had been searching that vehicle, one of
the things he would have done, knowing about Mr. Morgan, is
look for weapons.  If he had found weapons in the vehicle, he
would have kept them until the encounter was over.  He didn't
find any of these things.  You know why he didn't find any of
these things?  Because he wasn't looking.

He just simply did not perform a search on that
vehicle.  It did not happen.  He went looking for the one thing
he was looking for, in the place Mr. Morgan told him it was
located, and he didn't find it.  Why didn't he find the
registration?  Because it didn't exist.

Now, if you can, please, go to the aerial photograph.

So everyone who's testified about the traffic
encounter so far has said that this was a calm, professional
encounter.

And we've heard an awful lot about this middle
entrance to the field.  And we've seen this aerial photograph

over and over again.  Mr. Morgan testified Friday that
thousands of vehicles had transited into the middle entrance.
Well, if thousands of vehicles transited the middle entrance,
there would be worn tracks there, not tall grass.  Deputy
Spivey did not know it existed.

Was there a culvert pipe there?  Yep, there was.  Did
Deputy Spivey know it was there?  No, he didn't.  He came in
the southern entrance of that field, which is a gravel,
well-marked entrance.  It's where he knew to come in.  He came
up the field and met with these two guys.  But the idea that he
deliberately chose not to exercise this other entrance is just
not supported by any evidence.  It wasn't clearly visible to
him and he just didn't know it was there.

So Mr. Morgan -- if you can go to the next one, the
screen shot, please.

Mr. Morgan was shown this same video we've been
talking about and said, okay, mark on the screen where the
middle entrance is.

Give us just a moment.

And the funny thing was, after looking at the film
for about 10 minutes, he put the entrance in the wrong place.
So even Mr. Morgan doesn't know where it is all the time.  And
he's lived across that road for over a decade.

So we've got this situation, now we're turning to
Deputy Legan and Deputy Miller.  They arrive at the scene.  And

1  after the traffic encounter is over, what do they do?  They

2  calmly start walking back to their vehicle.

3         If we can play the next section of the video, please.

4    (Video played in open court.)

5         MR. LITTLE:  And if you watch, at the time they're

6  walking back to the vehicle, Mr. Morgan is down at the other

7  end of the field having a tantrum.  And he's angry and he's

8  upset and he's putting the gas to the floor in that vehicle.

9  But are Deputy Legan and Deputy Miller doing anything about it?

10 No, they are not.  If they had a vendetta to get Mr. Morgan, if

11 they were out to get him, as has been suggested, they had

12 multiple opportunities to do so.

13        When he drove that vehicle with a revoked license,

14 that was a misdemeanor; they could have arrested him and put

15 him in handcuffs.

16        When he drove that vehicle without a registration,

17 that was an arrestable offense; it's a misdemeanor, they could

18 have put him in handcuffs.  They chose not to do so.  They gave

19 him traffic tickets instead.

20        Now, everything is calm at this point.  Nobody is

21 doing anything.  The next major event occurs when Mr. Morgan

22 makes a choice.

23        And if we can play the next section, please.

24    (Video played in open court.)

25         MR. LITTLE:  And you've seen this video over and over

again -- probably 15 times so far this week, so I apologize for playing it again, but as you watch, Mr. Morgan backs up, comes forward and stops.

Stop the video, please.

When you look at that screen, you can see the rear axle of the truck and you can see the front axle of the truck and you can see Deputy Spivey's cruiser in between them.  That truck is completely across that path and he is blocking Deputy Spivey's exit from the field.

And if you'll put up Exhibit 150, which is the statute.

Mr. Cloutier here sat there the other day and said that, oh, that -- he's not really blocking him, that's just a trick angle from the camera.  I'll leave it to you-all, you can see what the video shows.

The statute says -- and I apologize since I can't read it from over there -- "If any person shall willfully and unlawfully resist, delay or obstruct a public officer discharging or attempting to discharge a duty of his office, he shall be guilty of a Class 2 misdemeanor."

Mr. Morgan was the only one in that truck.  No argument the truck was mechanically defective; that the throttle didn't work, that the steering wheel didn't work, the brakes didn't work.  He chose to stop that truck where he chose to stop that truck.  And he meant to block Ricky Spivey.  No

other reasonable explanation for his conduct. He was angry and he was acting out.

Now, Mr. Johnson has given a good deal of -- a good bit -- ah, a good deal of testimony about what he claimed he seen and heard. And there was one piece of testimony from the very end of Mr. Johnson's testimony that I would like to read to you.

If you can put it up on the board, please.

Mr. Johnson was asked:

"QUESTION: All right. You told Mr. Ballew just a second ago that Deputy Spivey was facing away from you so you couldn't hear what he said, correct? Is that right?

"ANSWER: Yes, sir.

"QUESTION: So if he gave Mr. Morgan an order to get out of the truck or told him he was under arrest, you wouldn't have heard that, if he said it, right?

"ANSWER: No, sir."

So Mr. Johnson is about 20 feet behind Deputy Miller, looking slightly uphill. Deputy Spivey is on the other side of the 3500 Dodge. And he's yelling at Mr. Morgan, get out of the truck, you're under arrest, okay? Mr. Johnson admits he's not in a position to hear any of those words so the only witnesses to that conversation are Mr. Morgan and Deputy Spivey. And you have to choose who you believe.

Would he have gotten out of his car and said to a

1  person that he believed committed a crime you're under arrest?

2  Of course, he would.

3          Would he have said to a person in that vehicle get

4  out of the vehicle after he told him he's under arrest?  Of

5  course he would.

6          So, perhaps, the single biggest -- and one more

7  thing.  I want to hit on this before we go any further.

8  There's been all this testimony, all this dancing around about

9  the issue of the ASP baton.  An ASP baton is an extending steel

10  rod, about 20 inches long, weighs about a pound.  Okay?  If you

11  hit somebody hard in the head with that thing, it will leave a

12  mark.

13          And so one of the things I asked Dr. Erdmann at his

14  deposition -- if you can put the record up; and you-all heard

15  his testimony -- was:

16          "QUESTION:  Look, you're a board certified,

17  highly-experienced trauma surgeon; you specialize in facial and

18  head wounds.  You examined that guy's head yourself on July the

19  5th of 2013 at Duke University Medical Center.  Did you see any

20  sign at all; any lumps, any scratches?  Any marks at all?"

21          And the answer is:

22          "ANSWER:  No."

23          The emergency department physician examined

24  Mr. Morgan's head, not a mark.  The triage nurse examined

25  Mr. Morgan's head, not a mark.  Dr. Erdmann examined his head,

1  not a mark.  Dr. Beretta, Dr. Erdmann's resident, examined his

2  head, not a mark.

3          Mr. Morgan in his discovery deposition claimed he's

4  been hit in the head twice with a baton, not a mark.  So if

5  Mr. Morgan is willing to be untruthful under oath about that

6  topic, what else is he not telling the truth about?

7          So if we can, please, turn to the Sutton photo.

8          Now, probably the single biggest factual dispute in

9  this case that you-all have to resolve is to decide why did

10 that vehicle move forward.  Everybody agrees it moved forward.

11 Did it move forward because Mr. Morgan was dragged off the

12 brake or did it move forward because he stepped on the gas?

13         That's why Mike Sutton was hired, to answer that

14 question.  So he and Mike Whitley, the gentleman in this

15 picture, went out to the field and they took a laser survey.

16 And they got really good physical data from that field.

17         Next picture, please.

18         And they were trying to figure out a couple of

19 different things.  One, they wanted to understand the slope of

20 the field.  If it's a real steep downhill slope the truck will

21 move forward at a certain pace; if it's uphill, it'll do

22 something else.  So you can see, they took about 50 different

23 survey marks to obtain really good data from that field.

24         Next picture, please.

25         And what they then did is created that topographical

1  map.

2          If you can stand it a little bit, please.  Thank you.

3          So now we know what the field is like.

4          Oh, there we go.

5          It's important for a couple reasons.  One, Mr. Sutton

6  needed to figure out how far does that vehicle travel from

7  where it stopped in front of Deputy Spivey until where it comes

8  to rest on the wood line.  And he ends up measuring it at

9  40 feet.  That's two full truck lengths, which means the truck

10  moved its length and then its other length again.  So we now

11  know how far the truck moved.

12          So then, the next question is:  Okay, everybody has

13  said that after Mr. Morgan's shirt tore and he fell back in

14  that car, the truck moved and the events of the shooting were

15  like that (indicating), a second or two, okay?

16          And we know from where the shell casings are that the

17  shooting occurred about 20 feet from where the truck began to

18  move, okay?

19          If we can go to the next picture, please.

20          So what Mr. Sutton -- this is one of the CCBI

21  pictures.  What he did is, he figured out -- that picture is

22  the final resting place of the truck.

23          Next picture.

24          And you can see where he looked and made sure he

25  understood where the shell casings were, which are ejected from

1　the gun to the right, as he shoots the gun, five to seven feet.

2　So that means from where that shell casing is there, Casey

3　Miller was seven feet back to the left when he pulled the

4　trigger on that gun.

5　　　　　Next picture, please.

6　　　　　And you can see, both of the shell casings are

7　basically in a straight line from the rear axle of the truck.

8　So he's -- at the time he shot that gun, he's five to

9　seven feet to the left of where you see those evidence flags.

10　　　　　So what Mr. Sutton did, because he's a scientist and

11　an engineer and an accident reconstructionist, is he said,

12　okay, scientific method, I look at the data, draw associations

13　between the data, I form a hypothesis and I test my hypothesis.

14　　　　　Okay.  I'm going to figure out what are the two

15　stories being told here.  Story number one, that Mr. Morgan was

16　dragged off the brake, the vehicle slowly eased forward and

17　Deputy Miller shot him.  Story number two, that Mr. Morgan hit

18　the gas, dragged Deputy Spivey and Deputy Miller shot him to

19　try and disable him.

20　　　　　So what Mr. Sutton did is, he did these two tests

21　that you-all saw this morning.

22　　　　　If you can play the first one, please.

23　　　　　This is what the truck looks like when you let it

24　idle forward.

25　　　　　(Video played in open court.)

1          MR. LITTLE:  Did I do good, Madam Court Reporter?

2          Okay.  I promise not to talk while it's on.

3          So it takes four seconds for the truck to move

4    seven feet under idle.  It takes seven-and-a-half seconds for

5    the truck to move the 20 feet, to the point where Deputy Miller

6    shot, under idle.  There has been no witness that said that

7    much time took place in this event.

8          Please, play the next video.

9        (Video played in open court.)

10          MR. LITTLE:  All right.  That's the test under

11    throttle.  It takes just a fraction over two seconds to cover

12    the 20 feet if you step on the gas.  And you-all remember the

13    testimony of these witnesses.  Everybody said it was quick.  If

14    you step on the gas, it happens quickly.  If you don't step on

15    the gas, it does not happen quickly.

16          So Mr. Sutton said, in my expert opinion, as a

17    Master's level mechanical engineer, the physical evidence from

18    the CCBI, the witness testimony and everything, this event is

19    consistent with Mr. Morgan stepping on the gas.  That was his

20    expert opinion.  And that's what happened.

21          Now, you-all have to go back and decide -- and I'm

22    going to talk to you about two legal claims here.  One I've

23    talked a little bit about, the search claim.  Mr. Ellis is

24    going to talk to you about the probable cause issue, use of

25    force issues and stuff like that.  And I'm not going to spend

your time repeating what he's about to say to you.

I've already talked to you about the search issue. Deputy Legan testified he didn't search the vehicle; if he had, he would have found those items and he would have impounded them until the encounter was over. It just didn't happen.

The other issue is this issue of bystander liability. And one of the other things that Judge Flanagan is going to read to you is, "In certain situations bystander officers have an obligation to intervene to prevent constitutional violations by a fellow officer."

And she's going to give you a couple things that you have to find and the plaintiff has to establish by the preponderance of the evidence.

"First, that Deputy Legan knew that Defendant Spivey was violating plaintiff's constitutional rights to be free from unlawful arrest or from excessive force."

He had to know it. He had to understand that this arrest was unlawful. How would he have known that as he's running up from his vehicle and Deputy Spivey is encountering him? To his knowledge, Deputy Spivey could have said you're under arrest, get out of the vehicle. The two of them are engaged with each other when he arrives.

"Second, Defendant Legan had a reasonable opportunity to prevent the harm."

In other words, in this really fast event he had to

have time and space to do something.

"And third, the Defendant Legan chose not to act to prevent the harm."

And once again, there's no evidence that he went through the thought process and thought, hey, I'm going to do something or I'm not going to do something.

And I told you a little while ago I wasn't going to talk about opposing counsel a whole lot, but I have one observation to make. Mr. Zaytoun sat there and talked about the six years that his firm has represented Mr. Morgan and this lawsuit has been pending for multiple years and we've been here a week and a couple days. Deputy Legan sat up there on that stand for over an hour on direct examination and they asked him two questions on cross. Is that the best they have? They spent three years suing him so they could ask him one or two questions?

Now, the jury instructions that Judge Flanagan is going to read you talks about the burden of proof. And for almost all of the issues in the case, the burden of proof is on the plaintiff.

And when you-all were sworn in, you agreed to take the law from Judge Flanagan that she will instruct you and carry out your duties as a juror. And the instructions will be that the plaintiff must prove, the plaintiff must prove more likely than not that the things he says happened happened.

That not only the facts that he says happened, but that these constitutional violations occurred.

And I ask you respectfully, at the end of the day, when you go back and deliberate on these two issues that I'm talking about, the search and the bystander liability claim, that you enter the box for "no" on those things.

Thank you for your time.

THE COURT:  Thank you, Counsel.

And now other counsel for defendants will come forward.

MR. ELLIS:  Thank you, Your Honor.

I want to talk to you for just a little bit this afternoon.  I'm going to try not to repeat some of the things that you've heard from Mr. Little; may do so.

I think lawsuits -- most people come to court thinking, when they're going to serve on a jury, that lawsuits are involving disputed facts and, again, as everybody has said, having the jury try to sort out those disputed facts; and then, have those facts, once they've been resolved, applied to the law and we come up with a verdict.

I think one of the issues in this case that you've heard about that is disputed is, again, what caused the truck to move.  Now, I want to talk to you about what the evidence has shown in that case.  Because what caused the truck to move is Mr. Morgan.  Mr. Morgan is driving the truck, we all know

1 that.  He is being arrested.

2          I want you to just think about this -- and make sure

3 everybody understands that what Mr. Sutton did was with math.

4 And math is usually a black or white equation.  There's not a

5 lot of gray in math.  So what did he do?  Again, he says, we

6 know where the truck started, we know where it stopped and we

7 know where the shell casings were, we know how far the shell

8 casings eject, so if it stopped here, the shell casings are

9 here, then that means Deputy Miller is here.  And if the truck

10 starts there, from there to here is 20 feet.  Pretty sensible,

11 pretty logical, pretty mathematical.

12          And therefore, you say, well, okay, how long does it

13 take the truck to go 20 feet?  And what did all of the

14 witnesses say?  Again, all of the witnesses -- Mr. Morgan

15 Friday afternoon on three occasions said:

16          "QUESTION:  How long was it from the time the truck

17 started to move until Deputy Miller discharged his weapon?

18          "ANSWER:  A second or two."

19          And so as Mr. Sutton showed, if you accelerate -- and

20 this was putting it all the way down, if you accelerate, then

21 in about two-and-a-half seconds it goes 20 feet.  It brings you

22 to the point where the shots would have been discharged.

23 Thousand one, thousand two.  All the witnesses says it happened

24 really fast.

25          If it idles -- we saw what happens when it idles.  He

said the average time was seven-and-a-half seconds.  Thousand one, thousand two, thousand three, thousand four, thousand five, thousand six, thousand seven.  None of the witnesses said that much time elapsed from the time the truck started to move until the shots were discharged.  So the math tells us that it is in two-and-a-half seconds.  And the only way the truck goes 20 feet in two-and-a-half seconds is with the accelerator being pressed down.

When Mr. Combs testified, counsel on cross-examination said:

"QUESTION:  You've accepted the version of the facts as presented by the deputies?"

Now, he said:

"ANSWER:  Yeah.  I'm not here to judge who is telling the truth and who's not.  I am looking at it from their perspective.  And if I look at it from their perspective, what are the conclusions I make?"

And then, when I asked him on redirect, I said:

"QUESTION:  Well, let's see what truly is in dispute."

Because we all have heard all of the witnesses talk about the totality of the circumstances.  And as we went through that we heard, that the totality of the circumstances were not in dispute.  Similarly, what's not in dispute?

The plaintiff, Mr. Ballew, I'm assuming is going to

1  come up next, and I think earlier today, or when this trial

2  started, said they would be asking for millions and millions of

3  dollars.  That's a lot of money, obviously.  And they're going

4  to ask for those millions and millions of dollars based on

5  what?

6          Who was Mr. Morgan before July 5th?  He was somebody

7  who had been in two car wrecks; torn rotator cuff; torn bicep;

8  compression fractures; a motorcycle accident; a

9  falling-out-of-the-tree workplace accident; 17 broken bones;

10 anxiety I think through most of his life, taking Xanax to

11 address that; taking pain medication for all of these injuries

12 and other things that he had.  That's who he was before.

13         He says -- and his counsel will tell you that, well,

14 he must have been hit with this ASP baton over the head, but he

15 said Friday afternoon, well, it was either the doorjamb or the

16 ASP baton, I'm not sure.

17         If you're asking for millions and millions of

18 dollars, you need to present credible evidence that you're sure

19 of.

20         You heard Mr. Little just say that the three medical

21 doctors at Duke University -- nobody found evidence of any head

22 or trauma injury.  Mr. Morgan says, well, you couldn't see it,

23 but my wife could tell, she could feel the bumps on my head.

24 Well, I'm not sure where the wife has been this week.  Now, we

25 heard something about her father and having some oral surgery

1    or something.  This case has been pending for three years.

2           Dr. Erdmann didn't come to court and testify, but

3    arrangements were made for Dr. Erdmann to be videotaped for his

4    deposition.

5           Mr. Johnson, he didn't come to court and testify, but

6    arrangements were made by plaintiff and his attorneys to

7    videotape his deposition that could be shown to you.

8           If these bumps and knots truly existed and

9    Mrs. Morgan truly felt them, just ask yourself:  Wouldn't she

10   have come to court in some fashion, either on that stand or a

11   videotape deposition like apparently everybody else was, and

12   then presented that evidence to us if it is truly the evidence,

13   if it's truly credible?

14          We know Mr. Morgan has not been to see the doctor

15   since the fall of 2013 for his hand or his knee.  We know that

16   in May of '14 he's working at Evergreen.  And, of course,

17   Evergreen, you've heard, is a place where he got into an

18   altercation.  And this is, again, about 10 months or so after

19   this encounter.  He tells you, well, I went to work there with

20   my buddy and -- but I quit because my attorney got my house

21   arrest conditions changed so I could go back and run my own

22   business.  Well, then, we find out, no, you got in an

23   altercation with a coworker, you got in an altercation with a

24   customer, and you got fired.

25          But you had a workplace accident, you say; and you

went to the doctor's office.  And the doctor's office on May the 5th said you had full range of motion of your lower extremities; that means the knee that you got shot in you had full range of motion in, just like your right.

The week after that, May 16th, you go back to the emergency room for this workplace fall.  The doctor says your gait is stable.  And everybody saw Mr. Morgan move around this week.  I don't think there is any real contention that he is -- has any difficulty walking or anything of that nature.  But certainly in the medical records showed that he didn't have any problems; that his strength was five of five in his right leg and in his left leg.

We also heard that his physical lifestyle -- and I'm talking about this because Mr. Ballew, Mr. Morgan's lawyer, again, is going to come to you and he's going to ask you to reward his client with a substantial amount of money.

So his physical lifestyle before and after, how has that changed?  He still hunts duck.  He still hunts dove.  He still hunts deer.  He still hunts squirrel.  He said squirrel you use a rifle; if you use a rifle, you have to get in the stand, you've got to get eight feet off the ground.  You didn't hear any evidence about any difficulty doing any of that.  He does fish.

And the Bass Pro shop video shows what it shows.  And if there's any contention that Mr. Morgan is anxious and can't

go out into the public, well, for whatever reason that day he was able to go out there with Mr. Johnson and his wife and buy a fishing rod and a fishing reel and a lot of other things he said. Did he appear to have any difficulty or impairment whatsoever moving around, manipulating the rod and reel with his hand, casting? No.

He says he still rides an ATV in his field.

He talks about his business. We kind of heard about the mysterious Mike's tree business somewhat. He's not making a claim, and there's no evidence at all that's been introduced that he couldn't make a living, he couldn't make a go at it because of this. So he hasn't told you he's lost any money up-to-date. He's not told you, well, I can't work going forward because of this injury. So I can't do anything, so reward me for that. So there has been no evidence that he's impaired or unable to work.

He got a job with Evergreen doing landscaping business, operating heavy equipment that, unfortunately, he lost because of some of his behavior on the job.

The tree business. He said, well, when I did get back at it after Evergreen in 2014 and 2015, I was able to climb a 100-foot tall tree, use a chainsaw, use a pole saw, use ladders, use stepladders.

Mr. Morgan's attorney this morning, I think, said, but he can't do it safely. Well, in the year of 2014 and 2015

that he did it, did he ever say, well, I tried to do it and I fell or I tried to do it and I dropped a piece of equipment or I tried to do it and I couldn't handle my tools?  No.  All he did was say, yeah, I could still get up a 100-foot tree and use all the same gear that I used before this ever happened.

He's going to tell you that he's got an emotional impact on him from all of this.  And what is that?  Mr. Morgan actually didn't say a whole lot about how this has emotionally impacted him.  But what did he do?  He brought Kyle Cox in to testify about, well, we used to throw the baseball together, we used to throw the football together, we used to play basketball; not so much basketball, it wasn't his favorite, but we did all those things.

And then, what is the most telling thing about the credibility of Mr. Morgan?  These are simple questions.  You said your son dropped out of high school.  When did he drop out?  And you saw him on the witness stand, he couldn't tell you when his son dropped out of high school.  What grade was your son in when he dropped out, Mr. Morgan?  I don't know, I can't tell you, all I was worried about was my defense.

Well, I'm talking about in 2014 and 2015.  And this is the one witness from your family that you're going to bring to court as justification for a multi-million-dollar award and you can't even tell the jury when he dropped out of school, what grade he was in?  He couldn't even tell you what school he

attended.

And just ask yourselves, if this is such an emotional impact on somebody, shouldn't they be coming to you from the witness stand and say, you know, I tried to help my son stay in school, I encouraged him to stay in school, he was in ninth grade at Wake Roosevelt High School; I remember going talking to his teachers, trying to encourage him, you know, so he would stay in school?  None of that came from Mr. Morgan.

On this issue about damages, about awarding money, the burden of proof is on the plaintiff.  And I'm talking about this because they're going to talk about it.  The Judge's instruction is going to say, look, that's part of the case, but you don't consider that at all until you've considered whether or not the burden of proof on liability has been established by the plaintiff.

So let's talk about that now.

Again, they tried to say, well, Mr. Combs, these facts are disputed, you shouldn't even consider them.  Well, what is not disputed?

It's not disputed that Mr. Morgan was assaultive of a highway patrolman and a Wake deputy before and he was convicted of it.  The criminal jury never heard that.

The CAD alert, C-A-D alert that Mr. Little showed you a minute ago, that's undisputed.  The criminal jury never heard that.

1          Shooting at a tow truck operator who is trying to

2    repossess your car, that's undisputed.  The criminal jury never

3    heard that.

4          Mr. Lane has represented him six or seven times in

5    other criminal cases.  The jury never heard that.  That's

6    undisputed.

7          The day of this incident Mr. DiMarino said Mr. Morgan

8    told him he was trying to stop his bad boy ways.  That's

9    undisputed, the criminal jury never heard that.

10          The day of going to take the debris -- now, I think

11    there's probably some type of suggestion that Deputy Spivey had

12    it out for Mr. Morgan.  But Mr. Morgan said, I've never filed

13    any written complaints against Deputy Spivey; he's never even

14    stopped me.  And so what did the suggestion become this

15    morning?  Oh, they had it out for the plaintiff.

16          Well, let's talk about, again, one of the reasons --

17    multiple reasons why he was stopped on July 5th.  This is from

18    Mr. Johnson.

19          "QUESTION:  When you passed Deputy Spivey's patrol

20    car, did you or Mr. Morgan say anything to each other?

21          "ANSWER:  No, I didn't say nothing.  But if I recall

22    right, I'm sure Mike was talking about he's probably going to

23    mess with us because the tree limbs in the back of the truck,

24    they were stacked above the cab, and -- and -- and hanging

25    outside, which, I mean, they were strapped, but, I mean, the

load -- I mean, I'm sure going down the road it didn't look good to a police officer."

"QUESTION:  Did you say that Mr. Morgan said he's probably going to mess with us?

"ANSWER:  Yeah.  I mean, we figured that he was probably going to mess with us because of the way the load looked."

That's Mr. Johnson's sworn testimony.

Now counsel this morning said, well, Mr. Morgan was driving normally to take this load of debris.  Is it normal to drive with a revoked license for a year-and-a-half?  Is it normal to drive a truck for months and months with an expired registration?  Is that normal behavior?

You remember the driving with license revoked? Mr. Morgan testified, I thought my lawyer was going to get all that fixed for me, not my fault, not my responsibility, not my responsibility to know whether or not I have a valid driver's license.

The expired registration?  Well, that was this Richard Swain guy, his fault, not my responsibility.

Yeah, the Cary police officer did stop me in March of 2013, just a few months before this, and, yeah, I didn't have a license then, yeah, my registration was expired then, not in dispute.

Well, when he said that I said the truck was owned by

my boss -- and I've never worked for Mr. Richard Swain, that was my son. My son said dad is the boss man. So the officer must have misunderstood what he said. Not my fault.

Again, what's going on in the traffic citations? There is no questions about that. Everybody is behaving the way they should behave at that point in time.

Deputy Spivey, described by the plaintiff himself as professional. And then what happens? Then Mr. Morgan gets some tickets and he doesn't like them. And he thinks, I'm on private property, I'm on my land, I can do what I want. So he starts doing the doughnuts. And he does that. And we seen in the dash cam -- when you're looking at the deputies behind, are they sitting there getting ready to go? No. Everybody is just kind of milling around talking. Deputy Spivey enters the field at the southern end to begin and he is exiting at the southern field to end. None of these facts are in dispute.

Deputy Spivey is leaving. Nothing is unusual. Now, the -- I'll just talk briefly about this, but -- I have to. The middle entrance. Again, Mr. Morgan testifies, well, I can kind of tell because I know where it's at, but I don't -- I don't know if anybody else could.

Friday afternoon could Mr. Morgan even tell where the middle entrance was? He put his points here and then he said, nope, that's in the wrong place, let me start all over again.

Again, this is credibility. If you say that there's

a middle entrance, but you, the owner of the land, the guy who

maintains it, can't look at a picture and tell where it is, but

then try to project that there's this middle entrance that's so

well marked that thousands of trucks and cars have gone over

it -- but we saw the picture of that, none of the grass is beat

down, none of it is mowed down, there is no tire tracks there.

So what does then Mr. Morgan do?  He goes to the end

of the field where he has an unobstructed view of Deputy

Spivey.  He makes three intentional, purposeful moves with that

truck.  He backs it up, he pulls it ready forward and he puts

on the brakes right in the middle of the path for one reason,

to obstruct Deputy Spivey.

What does he do once he stops?  And excuse my

language, but this is what the evidence is.  He says, "You

ain't going no fucking where.  This is F'ing private property."

This is Mr. Morgan stating that I'm in charge.

Now, counsel this morning said he wasn't trapped.

Well, let's look at the statute, 14-233.  I know you've seen it

before, but I want to make sure we all understand what the law

in North Carolina is versus what Mr. Morgan and his counsel may

say it is.  And we all have heard it before.  And there it is

in front of you.  And let's see if the word "trap" appears

someplace.  If any person shall willfully and unlawfully

resist, delay or obstruct -- resist, delay or obstruct -- then

you have committed a crime.

     1          And one of the things we'll talk about in a minute is

     2     the severity of this crime.

     3          But you're going to have an issue before you:  Were

     4     the plaintiff's constitutional rights violated by an unlawful

     5     arrest?

     6          Again, you people probably all feel like you

     7     qualified for the BLET class after this week and last week.

     8     Probable cause is what is required to make an arrest.  Probable

     9     cause -- and the judge is going to explain it in her

    10     instructions, but it's not beyond a reasonable doubt, it's not

    11     even by the preponderance of the evidence, which is what your

    12     burden is in this case, it is less than 50 percent.  It is just

    13     having some reasonable belief that the crime has been

    14     committed.

    15          And why does it not say trapped?  We're talking about

    16     not some of us being in a parking lot and somebody gets in the

    17     way of the other person and says, you know, I don't like the

    18     color of your truck, I'm going to sit here and block your way.

    19     Resist, delay or obstruct -- and it's not quantified.  It

    20     doesn't say by five minutes or by 30 seconds or makes you take

    21     a detour by 45 seconds or, well, I'm okay to do that as long as

    22     you can drive through the utility pole and the guide wire exit.

    23     It just says resist, delay and obstruct.  And why?  Because --

    24     and this is from the State of North Carolina Supreme Court,

    25     talking about this statute.  This is the case of State vs. Lee.

It goes all the way back to 1971.

THE COURT:  Sustained.

MR. BALLEW:  Objection.

THE COURT:  Sustained.

MR. ELLIS:  You've got a situation where it's not a private person trying to obstruct or delay another private person.  It's somebody trying to obstruct or delay a law enforcement officer.

And what that law was put in place for was to prevent the exact type of thing that the plaintiff did on July 5th.  So when you're asked the question on your verdict about were Mr. Morgan's constitutional rights violated by an unlawful arrest by Deputy Spivey, all of this undisputed evidence is no, that they were not violated because probable cause did exist.

Now, the next issue that you'll consider as far as constitutional rights being violated is the use of force.  Now, Mr. Cloutier here and Mr. Henley, basically their entire opinions were based on them assuming that no, there was no delay or obstruct.  Because they all -- when I asked questions and when Mr. Little asked questions -- said yes, if the truck was going straight and they both -- and this is Mr. Henley; well, I misunderstood you first time, Counsel, yeah, but I agree, if the truck is sitting here and the deputy's patrol car is here, it's going to hit.  There is no dispute about that.  That's not a disputed fact.  So they all acknowledge.

1          And the law that we've talked about, 15A-401, it

2  talks about what you have to do to make an arrest.  You have

3  probable cause to make an arrest and then either a person can

4  submit, which this didn't happen, or the law enforcement

5  officer is authorized to use force to effect the arrest.  Mr.

6  Cloutier, Mr. Henley acknowledged, yes, they can use force.

7          The statute says -- well, can they go inside of a

8  vehicle to use force to effect an arrest?  The statute says

9  yes, they can.  The witnesses all said yes, they can.

10          All Deputy Spivey did was put his hands on the

11  plaintiff and try, as this statute permits him to do, to effect

12  his arrest.  His constitutional rights were not violated.

13          None of those facts are in dispute.

14          Of course, we have to address the claims against

15  Mr. Miller, Deputy Miller.  Now, first of all, one of the

16  things said this morning is he was kicked off the force.

17  Deputy Miller was straight about that, he was not kicked off

18  the force, he resigned.  Why did he resign?  He made a dumb

19  mistake.  But did he try to pin it on somebody else or blame

20  somebody else?  No.  He went and accepted the fact that what he

21  did was something that he shouldn't have, told the sheriff

22  about it, and resigned.

23          And what did he also tell you?  That he's now come

24  back into law enforcement, the Criminal Justice Standards

25  Commission of North Carolina has said you are acceptable to be

a law enforcement officer.  Sheriff Harrison, who was his

sheriff at the time, his employer, was there at the hearing.

But when looking at what Deputy Miller did and what

he's confronted with, again, what's in dispute and what's not?

Everybody, Mr. Henley, Mr. Cloutier -- everybody says this

truck can be a deadly weapon.

The law in this statute, as we've talked about

multiple times, says that when confronted with a deadly weapon,

when confronted with bodily injury to you or to someone else

and it's imminent, that you are authorized to use deadly force

to prevent that from happening.

The judge is going to talk about, well, when you

consider all of this, as far as the objectively reasonable --

and "objectively reasonable" just means not what I personally

may think in a situation, but what would someone who is

reasonable looking at the situation think.

And the judge will say, well, you look at the

severity of the crime.  Again, resisting, delay and

obstruction.  This is not just painting graffiti on the wall of

a building.  This is not just going into a warehouse after

hours and stealing some property.  This is taking an

intentional, willful action against a law enforcement officer.

And the State of North Carolina, like every other

state, has said you've got rights as an individual, but they

don't trump your ability or give you an ability to go delay and

obstruct law enforcement officers.  So the severity of the

crime, it's against a law enforcement officer.

The immediate threat to the officer.  This is the

opportunity -- again, the truck's a deadly weapon.  Deputy

Spivey and Mr. Morgan -- Spivey has given multiple commands;

Mr. Morgan has not complied with any.  The truck is moving.

Everybody understands that.

Now, they dispute why the truck moved, but the truck

moved for one or two things.  Mr. Morgan intentionally puts his

foot on the accelerator or if his foot comes off -- and his

foot, obviously -- if it's on the brake, it has to come off the

brake to get on the accelerator.  It's just common sense.

He says, no, my foot came off the brake because I was

getting pulled up by my seat.  Every witness, including

Mr. Morgan, says I got pulled up, my shirt ripped, and I came

right back down.  So did his foot come off the brake for half a

second and then go right back on the brake or did his foot come

off the brake and go right down on the accelerator?

Which of those comports with the math that you heard

from Mr. Sutton?

There is no question that Mr. Morgan was responsible

for making that truck move.  There, likewise, is no question

that when this deadly weapon moved that Deputy Spivey could

have been dragged underneath it.  And there is no question that

the law in North Carolina says that permits you to use deadly

1  force.

2         So did Deputy Miller violate any constitutional

3  rights of Mr. Morgan?  The answer to that is no.

4         Now, the last claim that I'm going to talk about is

5  this malicious prosecution.  And all of the evidence, of

6  course, is that this was presented to multiple parties.  It was

7  presented to Magistrate Judge Cronk, who found probable cause

8  to believe.  It was presented to another magistrate, Judge

9  Phillips; I find probable cause to believe.  None of these

10 deputies went to the magistrate and testified and said just

11 listen to us, we'll tell you what happened, you issue these

12 warrants based on what we're telling you, nobody else.  They

13 didn't go to the district attorney's office and say draw these

14 charges up this way or that way.

15        The Grand Jury heard the case.

16        Investigator Bell, she said I gave a summary of what

17 not only the deputies told me, but what Mr. Johnson told me.

18 And then based on all of that -- and you'll see from the law

19 that the judge will tell you -- that that's probable cause and

20 you cannot find that somebody has maliciously prosecuted you if

21 there's probable cause, unless they deliberately mislead or

22 recklessly disregard the truth somehow.

23        Has there been any evidence that any of these

24 deputies talked to the assistant DA or to the DA or to the

25 magistrate judge?  Did they do anything to deliberately mislead

1  in having the warrants issued or the Grand Jury indictments

2  issued?  No.

3          At the beginning of the case, in the opening

4  statement, I talked about responsibility.  Who was responsible

5  for July 5th?  Who was there driving on the road without a

6  valid license?  It's not Deputy Spivey that created that

7  situation.  Who was there driving with an expired registration?

8  Who's driving a truck that the license plate is hidden on the

9  back?  All of that is the responsibility of the plaintiff.  Who

10  strapped down the debris, but even strapped it down in such a

11  way that any police officer would look at it and think it's

12  funny?  It's not anybody on the defendant's side.  Who

13  deliberately moved their truck three times to place it directly

14  and obstruct Deputy Spivey?  That was done by the plaintiff.

15          This is a case where, obviously, you've got issues

16  involving law enforcement officers and you've got a plaintiff.

17  We ask that you consider everybody in this case, not only

18  consider what's happened to Mr. Morgan, but consider what's

19  happened to everybody else in this courtroom.

20          We ask that you look at the evidence, the undisputed

21  evidence, the undisputed material evidence and find a verdict

22  that there were no Constitutional violations committed by any

23  of these defendants against Mr. Morgan.

24          Thank you for your time.

25          THE COURT:  Thank you, Counsel.

 1          We'll take a brief, 10-minute recess at this point.

 2          Everybody stay seated as our jurors leave the room.

 3     (The jury exited the courtroom at 2:19 p.m.)

 4     (The proceedings were recessed at 2:20 p.m. and reconvened

 5 at 2:30 p.m.)

 6          THE COURT:  Counsel, depending on Mr. Ballew's length

 7 of time -- and whatever it is, it is.  But I may go into

 8 instructing the jury without a break.  And if that's the case,

 9 please know that when I'm done instructing I always look out

10 and say are there any matters that haven't been considered

11 previously that you'd like to note on the record.  And, you

12 know, hopefully we've caught everything, but if something

13 appears, then that's your time to come up.  Are you

14 understanding me?

15          MR. ELLIS:  I just want to make sure that I do.

16          THE COURT:  Okay.

17          MR. ELLIS:  As far as any instructions, any

18 objections we've previously made we don't need to make again?

19          THE COURT:  Absolutely not.

20          MR. ELLIS:  Okay.

21          THE COURT:  If you think I've misspoke.

22          MR. ELLIS:  Understand.

23          THE COURT:  Now, if you think that something so

24 altering has happened, you know, during the course of my

25 instructions, that is just a glaring issue, and you want to

```
 1    bring it to my attention right away, I'm not telling you you
 2    can't.
 3              MR. ELLIS:  That's fine.
 4              THE COURT:  But just know that I'll give you that
 5    opportunity at the end.
 6              MR. ELLIS:  Thank you, Your Honor.
 7              THE COURT:  Sure.
 8              And are you all set up, Mr. Ballew, the way you want
 9    it?
10              MR. BALLEW:  All set up.
11              THE COURT:  So let's just keep talking since we're
12    waiting for Mr. Zaytoun.
13              Say it's 5:00 o'clock when I finish, what I'm going
14    to do is send them to the jury room and tell them you need to
15    go elect your foreperson.  And while -- and then, your
16    foreperson needs to send me a note on your behalf as to whether
17    you wish to continue in your deliberations this evening or come
18    back tomorrow.
19              MR. BALLEW:  We're fine with that.
20              THE COURT:  And that'll be your chance, if you
21    haven't already, to look at the exhibits, while we're waiting
22    for the answer.
23              Okay.  All right.  Looks like everybody's back.
24    We'll get our jury in.
25              Counsel, you should have the clerk's exhibit list --
```

1          MR. LITTLE:  We do, Your Honor.

2          THE COURT:  -- sanitized to go back to the jury.

3      (The jury entered the courtroom at 2:31 p.m.)

4          THE COURT:  And now I invite counsel for the

5  plaintiff to come to the podium.

6          MR. BALLEW:  Thank you, Your Honor.

7          Good afternoon, everyone.  Thank you for listening so

8  attentively to the entire trial.  We very much appreciate all

9  of your patience, all of your attention to this very, very

10  important case.

11          And you may have seen me over here -- what I do

12  during closing arguments, I find it's very helpful to me, is I

13  make these note cards when I hear opposing counsel say

14  something that is either taken out of context, unfair or just

15  flatout wrong.  I try to write them as fast as I can.  And I'd

16  like to go through some of these with you before I do my part

17  of the closing argument.

18          But before I even look at one of these, I just want

19  to address right up front:  You heard a lot of stuff about who

20  Mike Morgan is.  You heard Mr. Ellis and Mr. Little tell you,

21  as they have done the entire trial, what kind of guy is this.

22  And you know what the undertone of that is?  Is that he doesn't

23  deserve anything.

24          Well, let me tell you something.  The Constitution of

25  our country says that it protects everyone, every person.  It

doesn't matter if you're rich. It doesn't matter if you're
poor. It doesn't matter if you're educated. It doesn't matter
if you're not. It doesn't matter if you're a lawyer and live
in some nice neighborhood; doesn't matter if you live on a dirt
road in a trailer. It doesn't matter if you don't even live in
a home. It protects all of us the same.

Mr. Zaytoun mentioned we're in this incredible
courtroom. Right up there, one of those phrases, one of those
paintings is a very, very famous case for the State of North
Carolina, Bayard vs. Singleton. That case dates all the way
back to the founding of this country. And it actually impacts
the United States Constitution. I mean, we're talking about
the Bill of Rights that our forefathers put into place.
Because the Constitution creates a very powerful government.
And we need government to do a lot of things for us, such as
police. But the Bill of Rights had to come right along with it
before we would agree to become a part of this country. And
the Bill of Rights said we're going to give the Government
power, but we're going to reserve for ourselves sacred and
inviolable rights.

So it doesn't matter if you've got a past when you
were younger that some people might disagree with or be
unfamiliar with. It doesn't matter if you have a kid that
dropped out of high school. The Constitution protects all of
us. And that's what this case is about.

1 　　　　So to my note cards. And I'll try to do this fast.

2 　　　　It struck me that -- how much time did Mr. Ellis

3 spend talking about Mr. Morgan and how he's not really injured,

4 even though he had his hand blown apart and he's got a bullet

5 in his knee right now. He's not really injured. He hasn't

6 gone to the doctor in years. He still can climb a tree, if he

7 needs to. He's had all these prior injuries. We had the Bass

8 Pro shop video. Where in the world did that come from, by the

9 way?

10 　　　　Why did he spend so much time talking about all of

11 those things and so little time talking about what happened in

12 the field? Well, I would submit to you, it's because they know

13 the truth about this case. And they've known it all along.

14 And that is, there were constitutional violations that happened

15 out there. No reasonable officer should have done these things

16 and acted these ways. And they know that you're going to find

17 that. And so when you find that, you're going to be asked and

18 instructed by the Court -- you're going to be asked to decide

19 damages issues.

20 　　　　And I don't know if you remember now all the way back

21 when the Court was picking jurors and doing the jury selection

22 process, but everybody was asked whether anybody had a problem

23 with the civil justice system which involves money damages.

24 That's what the civil justice system is, is money damages, if

25 you've proven your case. And everybody said, no, we're totally

1  fine with that.

2          They know that's what this case is about.  So that's

3  why they spend all this time talking about it.  And we'll

4  address the damages issue that Mr. Ellis raised.  I'll address

5  those, but that's the first note I had; why so much time.

6          These are in no particular order, by the way.

7          Jasmine is going to help me a whole lot during this

8  thing, just like she has during the whole trial.

9          Jasmine, can you please pull up Defense Exhibit 30,

10 which is the -- what they call the CAD alert.  How many times

11 have you heard that, the CAD alert?  Well, I was waiting the

12 whole trial to see if they would actually show this to you.

13 And I waited during closing to see if they were going to show

14 it to you.  It never happened.

15          I'm going to have you stop right there.

16          The very first page.  They call this the CAD alert.

17 And they want to make it seem like, to you, that this was a big

18 bulletin.  I mean, it says Information Bulletin in big, bold

19 letters on the front.  And they want to make it seem like this

20 is the information that was broadcast out to all the law

21 enforcement and firefighter world about Mike Morgan and how

22 dangerous he was.

23          But, wait a minute.  I'm going to walk over here.

24 What does it say right here?  What's that date?  August 29th of

25 2013.  Wait a minute.  That's more than a month after our

1    incident.

2              And if you scroll down, Jasmine.

3              "Threat to law enforcement officers."  They didn't

4    show you this page or ask you to read it.  It's all about the

5    shooting incident, our case; where they write in there, "He

6    dragged an officer with the truck, he's a threat to officers,

7    he tried to kill an officer with the truck, he's incarcerated

8    right now awaiting his trial."

9              Scroll down to the next page, please, if you don't

10   mind.

11             Mr. Zaytoun already pointed out there's his mugshot

12   with his hospital gown on after our case.

13             Go down, please.

14             Keep going.

15             They didn't show you this page, which is another

16   photocopy, August 29th of 2013.  So you know that wasn't an

17   alert at the time.

18             Keep scrolling.

19             This thing's got a lot of pages in it.  Keep going.

20   Oh, I'm sorry.  Go right back up.

21             Now, here's a document -- I'm going to walk over here

22   again.  Pardon me.  Here's a document that's part of this CAD

23   alert that put everybody on notice.  They never read what was

24   down here.  "The subject is extremely dangerous.  He was shot

25   by a Wake County deputy."

1        All of this, except for one page, which is that

2   computer screen shot that we showed you, all of what they call

3   the CAD alert -- and it's in evidence as Defense Exhibit 130,

4   and you can look at it when you're back in the jury room --

5   it's all about after our incident.  But they want to make it

6   seem like -- trying to, kind of, sneak one past the goalie

7   here -- that this was information these officers had in mind

8   when they were dealing with Mr. Morgan.

9        Okay.  Next one down.

10       You can take that one down, Jasmine.

11       Middle entrance, that Spivey had no idea that it was

12  there.  I'm going to wager that I don't even need to pull up

13  the dash camera for you when they -- when Miller drives right

14  up, and you can go slow motion, and you can literally see the

15  flat middle entrance that they now for the first time --

16  Mr. Little admitted to you for the first time, yeah, it did

17  have a culvert underneath it, which is pretty significant

18  because what did Deputy Spivey say on the witness stand?  He

19  tried to tell you that was the brush that he saw which, I

20  guess, flew out 100 yards from Mr. Morgan's truck when he

21  caught air and jumped up into the northern end of the field.

22  It just flew all the way down there and landed like two potted

23  plants on either side of each other and those dark spots were

24  the brush.  But now Mr. Little doesn't even believe his own

25  client and says, yeah, that's a culvert there.

1        So the nose of Mr. Spivey's patrol car is sitting,

2   what, 20 feet away from this middle entrance.  So he says, I

3   didn't even know it was there.  Well, they were sitting and

4   standing 20 feet away from it -- the -- Mr. Morgan and

5   Mr. Johnson told you -- in fact, Mr. Johnson specifically --

6   because I asked him the question.  I said, would it have been

7   obvious to anybody standing right there at the traffic stop

8   that, hey, right there is a flat driveway, I can just drive

9   right over to get in and out of this field?  And he said, oh,

10  yeah, it'd be no problem at all, it would be obvious.

11       Deputy Miller resigning from Wake County Sheriff's

12  Office.  All I'll say about that is, they did a lot of work to

13  have him explain to you how he lied and violated his oath as a

14  law enforcement officer.  And then, he said that after a couple

15  or three days his conscience got the better of him so he went

16  in and said, hey, boss, Sheriff Harrison, I've been untruthful,

17  I've just got to step down.

18       It's up to you to decide whether you believe that.

19  How do things happen in the real world, though?  Do you think

20  they happen that way?  Or do you think that more likely than

21  not happened is a supervisor found out why there was damage on

22  that car and they had a little meeting that went something like

23  this:  Casey, this can go one of two ways, you can either go

24  ahead and resign or we can let you out of here.  You just have

25  to decide how it happened.

1          "You ain't going no F'ing where."  So two things

2   about that.  Of course, that's what they say is kind of their

3   whole case, is Deputy Spivey's claim that Mike Morgan looked

4   out across his window and yelled to him, "You ain't going no

5   F'ing where."

6          So two things about that.  One, Mr. Zaytoun said use

7   your common sense.  Mr. Little said use your common sense.

8   Even if you had a history with law enforcement in your younger

9   days, who in the world would yell over in an open field, mind

10  you, where you can't block somebody in, they can just drive

11  right around you if they want, who would yell over to an

12  officer, fully loaded in his patrol car, with two officers

13  right on the side of the road also fully loaded in their

14  separate patrol cars, you ain't going no F'ing where?  Does

15  that make any sense?

16         And half the time they also say that Mr. Morgan said,

17  go the F around me, this is private property, you got plenty of

18  room.  Half the time they say he said that.  Those two do not

19  fit together.  Why in the world would someone say something

20  like that?  Why in the world?

21         Second thing about this is -- and this is where you

22  got to look a little deeper to figure out the credibility,

23  where it belongs and who deserves it in this case.

24         Deputy Legan, very polished witness, a highway

25  trooper now, very polished on the witness stand, but what did

the evidence at the time show?

You-all are going to have the dash camera footage in the jury room. I won't even pull it up for you now. This is something you can do together, if you want to.

You hit play on it and watch when the encounter is over, Mike is all the way down at the southern end of the field halfway done with his doughnuts, Deputy Spivey drives all the way down. And when Deputy Spivey pulls up, where is Legan -- where are Legan and Miller? You can see them casually walk to their car. And if you watch that rearview shot, Deputy Legan sits down in his car and shuts the door of his car before Spivey even comes to a stop. And yet, he told you on the witness stand, I heard Mr. Morgan yell, "You ain't going no F'ing where," over his diesel engine, the powerful engine of Deputy Spivey's Dodge Charger patrol car, the engine of his own Dodge Charger patrol car, the engine of Miller's patrol car and -- I don't know -- about 100, 150 yards' worth of distance down the field. And he said, I heard him say that, too.

They got their stories straight.

Mr. Ellis said there's no evidence in this case that Mike Morgan is impaired or that he can't do things safely anymore. You haven't heard any evidence of that. Well, maybe he was out of the room when Dr. Erdmann's testimony was played, who was accepted by the Court as an expert, who said he has permanent disfigurement, permanent injury, permanent

limitations and he can no longer safely perform any of the tree work that he was doing. Dr. Erdmann told you that.

We didn't just rely on Mike to come in here and tell you that and say, hey, you just got to believe me because I brought a lawsuit. So, I guess -- I mean, I guess he was out of the room when that evidence happened.

Tracy Morgan, Mike's wife, don't -- I would just respectfully request that you not take the bait on what has been told to you. There's a process. There are rules in our system. Tracy Morgan could have been called just as easily by the defense if they wanted her here. Don't take the bait and think anything about that. She's equally available to both sides, just as every witness under subpoena is. If they wanted her here and they actually wanted to challenge her and hear what she had to say, they could have brought her, too.

Mike's head injury from this incident. Counsel characterized the evidence. I am characterizing the evidence when I'm up here right now. It's your job to remember the evidence as you remember it.

I hope, and I submit, that when I sit down you will find that I have fairly characterized the evidence as it came in during this trial. And regarding the head injury, it just did not come in the way Mr. Ellis has characterized it.

Mr. Morgan testified he didn't know what hit him, it was either the baton -- which, by the way, they admit that

Deputy Spivey slapped that thing out and extended it at basically the moment he got out of the car; and just mysteriously, they have no idea what happened to it. Where did the thing go? It's extended out? Where did it go?

Anyway, Mike said he didn't know. He could not be sure what hit him in the head. He said it could have been the doorjamb, but Spivey was coming down so it could have been the baton as well. He didn't know.

Charlie Johnson said, hey, in fairness, I saw him extend that thing out, just like Legan did, but he said, in fairness, I couldn't see what his hand did when it moved down because the truck was between us. He said that in fairness.

Mike said, and testified to you, that his attention in the hospital was on the fact that his hand had been blown apart by a gunshot and his knee had been blown apart by a gunshot. He still had a bullet in his knee and he had to be rushed into trauma surgery basically within hours of getting to Duke, which Dr. Erdmann told you that's pretty fast in the medical world. Sorry that his attention wasn't on his head more than his hand and his knees to figure all of that out.

And if he had, if he had done that, if he had taken pictures of it, if he had documented it, then they would just do what they've already done and say, well, discount that because he's just trying to build his defense.

They say, oh, that shows you that Mike Morgan is

lying; if he would lie about that, he would lie about anything in this case.  Well, you have to decide whether that's actually the evidence that he testified to.

But if we're on the subject of untruthful statements and untruthful testimony, there was actually a witness here who admitted to you that he did make untrue statements in this case.  That was Deputy Spivey.  When I cross-examined him and said, isn't it true that you gave this -- an interview to SBI that night, Agent Gay, and isn't it true that I showed you that interview at your deposition and made you confirm for us, so there was no confusion, that everything in that interview summary is something you told Agent Gay?  And he said yes, that is correct.

And he told him in that interview that night that he had dealt with Mike Morgan a hundred times in the past 10 years, they knew each other well.  And I said, and that wasn't true, was it?  And he said no, that was untrue, that was a heat-of-the-moment statement.

And I don't know if you recall, but I ended my cross-examination by saying, well, can you even tell us how many more heat-of-the-moment, untrue statements that you made in this case?  And what was his answer?  I cannot.

I actually wrote down two cards here on the search by Deputy Legan.  And I'll just combine them into one point.  This is another don't be fooled, don't take the bait.  Somehow they

want to say out of this side of their mouth, yeah, he opened
the door, yep, he went in there and lifted up the console, yes,
he looked in the glove box, all the while, by the way, his eyes
are everywhere inside the passenger compartment of the car.
They want to tell you that, but on the other side they want to
say that search just didn't happen.  It didn't happen.  Well,
if that's not a search, I, with an actual law degree -- I don't
have any idea what one is.  But you'll get the law from the
judge.  She will tell you when a search is allowed, when a
search isn't.

        And the other thing to pay attention to is:  They
admit -- if you listen carefully, they admit there was no
lawful basis for a search of that truck.  He was not under
arrest.  There cannot be a search incident to arrest if you're
not under arrest.  There was no warrant.  Didn't have a search
warrant.  There was no consent.  There was no exigent
circumstance.

        And they told you just a moment ago that everything
was totally calm, everyone was behaving the way they were
supposed to.  It's undisputed that Mike and Charlie weren't
even inside the truck.  They were outside the truck, standing
there where they had been told to stand; just calmly standing
there.  Nobody made any quick movements towards the truck.
Nobody did anything -- what they might call furtive movements
in some of the law you read.  Nothing like that.

 1          The best they've got is to say, well, his

 2     registration was expired and so that's an arrestable offense in

 3     2013.  And even though he wasn't under arrest, he just got a

 4     traffic ticket, it was somehow okay for the officer -- when

 5     he's told you don't have permission to go in my truck, to go in

 6     there and look for the registration because that's evidence of

 7     a crime.  Well, ask yourselves this:  Why do you need to search

 8     for evidence of a crime that they say they already knew had

 9     been committed; that they already knew the registration was

10     bad; that Deputy Spivey was already in the car typing up the

11     citation?  Do you need to go looking for evidence of a crime

12     that you're writing a citation for?  No, you do not.  It's an

13     unlawful search.

14          The RDO statute.

15          Jasmine, could you go to the jury instructions.  This

16     time for the unlawful arrest instruction.

17          So as this is being pulled up -- Mr. Ellis showed you

18     an exhibit that was introduced; that's the statute for RDO -- I

19     wanted to show you actually the Court's real instruction.

20          Right there, it is.  It would be -- it says, "Arrest

21     by Defendant Spivey."  So page 20.

22          I wanted to show you -- because her Honor gave us an

23     advance copy of these instructions.  That's why we can pull

24     them up on the screen.  These are the same ones that will get

25     printed for you.

1          Can you scroll down, please, Jasmine?

2          I'm not even going to bother telling you everything

3    that's in there about probable cause and how you can't arrest

4    without probable cause and all that statute, 15A-402, that they

5    show repeatedly.  None of it even applies if you don't have

6    probable cause to arrest.

7          But I wanted to show you -- if you go up, Jasmine,

8    please -- the Court has actually put into your jury

9    instructions the quote, the controlling quote for the crime of

10   resist, delay and obstruct.  And isn't it interesting that

11   every time the defense, the counsel and the deputies talk about

12   this statute -- I'm going to come over here again.  Isn't it

13   interesting that every time they talk about it they leave out

14   this word, unlawfully?  They just want you to skip ahead to the

15   word resist, delay or obstruct and forget what comes before it.

16         The evidence is -- the law is, if a citizen is not

17   breaking the law, if they have a lawful right to do what

18   they're doing or say what they're saying or to be in the place

19   where they are, you cannot commit the crime of resist, delay

20   and obstruct.  You cannot act unlawfully if you are, in fact,

21   within your lawful rights to do what you are doing.

22         They all admit to you it's private property.  He

23   wasn't violating any crimes.  He was just sitting in his truck

24   on private property.  The best they can do is to say he --

25   Deputy Spivey was blocked or trapped or obstructed and he

1  couldn't drive around and leave.  And what did they -- what

2  evidence did they bring to you about that?  Was this terrifying

3  grass and this dangerous-looking vegetation and grass.  That

4  was it.  That's it.

5          Their own expert, though, Mr. Sutton -- I don't even

6  think we need to pull it up.  It's Exhibit -- I think it's

7  Defense Exhibit 166.

8          You remember the overhead shot that he did?  And he

9  somehow calculated the blue rectangle -- here it is.  Thank

10 you.

11         He somehow calculated the blue rectangle of Deputy

12 Spivey's car and the black rectangle of Mr. Morgan's truck.

13 And everyone else admitted it's pretty hard to tell exactly

14 where they were when you look at the angles of the dash cam,

15 but somehow with his math he has calculated exactly where they

16 are.

17         But look at this.  On his own exhibit that he created

18 for you, it's got gigantic tire marks going right around

19 Mr. Morgan's truck, back on to the field -- or, excuse me, back

20 on to the path.  Their own exhibit proves to you that you can

21 drive right around the truck and you don't have to go through

22 the guide wire, you don't even have to go out the grassy ditch,

23 which would be fine -- by the way, you've seen that -- you just

24 go right around him and leave the way you came in.  If that's

25 what you actually want to do, you can do it.

1          The other thing I'll just point out about this, while

2   it's on the screen, I would urge you all to take a close look

3   at this, when you think about Mike Sutton and what did he bring

4   to the table and why he's actually here?

5          Where are the rear wheels on Mr. Morgan's truck on

6   his own diagram?  They're sitting on the dirt path that he told

7   you, oh, yeah -- well, if it was on loose dirt and it was

8   floored, you would see some rut marks then, you would see some

9   signs then.  He's got the rear wheel sitting on the dirt path.

10  Why is Mr. Sutton even here?

11         Here is what I submit to you -- you draw your own

12  conclusions.  This is what I submit to you:  Mr. Sutton is here

13  as a paid expert.  He says he's from Raleigh and he works in

14  Raleigh, but he also mentioned he lives in Charleston now and I

15  guess he just travels.  Charleston is a very nice place.  He

16  makes $325 an hour to do this.  He has over 50 hours in this

17  case.  I think that's about -- that means he's getting paid

18  about $16,000 to make these exhibits for you and give these

19  opinions.

20         Why is he here?  I would submit it's because the

21  defendants and their attorneys have known from day one that

22  their testimony is not true about the tires spinning, the

23  accelerator being floored.  They knew it when they went into

24  the criminal trial.  The criminal jury said no way, we're not

25  buying that.  They've known it from day one when this lawsuit

was filed.  They had to do something about it.  They can't live with the actual facts of this case so you hire an engineer expert to engineer new facts for you because the actual facts, you can't live with them.  That's why Mike Sutton is here, I submit to you.

And the Court will instruct you that when it comes to expert witnesses, you decide whatever you want on whether to believe them.

And that's true for our experts, too.  If you don't think that Mr. Cloutier was credible based on his experience or Mr. Henley was credible when he showed you his demonstration of what actually happened to him, if, for whatever reason -- you don't have to believe them.  But just because somebody comes in and says I'm from NC State, I'm an expert engineer, I used math -- which I think everybody in this room knows you can do whatever you want with numbers.  You can turn numbers and manipulate them however you want.  They're not just black and white.

Just because they're an expert doesn't mean you have to accept anything, anything about their testimony.

And even Mr. Sutton told Mr. Zaytoun, oh, yeah, I am not giving the opinion that the -- that an officer would actually be able to move with a truck accelerated like I showed you in my demonstration of acceleration.  I had the same thought you did, Mr. Zaytoun; I'm not giving that opinion.  And

by the way, I also agree that there's not a single piece of
evidence that would ever even support the deputy's under oath
testimony that the tires were spinning and grabbing the dirt as
he floored the accelerator.

Mr. Legan's duty to intervene, his duty to intervene,
which you're going to see an instruction from the Court on
that, but it is the law. And you also saw that he had his own
written policies and procedures from Wake County Sheriff's
office that said you need to intervene if you see a fellow
officer violating someone's constitutional rights.

And Mr. Little said they only asked him one or two
questions on cross. Well, that was me, who did the
cross-examination. And I hope that you appreciated our attempt
at brevity, to get to the point and move this case along. And
I asked him three questions. And here's why, because that's
all you need to know about Deputy Legan and whether he failed
to intervene.

He said:

"ANSWER: I did see Deputy Spivey extend that baton
as soon as he got out of the car. And when I told you I was
six to seven feet away from him and I was back at the corner of
the truck, that was actually after the truck had already
started to move. When he was standing there pulling Mike out
of the window I was only two to three feet away."

That's arm's length. He could have touched him. He

1    could have said whatever he wanted to.  He was right there.

2            And then, the last question was:

3            "QUESTION:  And you told the SBI and the criminal

4    jury multiple times that you watched Deputy Spivey pull this

5    man a third of the way up and out of the window?"

6            And he said:

7            "ANSWER:  Yes, sir, just like I told you today."

8            No further questions because none further are needed.

9            Use of force factors.  There's a jury instruction

10   you're going to see on this.  I'm going to do this very briefly

11   because it's my argument to you, it's my submission to you that

12   this is easy and it doesn't require a whole bunch of analysis

13   to get this right about police procedures.

14           They ripped a man out of a window, the truck started

15   moving and he got shot because of it.  It's really that simple.

16   But when it comes to use of force the Court is going to tell

17   you that there are factors.  You may have even heard the

18   evidence when you looked at the BLET manuals, it's actually

19   called the Graham factors from the *Graham v. Connor* case.

20   Those factors will lead you to the right answer on Deputy

21   Spivey's excessive use of force in this case.

22           Those factors are:  What was the severity of the

23   alleged crime at issue?  Well, there is no crime at issue.  If

24   you find his arrest is unlawful because there was no probable

25   cause to believe he had committed a resist, delay and obstruct,

there is no crime Mr. Morgan was committing.  That factor

weighs one -- literally 100 percent in Mr. Morgan's favor.

Whether he was resisting arrest.  If the arrest is

unlawful, then a citizen has a right to resist.  Was he

resisting?  No.  He was getting his body jerked out of the

window.  But even if he was, if it's an unlawful arrest you

have a right to resist.

You heard that an officer can be charged with assault

if they go and use force against you when there's no right to

arrest to begin with.

And then, the third factor has zero application to

this case, was he fleeing arrest?  Pretty hard to flee when

you're literally being pulled a third of the way out of the

window.

So you actually use those factors, they lead you to

the right answer, when you go through all of that analysis,

even though it's a really easy case if you just take a step

back.

And then, deadly force.  Deadly force is the same

way.  You use the same factors except there's a special rule

that gets put on top of the deadly force -- of the force

factors.  When you're going to hold your gun and fire -- well,

do you remember what I said in opening when I showed you the

rules that you would hear about in this case?  And note, a

reasonable officer can never pull out his gun and fire if it's

plain to see that the citizen isn't the one posing a threat of

harm to anybody.

What they continually leave out every time they talk

about deadly force is the words that you're going to see in the

Court's instruction.

Can we actually go to that, Jasmine; the deadly force

instruction?  Right there at page 26.  If you'll scroll down.

Pardon me.  I'm going to come over here one more time.  Right

there.  Perfect.

You have to determine, based on a reasonable officer

on scene -- not what Deputy Miller says.  You're allowed to

disbelieve, by the way, what Deputy Miller says and you can say

no, I think he actually saw it happen a different way than what

he's telling you.

But as you come down here through the test that the

judge will give you, it says:  "You must determine if a

reasonable officer in the same circumstances would have

concluded that the suspect poses a threat justifying a

particular use of force by Defendant Miller."

"The suspect," whether the plaintiff posed an

immediate threat to safety.  What did they say when they

described it to you?  They always leave out that part.  And

they say the test is, just:  Was there a threat present of some

kind?  If there's a threat, boom, you can shoot the citizen.

That is not the standard.  The standard is, would a reasonable

officer have believed the suspect was creating a threat, the
suspect was posing a threat?  Then, and only then, can you
shoot the suspect; twice.

Who was creating the threat here?  Who posed the
threat here?  And who did Deputy Miller see was creating this
threat?  Deputy Spivey.  Pulling him out of the window and off
the brake.  Not Mr. Morgan.

I'm just going to move on from these.  I wish there
was time to show you all the flaws in their case, but there
just simply isn't.  And I need to move on to the most important
part of the case.

And I want to transition now and talk with you about
your extraordinarily important job of valuing the fullness of
what was taken from Mike Morgan in this case through no fault
of his own.

His injuries and limitations, they were thrust into
his life by the defendants, who chose to violate their own
policies and procedures and even the most basic rules of law
enforcement.  You can't needlessly escalate an encounter.  And
those rules are designed to protect all of our Fourth Amendment
rights.

Now, this case is not about medical bills or lost
wages.  And Mr. Ellis has told you several times you haven't
heard anything about his business losing income and lost wages.
It's not about that.  Those numbers pale in comparison to the

real human damages that he now will live with for the rest of
his life.  So these are life-altering damages.

        And your job is, you have to sit as a group of
appraisers -- that's really the way -- I think the best way to
think about it, you're appraisers.  And you have to come up
together with a value that measures the full magnitude of what
was taken from him.  It's not about how much he's going to get.
It's about how much was taken from him and will be for the rest
of his life.  So it demands a remedy that measures that full
extent of the laws.

        And it's my job here at the end to give you some, I
guess you would call them, measuring sticks or ways that you
can think through this, to help you in that process of
assessing what is fair value, what is just value.

        And rather than just pull a number out of thin air
and say this is what you should award, I'm going to walk you
through some of this and give you some -- some measures and
some ways to do this that I think will make sense to you and
will help put things in the proper perspective.

        Becoming permanently disfigured in his right hand,
his dominant hand, is a terrible injury, but it's the tip of
the iceberg.

        Honoring -- if you honor the oath that you took to be
jurors in this case, then that means that we have to kind of
stare into the reality of what lies beneath the exterior that

1    Mike puts on when he's up here to try to show that he's a

2    fighter and that he's going to be working through all of this.

3    We have to pull that back and see what's underneath the shield

4    and actually have to stare at these damages.  And it's

5    uncomfortable to talk about and it's hard to do, but that's

6    what you have to do as jurors in this case.

7              So the law is not just on liability that you're going

8    to get.  There is a whole body of law that the judge will

9    instruct you about on damages.  And you'll see the law requires

10   you to value each categories of harms and losses that have

11   actually been caused by the improper conduct in this case.

12             I'd like to look at that law with you and show you

13   that everything I'm saying comes straight from that law.  But

14   before we look at that, I wanted to briefly look at the burden

15   of proof instruction, if we could, please.

16             As you know, this is a civil case.  And the burden of

17   proof for -- the party who bears it -- and by the way, there

18   are aspects of this case that you're going to hear about that

19   the defense bears the burden of proof on, not us.  There's

20   going to be a series of questions on your verdict sheet that

21   kind of look like they come out of nowhere almost, questions

22   about whether certain facts are true or not, certain specific

23   facts.  And the Court will instruct you on those special

24   questions that it's the defense who bears the burden of proof,

25   not us.

```
 1          But on the ones that we bear the burden of proof
 2  on -- and I just wanted to remind you what the actual language
 3  is that you're going to be instructed on.  It just says that
 4  you have to decide if we've proven a claim more likely true
 5  than not true.  You can -- it says, just think about the scales
 6  of justice and have we tipped the scales somewhat on its side.
 7  If we just tipped it somewhat, then in a civil case we've met
 8  the burden of proof of proving that.
 9          What I really wanted to draw your attention to, if
10  you'll scroll down, is the paragraph right below it.  Do you
11  remember in jury selection when there was a question to make
12  sure everybody understood this was not a criminal case and
13  there's a different burden of proof in a criminal case?  This,
14  the beyond a reasonable doubt proof, doesn't exist here.  And
15  the judge's instructions say you have to put that out of your
16  mind.
17          Well, here's the way I think that you should think
18  about that.  If you have a doubt in this case about one of our
19  claims or one of our issues, a doubt does not create an out for
20  the defendants.  Doubt is okay in a civil case.  All you have
21  to decide is we're more likely true than not in what we've
22  proved.  Even if you have some questions, if we're more likely
23  true, then we've met our burden of proof.
24          Could we go to the actual damages jury instruction,
25  please?
```

1          Okay.  If I may, I'm going to come over here again

2    with you, just so I can point to some things.

3          You're going to get this instruction that's called

4    Actual or Nominal Damages.  Nominal damages are really simple.

5    They're at the end of this instruction.  I won't even spend

6    time talking with you about them because when you hear the

7    judge read them out, it makes perfect sense to you the first

8    time through.  So I don't need to even waste time on that.

9          Actual damages, that term under the law, it means a

10   lot more and I need to talk with you about that.

11         Jasmine, if we can scroll down to the third

12   paragraph.  Right here.

13         "Actual damages may not be based on speculation or

14   sympathy."  So we don't want you to have sympathy for

15   Mr. Morgan and say, well, that's the reason I'm giving the man

16   this, because I feel so bad for him.  We want you to award

17   damages if we have proven that to you based on the evidence.

18         But the sympathy rule applies on the other side, too.

19   You can't have sympathy for the defendants and say I feel bad

20   for them.  They got themselves in this mess now.  You can't

21   have those kind of thoughts.  You have to look at what the

22   evidence is.

23         It says:  "Actual damages must be based on the

24   evidence presented at trial and only that evidence.  You should

25   consider the following:  Past, present, and future damages."

1          So it's three things, past damages, present damages,

2    and future damages.  To the extent you find any are proved by

3    the preponderance of the evidence, which is the burden of proof

4    I was just talking about.

5          So those three things lead us to the categories of

6    damages that you can consider for the past, present or future.

7          Have we proved any past, present or future physical

8    pain or emotional pain or mental anguish?  That's category one.

9          Have we proved any scars or disfigurement in the

10   past, present or going into the future?

11         Have we proved partial loss of use of a part of the

12   body, of body parts?  That's a separate category of damages

13   that the law says you have to consider it.

14         Have we proved any past, present or future damages on

15   it?

16         And then, the last one is a big one, permanent

17   injury.  That one looks forward.  You can clearly see that one

18   looks forward, permanent injury for all time.

19         Now, if you scroll down, Jasmine, please.

20         The next paragraph, I believe, is the one that says

21   no double-dipping, basically.  When you consider all this and

22   try to work it all out, you can't award damages in the same

23   category twice.  You can't double count damages is what the

24   instruction says.

25         So how in the world are you going to do this?  I have

a method, that I'm getting ready to show you, that I submit if you follow this method it makes it impossible to double dip. And I think it'll make sense once we look at it.

And then, the next one is the last one I wanted to look at, the paragraph -- if you'll scroll down just a little bit, please; thank you -- that says: "An attorney is allowed to suggest an amount of damages and, therefore, can suggest an amount for each day of physical pain or mental suffering. However, there is no fixed formula for any of this and you use your own common sense in deciding it."

You don't have to accept what I say or what they say. There is no fixed formula you have to use, but the law says that we are allowed to make suggestions to you about amounts. And you can look at it by breaking things up into more manageable sections about days and amounts of time and what's it going to be like for Mr. Morgan when we break it up into these more manageable sections. So I wanted to show you that because that's part of what I'm going to do in my discussion with you.

So it all -- everything I'm going to tell you comes straight out of this jury instruction.

So if I was sitting there in your position, I would be saying: How are we expected to do this? Well, let me show you what I mean by that.

Jasmine, can we go back to the presentation screen,

 1  please?  I think this is still on...

 2          Okay.  Here's about the only way I know how to do it.

 3  I suggest that you-all start by thinking in your minds what

 4  types of damages have happened here, what types of injuries.

 5  And the first, obviously, is the shooting, the shooting damages

 6  and everything that flowed from that.  And so what I've done

 7  is, I've broke this up -- and I'll walk over here again; be as

 8  brief as I can.  I've broken this up to make it impossible for

 9  you to double count.

10          The first section up here under shooting damages is

11  only the stuff that you may find are damages that we proved

12  from the day of the shooting all the way up until today;

13  physical pain, emotional pain, mental anguish, loss of use of

14  his body parts from the day of the shooting up until today.

15          Stop.  That's past to present.

16          The next one is future.  Separately you look at what

17  should be valued for going forward in his life.

18          Then, if you add those two things together you can

19  now have a figure for the shooting damages.  That never double

20  counts and never double dips.

21          Future injuries.  While we're on this topic, just let

22  me say that you might recall at the end of our case in chief,

23  before we rested, Mr. Zaytoun read out to you a stipulation

24  that the parties have entered into.  And a "stipulation" means

25  both sides agreed to it, it's an accepted fact in this case.

 1          Mr. Morgan's life expectancy, looking forward how

 2   many years he has left as a matter of law that you have to

 3   value and consider is 40.1 years.  He's 38 years old today.  So

 4   he has more than half of his life left ahead of him, and that's

 5   what we have to value.

 6          So let's talk this first block, past to present, just

 7   for the shooting damages.  What is the evidence that we brought

 8   you?  Some of this is hard to look at.  I'm sorry, but it is

 9   important.  This is the photograph that Dr. Erdmann took of

10   Mr. Morgan's hand.  You can see bone.  You can see tendon.  You

11   can see what he described to you is a very gross term, what he

12   described to you as a degloving injury.  I know it's gross, I'm

13   sorry, but it's very, very important because this is what

14   happened to Mike Morgan right there.

15          He also showed you that this was a

16   through-and-through bullet wound; meaning, the bullet went

17   right through.  And you know it did because it went right

18   through the driver's door and almost hit Deputy Spivey.

19          But over on the right side of the screen -- do you

20   remember how Dr. Erdmann showed you that the top half of the

21   metacarpal bones, the word he used, that they were obliterated

22   in this gunshot?  Obliterated.

23          He showed you the knee entry wound, inside of the

24   left knee, right here.  And that bullet is still there right

25   now in his knee bone.  He described to you how it fractured

that bone.  And medically, it's still there.  Here is the
actual x-ray we put into evidence that shows you the bullet and
the bullet fragments that are still in his bone, and will be
there going forward.

This -- I'm going to come over here again.  This is
not the first x-ray of his hand.  This is the final x-ray that
Dr. Erdmann took.  And the reason I put this one up is because
look at the huge space, where he literally has no bones
anymore.  The metacarpal heads and the -- half of the
metacarpal bones in these three fingers are literally gone.
And Dr. Erdmann told you with that kind of injury, what I would
expect to happen is those three fingers -- because they just
have no more support here -- are going to sink back down into
his hand.  And you saw it, that's exactly what Mike's hand
looks like today.

He stood up in front of you, which I'm sure is not a
very comfortable thing for somebody to have to do, and
displayed his hands to you.  And he said this is like Jello or
jelly, I think is what he said.  He literally has no use of
these three fingers.  And that's why Mr. Zaytoun says it's kind
of like a crab claw.  That's what he's got.

Dr. Erdmann discussed in his medical records how
Mr. Morgan experienced 10 out of 10 pain.  Excruciating was the
word in the medical records.  Crying.  He was in tears.
Dr. Erdmann had to get the acute pain service to try and come

1   in and help with this.

2           Could you pull up the Defendant's Exhibit 1 from

3   Dr. Erdmann's deposition?

4           There's something I want to show you.  The defendants

5   in this case introduced as Exhibit 1 to Dr. Erdmann's

6   deposition Mike Morgan's sworn discovery answers, his

7   interrogatory answers, where they asked him a whole lot of

8   questions about his damages and he had to answer them all.

9           Could we scroll down to page 2, beginning at page 2

10  and zoom in, please?

11          Interrogatory No. 1.  Now, we didn't put this into

12  evidence.  The defendants put this into evidence.  And the

13  first question they asked him is:  "Describe in detail every

14  injury or disorder you contend you suffered as a result of the

15  incident."

16          And if you'll scroll down, I wanted to show you, when

17  they told you -- when Mr. Ellis in particular told you there is

18  no evidence in this case of these categories of suffering and

19  injury, this is what they put into evidence.  It's his own

20  answers that he gave them in writing years ago about what

21  happened to him.

22          The physical injuries, I've already described those

23  to you and shown you pictures of.  But look right there at

24  emotional harms; emotional distress, anxiety, PTSD, depression,

25  loss of sleep, loss of livelihood and sense of purpose related

1  to physical limitations from the gunshot wounds, damage to and

2  harmful stress placed on his family unit and close

3  relationships such as wife, children, et cetera.

4          If we can keep going.

5          This thing goes on and on and on.  "Feeling of

6  unending or constant stress and headaches caused by the worry

7  and anxiety of criminal charges and this civil litigation and

8  Mr. Morgan's future as a result of the damages he continues to

9  endure."

10          Look at the next category.  Reputational harms;

11  damage to his personal and business reputation.  And you never

12  heard one iota of evidence to rebut what we're about to read.

13          Numerous news articles surrounding his arrest that

14  have been published online and still accessible through search

15  engines such as Google, if you Google him.

16          Mr. Morgan's reputation in and around his community

17  was tarnished.

18          Mr. Morgan has on several occasions been unable to

19  qualify for firearms permits because of this charge and the

20  assumptions they make about him because of these charges.

21          His criminal record information.  His criminal data

22  that shows up in the police reports.  You've now seen the CAD

23  log.  They all show threats to law enforcement officer about an

24  incident that he was found not guilty of and now he's in a

25  civil trial about.

1    Mr. Ellis attempted to attack the credibility or

2 diminish the impact of the testimony of Mike's son, Kyle.  I

3 will leave to you and trust you, as the jury in this case, to

4 decide whether Kyle Cox was a believable witness when he told

5 you how his dad has changed and how he's no longer the dad that

6 he once had.

7    If we can go back to the presentation, please.

8    So when you add all of those things together for six years

9 that this has been happening for Mr. Morgan, from the day of

10 the incident up until today, six years -- and you have your

11 common sense to know that the first years and first months

12 especially of a terrible physical injury or debilitating injury

13 are the worst; they're when you're having to overcome all of

14 the pain and medical issues that you faced, the surgeries, the

15 recoveries, and then trying to adapt your life and learn how to

16 live.  They're the hardest, they're the worst.

17    So for six years our first category is this past to

18 present physical pain, emotional pain, mental anguish, loss of

19 use of his body parts.  We submit to you that a fair and just

20 number for those six years is 1.5 million.

21    All right.  Then we go to looking ahead and to the

22 future.  And remember, I read you that section that said

23 attorneys are allowed under the law to make a suggestion to you

24 about breaking down damages into days and chunks of time?  And

25 that's what I'm getting ready to do.  And I want to tell you

why.  It's because we live our lives in chunks of time.  That's
how we just think about things.  We live it moment to moment.
When things in our life are bad, we don't just go to bed and
wake up and they're not bad anymore.  We have to deal with them
in that moment of time.

          The value of time is important to us.  We measure
things by the day and by the hour.  How many hours is left
until the afternoon break?  How many hours until the grandkids
get here?  How many hours until the grandkids leave?  That's
how we think about life.  So that's why I think it makes the
most sense to try to come to grips with how are you going to
value 40.1 years of what he's got ahead of him.

          Well, let's look at that, if we could.  He was 31
years old at the time of the incident.  He's 38 years old
today.  He has 40.1 years of life ahead of him for the future.
So you can do -- this is simple math you can do.  That's 14,636
days that he has left to live.  And if you say, well, he's --
let's just give him an average of eight hours of sleep a night.
And when he's asleep, let's just say for the purposes of our
discussion, it's a restful sleep and he doesn't struggle with
it even though you saw he has loss of sleep as one of his
categories of damages.  Let's just say it's restful sleep.
That would be 16 hours a day when you're awake.

          And so with 14,000 days at 16 hours awake where
you're going to have to deal with this and be aware of it,

that's a little over 230,000 waking hours for the rest of his life that he's going to be conscious, he's going to be aware and he's going to know that he's got these problems and limitations. So we kind of start there when we think about this.

And what if we were only talking about his hand? What if that's all we were talking about? Nothing else. You know he's right-handed. His loss was sudden -- I mean, it's as sudden as you can get with a gunshot. He wasn't born like this. He lived for 31 years with a strong right hand, doing everything he did; climbing trees, hunting, fishing. Doing all the things he did the way he did them. He lived a happy, active life.

And he will now live the next 40 years trying to learn to adapt the best he can. And he's going to adapt as best he can. He's going to try to overcome because he is a fighter through all of this. He will -- Mike Morgan, you have seen now, is not the type of person where you tell him you can't go climb that tree or you can't go fishing with your son anymore. He's going to figure out the best way he can to make that happen. But it will always be there, it will always, always alter the way he uses everything that comes into contact with his hand.

Could we go back to the defendant's exhibit -- his interrogatory responses?

1           I want to show you something.

2           If we could scroll down.  I think it's maybe even

3  into the next page here.  Keep going, please.  I think we have

4  to come a little bit further.  A little bit further.  Okay.

5           This is a question where they asked him:  "What are

6  the activities that you either can no longer do or you say you

7  have difficulty doing now because of your physical

8  limitations?"

9           And I wanted to show you a couple of these because

10 they are pretty powerful when you think about them.

11          I'll come over here just so I can see better.

12          Sometimes, ladies and gentlemen, sometimes it's the

13 little things that show you so much about a case.  Yeah, we've

14 heard about the sports.  Yes, we've heard about football and

15 fishing and all of that.  But what about this?  Shaking hands.

16 None of you have shaken Mr. Morgan's hand, but he's

17 right-handed.  He has to extend that hand out to everybody who

18 offers him a shake.  And that's got to go in the other person's

19 hand.  And he knows it's really weird.  He knows that the other

20 person feels it's weird, sees it.  It's awkward.  He's got to

21 deal with that every single time he meets somebody, every

22 single time he's trying to deal with somebody in the business

23 world or just personal world.  That's a little thing.  Think

24 about that.

25          Writing.  I don't know how you use your pen or

pencil.  I use four fingers to write with my hand.  Could I
write with two?  Yeah, I could.  Would it be different and,
quite frankly, would it be crappy to have to adjust that way
for the rest of your life and have it slip out of your hand?
Yes, it would.

How about unable to snap fingers?  The little things.

Swimming.  You swim -- you put your fingers together
and you swim or you swim like this (indicating).  He literally
cannot do that with his hand.  He literally cannot put these
fingers together like that.  Does that mean he can't swim and
jump in the pool?  No, he can jump in the pool.  Is it
different and noticeable every time he has to move?  Yes.

How about this one?  These are the things that are
hard to talk about.  "Problems being affectionate towards
spouse in any way that requires him to use his hand."  I don't
need to go into all of that.

These are the things that the defendant said you have
no evidence that this has impacted his life.

If you can scroll down, please, Jasmine.

There are so many of these that you can go -- can you
scroll down even more, please, to the next page?

Carrying groceries, pushing shopping carts.

Look at this.  This is another one that is kind of
hard to talk about.  Personal hygiene, going to the bathroom.
Now he has to use his left hand to clean himself and to wipe.

And, you know, can he go to the bathroom, can he clean himself?
Yes.  Does he have to use his off-hand every time and is that
just frustrating and probably not as clean as it was and you
have to get used to all that?  Yeah.  These are the things that
are like -- you got to talk about them, but nobody wants to.

The last one I'll just mention on this list,
Mr. Morgan, through his interrogatory responses, has told you
that even his friends and family have been uncomfortable
handing him a baby to hold because they're worried he won't be
able to hold on to the baby.

This didn't happen to him when he was in his 80s or
70s.  It happened when he was 31 years old.

So if we can go back to the presentation screen,
please.

So what do we do about this?  Well, I would submit to
you that it's not worth less than the six years to date.  It's
not worth less.  I would submit to you that another 1.5 million
is a floor that is very reasonable.

You have no limitations, by the way, on what I say.
You can award -- if you want to go higher or lower, you have
the complete power on that.

But I submit to you this is a reasonable floor to
start with.  And using our math and breaking things down into
days and hours, that right there, when broken down into real
world chunks, represents about $6.50 an hour for each hour that

he's going to be awake for the rest of his life. I mean,
that's less than the minimum wage.

So you add those two things together, of course,
that's $3 million for the shooting damages. And that's a lot
of money. That's a lot of money. But a lot was taken from
Mr. Morgan, through no fault of his own.

There's a different category, a completely different
category that I want to show you next. I call them the
criminal prosecution damages.

Notice that I didn't say anything to you in the
shooting damages portion about all that he's had to deal with
from the warrants for arrest, the indictments, the fact that he
was facing all of these felonies and he had to go through that
trial.

This is a different claim. It is called under the
law malicious prosecution. Though, when you actually hear the
law and you get it from the Court, the word malice doesn't even
apply in any of the elements that have to be proven. All we
have to prove on this claim, by the way, is three things: That
Mr. Morgan was unlawfully arrested that day, an unlawful arrest
occurred; number two, that the defendants caused -- that they
just caused criminal prosecution to happen, criminal charges to
be taken out against Mr. Morgan; and then, three, that those
charges terminated in his favor, they ended in his favor,
which, of course, is undisputed. The jury in Wake County,

1  unanimous not guilty.

2          Even if the -- the jury instructions will show you

3  this.  Even if a magistrate or a Grand Jury found probable

4  cause, that doesn't mean this claim just disappears.

5          If you find that the reason the magistrate or the

6  Grand Jury said we're going to issue that indictment or we're

7  going to issue that warrant for arrest is because of the

8  information that Deputies Miller, Legan, and Spivey provided,

9  and the fact that they said he was drugged or dragged with the

10  truck as a deadly weapon, and you say that was not true, that

11  didn't happen, then the magistrate, the Grand Jury, they were

12  misled, they were misled by the untrue statements of the

13  deputies.  And if that's true, then Mr. Morgan has proven his

14  criminal prosecution or his malicious prosecution claim.

15          So what -- how do you value that as a category of

16  damages?  Well, there's one exhibit that was introduced that I

17  think can help you.  This was with Mr. Lane, Rob Lane.  It was

18  the summary of incarceration and house arrest.  We don't have

19  to go through all of this that he went through, but because of

20  these charges that were wrongfully taken out against him, based

21  on the deputies' statements of what happened, he spent 133 days

22  in confinement, in jail institutes; as Mr. Zaytoun said,

23  treated like he was a death row inmate.  But when he got out,

24  569 days of house arrest with a bracelet around his ankle.  He

25  didn't even get the bracelet off until a week after he was

found not guilty.

          Jasmine, can you pull up again the defendants'
exhibit, the interrogatory responses?  And actually go to page
three, please.  And if you'll scroll down.

          There's a whole section I didn't read to you.  See
that bullet there that says, "Loss of liberty and other harms
from improper incarceration and house arrest"?  Mr. Morgan's
jail cell was tossed several times.  He was not allowed to make
phone calls while he was in the medical ward.  The prison
detention facility or medical ward failed to clean his bandages
and change his wounds and clean his fingernails.

          Do you remember when he came back to Dr. Erdmann and
Dr. Erdmann said the bandage -- the dressing was bad enough,
but the skin was actually necrotic on the top of his gunshot
wound and it had pulled away so much that the antibiotic spacer
he put in was visible to the naked eye?  Just exposed.  Which
Mr. Morgan didn't know about because his hand was all bandaged
up and nobody had changed it while he was in jail.

          He was denied transport to numerous physical therapy
sessions that his doctor ordered.  He received threats of
violence from other inmates.  Items were stolen from his room
by other inmates.  He had -- I believe he told you that they
had medication mixups, where they gave him somebody else's
medications.  He lodged numerous complaints because the
conditions were so terrible.  And that's in his 133 days of

1 incarceration.  That should have never happened.

2    If we can go back to the presentation screen.

3    So what do we do, then, about these damages?  Well, I

4 submit to you that the fair and just value to be placed on your

5 liberty, being deprived of your liberty and having to go

6 through the criminal prosecution that he went through, is not

7 less than the total of those shooting damages that he went

8 through.  I would say they're about equal.

9    So the easiest way I know how to do it is to say each

10 one of these defendants -- they each had a hand in it, by the

11 way.  Charlie Johnson told you that after that shooting

12 occurred and he had been handcuffed and was laying face down in

13 the dirt and not moved over very nice and gentle to a sitting

14 area like Deputy Miller said, while he was laying there in the

15 dirt he could see the deputies -- and, oh, by the way, this was

16 after Spivey came around and said it don't matter where he's

17 been shot, that's what happens when you mess with the big dogs.

18 So after that, he could see the deputies standing together,

19 talking, in a place where they were far enough away where he

20 couldn't hear what they were saying, but his words were they

21 were conversating.

22    And then, isn't it curious that with no tire marks

23 out there at all, after they had just -- well, after Deputy

24 Miller had just shot this man twice, all three of them say the

25 same buzzwords and phrases; dragged by the truck, life was in

danger, fear in Spivey's eyes, floored the accelerator, tires spinning, deadly weapon. Those are like the law enforcement officer 101 class buzzwords to use to protect yourself when something like this happens.

And did they have a motive to protect themselves? Well, you've seen now how many policies and procedures of their own they violated that night or that day; how many Basic Law Enforcement training principles they violated that day. It was just a matter of minutes before people were going to come on to the scene. What in the world are we going to do about this? That's how it all started.

So you make them equal to the shooting damages, is what I respectfully submit that you do. So the shooting damages are 3 million. You make this equal and you say each of those officers who had an equal hand in it, a million dollars adds up for each of them, to a total of $3 million for the criminal prosecution damages.

By the way, while we're here, I just got to show you something.

Jasmine, can you pull up -- I want to say it's Plaintiff's Exhibit 32. It's the CCBI report. Not the photos, but the CCBI report.

I've got to show you this before I sit down.

As she's pulling it up -- I won't waste time -- do you remember how the deputies told you when they were out there

1  in the field they didn't talk about this at all?  They didn't

2  tell anybody anything; they got separated, got put in their

3  cars, taken down and that's when they gave their first

4  statements about what happened?

5          I distinctly recall Deputy Spivey saying that very

6  clearly, he didn't tell anybody, he didn't discuss it with

7  anybody in the field, he got taken down and gave his

8  statements.

9          Well, is that true?

10          MR. LITTLE:  Your Honor, may we approach?

11          THE COURT:  I'm sorry?

12          MR. LITTLE:  Objection.  May we approach?

13          THE COURT:  All right.  Come to the side.

14      (Bench conference on the record.)

15          MR. LITTLE:  Judge, I'm looking at the last -- unless

16  I missed it, I don't see Plaintiff's Exhibit 32 on the clerk's

17  evidence list.  What number is it?

18          MR. BALLEW:  CCBI report.  Right there, 26.

19          MR. LITTLE:  Okay.  Thank you.

20      (Bench conference concluded.)

21          MR. BALLEW:  May I continue?

22          THE COURT:  Yes.

23          MR. BALLEW:  I had the wrong exhibit number.  It's

24  Plaintiff's Exhibit 26, please.  The CCBI report.  There's a

25  lot of numbers.  Sorry about that.

1          So while that's getting pulled up, we put this

2     document into evidence through Dave Cloutier.  And it was the

3     report that CCBI did that night.  Agent Harvey -- you may or

4     may not remember his name -- he was the person that took all

5     those photographs, by the way.  He came out and did the scene

6     investigation and the report of what he found at the crime

7     scene.

8          And if you could scroll down, please, Jasmine.

9          There's something that hasn't been talked about yet.

10          Keep going.  Keep going to his narrative part.  Right

11     there.  I'm going to come over here with you.

12          He talks about how he arrived on scene at 2047, 8:47

13     p.m., not too long after this shooting happened.  And he tells

14     who he saw and what he did at the scene.  And then, here's what

15     is really curious.  Sheriff Harrison, so Donnie Harrison,

16     Sheriff of Wake County, is there.  And what does Sheriff

17     Harrison say to Agent Harvey?  "Sheriff Harrison advised that

18     the victim, Michael Morgan, was driving southeast on Wimberly

19     Road when Deputy Spivey was behind Mr. Morgan, which was not

20     true, noticed the registration on his vehicle had expired and

21     Deputy Spivey did attempt to pull the vehicle over; however,

22     Mr. Morgan left the roadway and drove off into an open field

23     northwest of 1116 Wimberly Road.  Deputy Spivey continued

24     through the roadway and drove on to the open field" -- excuse

25     me, "continued to the turnoff and proceeded to cross the open

field in a northwest direction toward Mr. Morgan. Deputy
Spivey then pulled up to the front of Mr. Morgan's vehicle
causing him to stop," which we also know is not true.

If you'll scroll down.

"Deputy Spivey proceeded to issue Mr. Morgan four
citations, after which Deputy Spivey got into his patrol
vehicle and began to turn around towards the turnoff. As he
was doing this, he noticed Mr. Morgan driving erratically in
the field, doing what Sheriff Harrison described as doughnuts
in the open field. Deputy Spivey continued to cross the open
field." He goes on and on and on. "Mr. Morgan pulled his
vehicle in front of Deputy Spivey, prevented him from exiting."
At this time, Miller and Legan arrive on the scene, parked
their vehicles along the west shoulder." It goes on and on and
on. Next paragraph. "Sheriff Harrison advised Deputy Spivey
got out of his car, approached the driver's side of
Mr. Morgan's vehicle. Deputy Legan also approached the
driver's side. Deputy Miller approached the passenger side.
Deputy Spivey attempted to open the driver's door." It goes on
and on.

Here are your buzzwords. Here are your buzzwords.
They needed to be in there. "He then attempted to pull
Mr. Morgan from the vehicle, at which time Mr. Morgan
accelerated the vehicle, dragging Deputy Spivey along the side
of the vehicle. Sheriff Harrison advised Deputy Miller fired

two rounds in the opened front passenger window, striking
Mr. Morgan in the left knee and once in the right hand, at
which time he stopped the vehicle."

So is it true what the deputies said, that they
didn't talk about this at all and that nobody heard them say
anything, they didn't say it to each other and they didn't say
it to anybody else until they were separated and taken down to
give their interviews that night?  Is that true?  How in the
world did Donnie Harrison, the Sheriff, know all of that then?

Could we pull up the verdict sheet please, Jasmine?
You saw -- you can actually go right back down to where it was.
I think it's number 17.

You saw Mr. Zaytoun show you a bunch of the answers
about whether constitutional violations had occurred and
marking "yes" to those.

After you get through that, you get to the damages
issues.  And that starts at number 17 and 18.  And I just
wanted today show you how -- what I put on the screen for you,
how we submit you would translate that into writing over on to
the verdict sheet.

So if you could scroll down -- well, we're going to
come back to 17 and 18 in just a moment.  If you can scroll
down right -- let's see.  Go up.  I'm sorry.  Keep going up,
please.  Keep going up.  I'm sorry.  Right there.

Number 16:  "What amount of actual or nominal damages

1    is plaintiff entitled to recover from Deputy Spivey for his use

2    of excessive force?"

3              So this gets us to what I call the shooting damages.

4    So why am I talking about shooting damages when Deputy Spivey's

5    force was pulling him from the window?  Well, it's because of

6    one more paragraph of law that you're going to get.

7              Could you please go to the jury instructions?  Back

8    on the instruction for actual damages.  We're right here.  You

9    just scroll up to the page above it.  And I can do this

10   briefly.  One more paragraph up.

11             The Court is going to instruct you, when you decide

12   damages you just think about what's the Constitutional

13   violation at issue and then what are all the damages that were

14   proximately caused by that constitutional violation.

15             We know the excessive force here is literally being

16   pulled out through the window.  But look at this instruction.

17   What does proximate cause mean?  "An injury or damage is

18   proximately caused by an act or failure to act when it appears

19   from the evidence that an act or omission played a substantial

20   part in bringing about or actually causing the injury or

21   damage, and that the injury or damage was either a direct

22   result or a reasonably probable consequence of the act or

23   omission."

24             What was reasonably probable?  What was a foreseeable

25   risk of walking up to a car -- to a truck in drive, with the

engine running, and somebody on the brake and literally ripping

him out through the window?  We all know what happens.  The

truck is going to move.

And what kind of risk does that create?  I would

submit to you that it is reasonably foreseeable that some

officer who is also there on the scene may run up and

improperly, unjustified pull out his gun and shoot because, oh,

it just got so crazy.

So Deputy Spivey is not just liable for physical pain

and whatever injuries you find were caused by pulling him out

of the car.  If you find that his actions in doing that, quote,

"played a substantial part in bringing about the shooting," and

that the shooting was one of the several reasonably probable

consequences that could flow from that, then you can find that

Deputy Spivey's excessive force includes damages for the

shooting.

So if we go back to the verdict sheet.

On number 16, remember how the shooting damages I

submitted to you was 1.5 -- excuse me, was $3 million and you

had to divide that up?  I would say here, for number 16, what

amount is Deputy Spivey responsible for?  $1.5 million.

Number 17, below it, should be the deadly force

question.  Yes.  "What amount is the plaintiff entitled to

recover from Miller for the unjustified use of deadly force?"

Same amount.  $1.5 million is what we suggest you write there.

        The next one below that is:  "What single amount is
the plaintiff entitled to recover for the criminal prosecution
damages?"  And remember, we looked at that a minute ago, the
same total amount of 3 million.  Right there for number 18 is
where we suggest you write in 3 million.

        And then we can actually go up.  Right there -- no.
Number 14, I think, is where we are.  Yes.

        So that brings us back to the beginning and the
search of the truck by Deputy Legan.  Now, in fairness, that
search did not cause Mr. Morgan's hand injury, it didn't cause
his knee injury, it didn't cause him any physical injury, but
you did hear evidence that Mr. Morgan is scared, is concerned
about going out and about being confronted by other law
enforcement officers and what they might do to him because he
experienced all this happen to him and his rights being
violated.

        In fact, if you -- I don't know how easy it is, if
you can jump back to the defense exhibit, the interrogatory at
page 3.  Actually, right there, that bullet.

        The second bullet, you see constant fear and worry
about the Wake County Sheriff's office coming on to his
property or around his home.  And being under the Wake County
Sheriff's jurisdiction he fears that he and his loved ones and
his friends will be unfairly targeted and, quote, "guilty by
association."

1          So -- you can go back to the verdict sheet.

2          So the search didn't cause any physical injury.  So

3     you should not value it as high as the other physical injury

4     and permanent injury damages.  You'll have to pick a number,

5     what you think is fair and just for having your constitutional

6     rights violated right in front of your face and being told you

7     can tell me what to do when you go to law school.  I submit

8     that a number that is fair and reasonable for number 14 is

9     250,000.

10         And then that brings us to number 15, which is the

11    unlawful arrest.  And this is separate from Deputy Spivey's

12    excessive force, the force we just looked at.  The fact that he

13    had his constitutional rights violated by being unlawfully

14    arrested is also worth something, but it's different from the

15    force.  I would submit to you that it's worse than the search.

16    And so I would submit that on 15 you should write $500,000.

17         And then, there's one final section of the verdict

18    sheet that you have to deal with in this case because it's an

19    element of this case.  And I don't know if you've ever heard of

20    the term punitive damages.  Some people have; some people

21    haven't.  But you'll be asked to decide whether you believe, in

22    addition to all of the damages that we just looked at, are

23    punitive damages appropriate in this case?  And you will have

24    guidance on this.  It doesn't come from us.  It comes from the

25    Court.  You will get the guidance on what those standards are

1  for punitive damages.

2          And could we go to the jury instruction on punitive

3  damages briefly, please?

4          I'd just like to read this with you so you can see

5  that it is different from actual damages that we looked at a

6  minute ago.  It says, if you find in our favor regarding any of

7  our claims, then you may, but are not required to, award

8  Mr. Morgan an amount as punitive damages if you find it is

9  appropriate to punish a defendant or deter a defendant and

10 others from like conduct in the future.  In other words, you

11 only reach this punitive damages question if you have answered

12 yes to the numbered questions the Court has pointed you to

13 there on the verdict sheet.

14         But let me say that one more time, what the purpose

15 of punitive damages is.  It can be to either punish the

16 defendant for what they did, if you find it was that bad or, or

17 using your verdict to deter the defendants who are still law

18 enforcement officers and others like them from committing

19 conduct in the future like this.

20         So if we scroll down, please.

21         We have to prove punitive damages by the same burden

22 of proof, preponderance of the evidence, just tipping the scale

23 somewhat.

24         And how do we prove it?

25         If you go down to the next paragraph.

     1          We have to prove that their conduct at issue was in,
     2    quote, "reckless disregard of Mr. Morgan's rights."  And
     3    conduct is in reckless disregard if under the circumstances it
     4    reflects a complete indifference to Mr. Morgan's safety or his
     5    rights.
     6          When Deputy Legan searched that truck over objection
     7    and said you can tell me what to do when you go to law school,
     8    is that complete indifference to Mr. Morgan's rights?
     9          When Deputy Spivey stopped his car and within one
    10    second was out and extended the baton in what Mr. Cloutier and
    11    Mr. Henley told you was offense, not defense, was that complete
    12    indifference to his rights?
    13          When Mr. Spivey literally pulled him a third of the
    14    way out of the window when his foot was on the brake and made
    15    the truck start rolling, was that complete indifference?
    16          And when Deputy Miller shot him twice after he told
    17    you, by the way, that he moved along with the truck doing a
    18    glide walk -- did he say he was running?  Did he run like
    19    Mr. Sutton's accelerated demo showed of the truck?  No.  He
    20    walked with it and saw all that he saw.  It wasn't over in a
    21    flash.  He saw Spivey's look.  He saw Morgan's look.  He saw
    22    what they were doing with their hands.  He saw what they were
    23    doing with their feet.  He saw, he tells you, the tires
    24    spinning.  He heard the engine rev.  He yelled commands.
    25    Deputy Spivey yelled commands.  Deputy Legan yelled commands.

1  This is all Deputy Miller's testimony, not us.  That's all he

2  saw, all he did and all he heard up there.  But yet, he wants

3  to say it happened like that (indicating).  You can't have it

4  both ways.  Their own expert showed you how slow the truck

5  moved.

6          So if you find all of that, then in your discretion

7  you can determine the amount of punitive damages to award.

8          And you get guidance on that, too.

9          And if you can scroll down.

10         You're allowed to consider factors in deciding what

11 is an appropriate amount of punitive damages.  And I'm just

12 going to briefly touch on these with you.

13         The reprehensibility of the defendant's conduct.  How

14 bad was this?  How much does society not like this?

15         The impact that it had on Mr. Morgan, who is now

16 going to go 40.1 years with his permanent damages.

17         The relationship between plaintiff and defendant.  I

18 don't know if they still have any interactions today, what they

19 see of each other, but you know what the past was; Deputy

20 Spivey said, I dealt with him over 100 times, which we know is

21 not true.

22         The likelihood that the defendant would repeat the

23 conduct if an award of punitive damages is not made.

24         So Deputy Legan is a highway patrolman now.  All he

25 does is on the roadways, stopping cars and dealing with the

1  public in that manner.  Is he going to search a car again and

2  tell another citizen you can tell me what to do when you go to

3  law school?

4          Deputy Spivey told you he's still in the Patrol

5  division at the Wake County Sheriff's Office.  Master Deputy I

6  think he said his rank was.

7          Deputy Miller is very proud of the fact that he's now

8  back on the force with Capital City Police, all around our

9  State Capitol buildings.  They're still out there.

10         If you let them have a free pass, so to say, if you

11  let them have a free pass, are they going to do this again?

12         And then number five says, "The relationship between

13  any award of punitive damages and the amount of the actual harm

14  that was suffered."  So this is where -- if we can go back to

15  the presentation screen briefly.

16         That last factor -- we've already looked at this.

17  We've already looked at this.

18         The last factor, the relationship, I think it's

19  helpful if you're going to award punitive damages to look back

20  and to tie it to something you've already awarded damages for.

21  So I would submit to you that if you find punitive damages is

22  appropriate, that altogether it shouldn't be less than the

23  shooting damages itself or the criminal prosecution damages

24  itself.  So that would be -- we know that's a total of

25  3 million.  So we respectfully suggest if you find it

appropriate, that you should write in on the verdict sheet

$1 million of punitive damages for each of the defendants.

And we can -- if we need to, we can go back to the

verdict sheet.  But you have a question on each of the

defendants for punitive damages, and that's what we would say

to you.

And I've come to sort of my closing remarks here.

You, ladies and gentlemen, have a very rare power and

opportunity as a jury right now.  Rarely do cases like this

come through.  And we're in the federal courthouse in the

federal system.  You-all came from many different counties.

You represent the Eastern District of North Carolina in the

Federal Courts and that's why you've been brought together.

You can turn this case into something that does a lot

of good.

The deter others prong -- do you remember how John

Combs told you, oh, yes, at the academy we pay attention to the

cases that come through?  If there's important case law updates

that happen, we put them in our manuals and we train our cadets

on them.

You have the ability to send that type of message

with your verdict and to say nothing like this should ever

happen again and we should be able to stop it with some pretty

basic training.  You have that power.

In our country, we do not believe in an

eye-for-an-eye justice.  We don't -- we aren't allowed if we win the case to say, well, you know, Deputy Miller or Deputy Spivey needs to have their hand shot or a bullet put in their knee or be incarcerated for 133 days or any of that stuff because that would be barbaric.  What happened to Mr. Morgan was.  We don't do that.

But what would also be very unfair and unjust is to just overlook and fail to fully address when something like this has happened.

I would remind you respectfully that it is not about how much Mr. Morgan is going to get, but -- it's about how much was taken from him and how reprehensible is this conduct and what kind of message needs to be sent to deter it from happening again.

Full responsibility means holding the defendants, the people that caused this fallout from happening, fully liable.  If you fail to fully compensate Mr. Morgan, then you're not creating a deterrent, you're not creating a deterrent that would stop this kind of thing from happening again.

So the moment has come where we are privileged and happy to give the case over to you, to put it into your hands.  And you're going to get to come together and you're going to work together and you're going to deliberate.  I don't know how you'll compare to the criminal court in Wake County, but don't even worry about that.  You just come together as a group and

1   do as the judge has instructed you and we know that you will do

2   the right thing.

3           You were all picked because of this very important

4   work that has to be done and it's comforting to know that we're

5   turning over the case to you.

6           And I ask you, we all ask you on behalf of Michael

7   Morgan to please bring back a verdict that speaks the truth

8   about what happened, a verdict that reverberates outside these

9   walls and means something more than just this room in here

10  today, a verdict that says proudly that our constitutional

11  rights, no matter who you are, are sacred and inviolable.

12          Thank you very much.

13                          *       *       *

14          (The proceedings concluded at 4:12 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1      UNITED STATE DISTRICT COURT

2     EASTERN DISTRICT OF NORTH CAROLINA

3

4

5     CERTIFICATE OF OFFICIAL REPORTER

6

7    I, Amy M. Condon, CRR, RPR, CSR, Federal Official

8 Court Reporter, in and for the United States District Court for

9 the Eastern District of North Carolina, do hereby certify that

10 pursuant to Section 753, Title 28, United States Code, that the

11 foregoing is a true and correct transcript of the

12 stenographically reported proceedings held in the

13 above-entitled matter and that the transcript page format is in

14 conformance with the regulations of the Judicial Conference of

15 the United States.

16

17

18 Dated this 28th day of October, 2019.

19

20

           /s/ <u>Amy M. Condon</u>

21          Amy M. Condon, CRR, CSR, RPR

           U.S. Official Court Reporter

22

23

24

25